# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JACK TRAWICK,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV02-S-1511-S** |
| | ) | |
| **DONAL CAMPBELL, Commissioner** | ) | |
| **of the Alabama Department of** | ) | |
| **Corrections; and the ATTORNEY** | ) | |
| **GENERAL OF THE STATE** | ) | |
| **OF ALABAMA,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OPINION

This action, filed pursuant to 28 U.S.C. § 2254, seeks *habeas corpus* relief with respect to petitioner's state court conviction and death sentence on a charge of capital murder.

## Procedural History

The Jefferson County, Alabama, grand jury indicted petitioner, Jack Trawick, on March 5, 1993, charging him with the intentional murder of Stephanie Gach[1] during a kidnaping that occurred on October 9, 1992, in violation of Alabama Code § 13A-5-40(a)(1) (1975).  Following a jury trial, petitioner was convicted of the

---

[1]  The victim's name has been variously spelled "Gach" and "Gash" throughout the record in this case.  For consistency, the court will refer to her as Stephanie Gach.

charge on March 23, 1994.  The next day, during the penalty phase of the trial, the jury voted 10 to 2 to recommend a sentence of death.  The trial court judge conducted a formal sentencing hearing on May 5, 1994, and, in accordance with the jury's recommendation, sentenced petitioner to death.  Petitioner was represented at trial by attorneys William DelGrosso and Kittren Walker.

The Alabama Court of Criminal Appeals affirmed petitioner's conviction and death sentence on November 9, 1995, in a published opinion.  *See Trawick v. State*, 698 So. 2d 151 (Ala. Crim. App. 1995).  Rehearing was denied on April 9, 1996.  The Supreme Court of Alabama subsequently granted petitioner's application for *certiorari* and, on February 28, 1997, affirmed his conviction and sentence in a published opinion.  *See Trawick v. State*, 698 So. 2d 162 (Ala. 1997).  The Alabama Supreme Court modified its opinion when denying rehearing on June 13, 1997.  In the Court of Criminal Appeals, petitioner was represented by DelGrosso, but during the *certiorari* proceedings in the Alabama Supreme Court, he was represented by both DelGrosso and his current lawyer, Randall S. Susskind.  The United States Supreme Court denied *certiorari* review on December 1, 1997.  *Trawick v. Alabama*, 522 U.S. 1000 (1997).

Almost a year later, on November 19, 1998, and with the assistance of attorney Randall S. Susskind, petitioner filed his state post-conviction petition under Rule 32

of the Alabama Rules of Criminal Procedure.  The petition was denied without an

evidentiary hearing on March 21, 2001.  (Tab R-62).  The Alabama Court of Criminal

Appeals affirmed the denial of Rule 32 relief in an unpublished memorandum opinion

on January 25, 2002.  (Tab R-63).  Rehearing was denied on February 15, 2002, and

*certiorari* was denied by the Alabama Supreme Court on June 14, 2002.  (Tab R-64).

The present § 2254 petition was filed with the assistance of counsel on June 21, 2002.

## The Offense

The Alabama Court of Criminal Appeals summarized the evidence relevant to

petitioner's crime in its opinion on direct appeal as follows:

> The state's evidence tended to show that on October 10, 1992, the
> partially nude body of Stephanie Gash was found on the side of Grants
> Mill Road in Birmingham.  Her mouth and nose were covered with duct
> tape.  Dr. Joseph Embry, medical examiner for the state of Alabama,
> testified that she died as a result of a three-inch knife wound that entered
> her heart and as a result of asphyxiation caused by strangulation.
>
> The appellant gave a detailed statement to the police in which he
> confessed to having murdered Stephanie Gash.  He stated that he
> followed Gash from Eastwood Mall to her apartment.  As Gash was
> walking from her parking space to her apartment, the appellant pulled
> up beside her in a van, pointed a toy gun at her, and ordered her to enter
> the van.  As the appellant was pushing Gash into the van she hit her
> head on the side window of the van, and her glasses fell off.  After she
> got in the van, the appellant tied the victim's hands with rope and put
> duct tape over her mouth.  He drove to a secluded area where he beat
> Gash about the head with a hammer, strangled her, and stabbed her in
> the chest at an upward angle so that the knife would enter her heart.  The
> appellant then disposed of the body by throwing it on the side of Grants

3

Mill Road.  The appellant confessed that he threw the contents of the victim's wallet out of the window as he was driving down Alton Road. He then cleaned the blood from the van at his house.  The appellant's confession was corroborated by the following facts.

Police identified the body as a result of a missing persons report filed by the victim's mother on the morning the body was found.  When Stephanie did not come home on the night of October 9, 1992, her mother, Mary Gash, telephoned her friends and tried to locate her. Rebecca Henderson, a friend of the victim's, came to the victim's apartment after talking with Stephanie's mother.  Henderson found a pair of eye glasses, identified as belonging to the victim, lying on the ground by where she customarily parked her automobile.

Jeremy Burns testified that on October 10, 1992, he was walking with a friend down Alton Road, approximately three miles from where Gash's body was found, when he discovered a Texaco gasoline credit card with the name "Gash" on it.  A search of this area resulted in the discovery of a college identification card issued to the victim and a health insurance card bearing the victim's name.

Gary Harris, an evidence technician for the Jefferson County Sheriff's Department, testified that he found a large brown-colored stain in the parking lot in front of the victim's apartment on October 22, 1992 after the appellant was questioned by police.

The appellant's Toyota van was towed to the police station on October 26, 1992.  Police found in the van a piece of carpet, a tarpaulin, ball-peen hammer, and a plastic bucket that contained an 11-inch knife. Using luminol spray, police discovered blood traces on the tarpaulin, the piece of carpet, the ball-peen hammer, the tailgate of the van, and on the knife.  A Ford station wagon which the appellant was known to drive was also impounded.  A toy gun was found in the passenger's floorboard of that vehicle.

Steven Drexler, of the Alabama Department of Forensic Sciences, testified that two fibers found on the victim's sweater, which was

4

recovered from the crime scene, were consistent with fibers from the carpet of the Toyota van. Also, fibers found on the duct tape that covered the victim's mouth were the same as the fibers from the carpet of the Toyota van.

*Trawick v State*, 698 So. 2d 151, 153-154 (Ala. Crim. App. 1995) (footnote omitted).

## The Claims

The § 2254 petition alleges multiple grounds for granting *habeas corpus* relief. Listed below are those remaining claims asserted by petitioner, after withdrawing several in the brief submitted in support of his petition.[2] Referring to the specific paragraphs of the petition, petitioner appears to be asserting the following claims for *habeas* relief:

I.    The prosecution engaged in gender discrimination during jury selection by using eleven of its fourteen peremptory strikes against women, in violation of *J.E.B. v. Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). (Paragraphs 11-12 of the petition).

II.   Petitioner's Fourth and Fifth Amendment rights were violated when certain inculpatory statements made by him were not suppressed and were admitted into evidence, as follows:

a.    The use of the statements violated the Fourth Amendment because there was no probable cause to arrest petitioner prior to his interrogation. (Paragraph 14 of the petition).

---

[2] At page 118 of the brief on the merits of his claims (doc. 23), petitioner expressly withdrew certain claims pleaded in the petition. The claims withdrawn by petitioner were set forth at paragraphs 43-53, 57, 63-64, 65-68, 71, 73-76a, 77-80, 84-86, and 92-93 of the petition.

b.    The use of the statements violated the Fifth Amendment because he requested and was denied access to a lawyer during interrogation.  (Paragraphs 15-17 of the petition).

c.    The use of the statements violated the Fifth Amendment because they were induced by promises from police interrogators, making the statements involuntary.  (Paragraph 18 of the petition).

III.    Petitioner received ineffective assistance of counsel at trial in the following specific instances:

a.    Alabama provides inadequate funding and compensation for capital defense counsel and defense experts. (Paragraphs 20 - 24a of the petition).

b.    Trial counsel failed to investigate adequately petitioner's history of mental illness.  (Paragraph 25 of the petition).

c.    Trial counsel failed to investigate adequately evidence for mitigation of the sentence.  (Paragraph 26 of the petition).

d.    Trial counsel failed to investigate and object to gender discrimination in jury selection.   (Paragraph 27 of the petition).

e.    Trial counsel failed to challenge the admissibility of inculpatory statements made by petitioner to the police. (Paragraph 28 of the petition).

f.    Trial counsel failed to cross-examine adequately the State's mental health expert, Dr. Ronan.  (Paragraph 29 of the petition).

g.    Trial counsel failed to object to the admissibility of inflammatory photographs of the victim. (Paragraph 30 of the petition).

h. Trial counsel failed to object to the petitioner's absence from certain trial proceedings. (Paragraph 31 of the petition).

i. Trial counsel failed to object to the trial court's failure to assure that bench conferences were transcribed. (Paragraph 32 of the petition).

j. Trial counsel failed to object to certain improper and prejudicial comments by the prosecutor. (Paragraph 33 of the petition).

k. Trial counsel failed to request correctly jury instructions on the definition of reasonable doubt, the definition of "clear and convincing evidence," and for lesser included offenses of capital murder. (Paragraph 34 of the petition).

l. Trial counsel failed to adequately support a motion for change of venue. (Paragraph 35 of the petition).

m. Trial counsel failed to move for recusal of the trial judge. (Paragraph 36 of the petition).

n. Trial counsel failed to object to the imposition of the death sentence as the product of a racially biased system. (Paragraph 37 of the petition).

o. All of trial counsel's failures cumulatively deprived petitioner of the effective assistance of counsel. (Paragraph 38 of the petition).

IV. Petitioner's right to due process of law under *Brady/Giglio* was violated when the prosecution failed to reveal to petitioner that members of the state team evaluating petitioner's mental health were under investigation for misconduct relating to petitioner, and that this investigation caused the state's mental health expert to be biased against petitioner. (Paragraph 39 of the petition).

7

V.    Petitioner's right to an unbiased jury was violated because two jurors failed to answer fully during *voir dire* that they or their family members had been victims of violent crime. (Paragraphs 40-42 of the petition).

VI.   Petitioner was deprived of due process of law because the trial court failed to give proper jury instructions in the following specific respects:

a.    The trial court misdefined the concept of "reasonable doubt," making the prosecution's burden of proof easier than required by *In re Winship*, 397 U.S. 358 (1970). (Paragraphs 54-56 of the petition).

b.    The trial court erroneously instructed the jury that petitioner's mental health defense had to be proven by "clear and convincing evidence," not merely a preponderance. (Paragraph 58 of the petition).

c.    The trial court failed to instruct the jury that, if petitioner were found not guilty due to a mental disease or defect, the State would commence proceedings to have him civilly committed. (Paragraphs 59-60 of the petition).

d.    The trial court failed to instruct the jury during the penalty phase that it could consider mercy as a mitigating factor. (Paragraphs 61-62 of the petition).

e.    The trial court failed to instruct the jury during the penalty phase that aggravating factors must outweigh mitigating factors, and that an equal balance of the two requires a sentence of life without parole, not death. (Paragraphs 69-70 of the petition).

VII.  The trial court erroneously granted a prosecution challenge for cause under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), with

respect to potential juror Porter.  (Paragraphs 81-83 of the petition).

VIII.  Petitioner was deprived of a fair and impartial trial when the trial judge failed to recuse himself, even though the judge had once prosecuted someone other than the petitioner for a murder now admitted by petitioner, and because the trial judge attended high school with the petitioner.  (Paragraphs 87-88 of the petition).

IX.  The death sentence violated the Eighth Amendment because the trial court erroneously placed the burden of proving mitigating circumstances on the petitioner and erroneously failed to find any statutory mitigating factors.  (Paragraphs 89-90 of the petition).

X.  Petitioner was deprived of a fair trial when the trial court denied his motion for change of venue.  (Paragraph 91 of the petition).

XI.  Petitioner was deprived of his Fifth and Sixth Amendment rights to be present at all trial proceedings when certain proceedings took place without him being present.  (Paragraphs 94-95 of the petition).

XII.  Petitioner was deprived of due process of law when the death sentence was imposed by the trial judge, not the jury, contrary to *Ring v. Arizona*, 536 U.S. 584 (2002).  (Paragraphs 95-100 of the petition).

XIII.  The cumulative effect of all of these errors deprived petitioner of his constitutional rights.  (Paragraph 101 of the petition).

This court will discuss each of these claims in turn, addressing questions of procedural default, as well as, where appropriate, the merits of each claim.

**Discussion**

**Claim I** — *Gender Discrimination in Jury Selection*

Petitioner contends that the prosecution violated the principals of *J.E.B. v. Alabama*, 511 U.S. 127 (1994), by engaging in discrimination against women during selection of the petit jury in his case.  He points out that the prosecution used eleven of its fourteen peremptory strikes to remove women, including the first seven consecutive strikes.   Although defense counsel at trial objected to perceived discriminatory striking on the basis of *race*, no objection was made that the gender discrimination motivated the prosecution's strikes.  Similarly,  the trial court ruled that the defense had established a *prima facie* showing of *race*-discriminatory striking, and required the prosecutors to state their race-neutral reasons for each strike.  Because gender as a motive for discrimination was not raised by trial counsel, however, the trial court did not require any statement of *gender*-neutral reasons by the prosecutors.

Petitioner raised his *race*-based *Batson* discrimination claim again on direct appeal.  The Alabama Court of Criminal Appeals rejected the claim, finding explicitly that the stated reasons for the State's strikes were *race* neutral.  On *certiorari* review, however, the Alabama Supreme Court said this:

> Trawick first argues that the State used its peremptory challenges to discriminate against female jurors, in violation of *J.E.B. v. Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), and that the trial court erred by not requiring the State to articulate its reasons for its strikes of females.  He points out that the State used 11 of its 14

peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was composed of 7 men and 5 women. He also argues that the prosecutor had a history of striking venire members based upon race. He thus concludes that his case should be remanded for a hearing on the State's reasons for striking women.

In *J.E.B. v. Alabama*, the United States Supreme Court extended the principles of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to apply to gender discrimination in jury selection. A party making a *Batson* or *J.E.B.* challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987); *Ex parte Bird*, 594 So. 2d 676 (Ala. 1991). In *Branch*, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.

At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female venire members shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent

> to discriminate against female jurors, that there was a lack of meaningful
> voir dire directed at the female jurors, or that female jurors and male
> jurors were treated differently.  He has offered no evidence that the
> prosecutor had a history of using peremptory challenges in a manner that
> discriminated against venire members of either gender.  Instead, Trawick
> has merely emphasized that the State used many of its strikes to remove
> women from the venire.  Without more, we do not find that the number
> of strikes this prosecutor used to remove women from the venire is
> sufficient to establish a prima facie case of gender discrimination.

*Trawick v. State*, 698 So. 2d 162, 167-168 (Ala. 1997).  This claim was not raised in

petitioner's post-conviction Rule 32 proceedings;[3] therefore, there were no additional

hearings or findings of fact on this claim after direct appeal.

In response to the claim, the State argues, among several defenses, that the

findings and resolution of this claim by the Alabama Supreme Court are entitled to

deference under 28 U.S.C. § 2254(d), because the Court's conclusions are neither

contrary to, nor an unreasonable application of, existing Supreme Court precedent.

This court agrees.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), the petitioner can obtain relief on this claim only if he shows that the

Alabama Supreme Court's  adjudication of his claim "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal

---

[3] *See* Tab R-46 of the Record.

law, as determined by the Supreme Court," or that the Court's rulings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2). *See also Williams v. Taylor*,  529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

"Moreover, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence."  *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, ___ U.S. ___, 126 S. Ct. 1828, (2006).

The foregoing standards of review are strict, and federal courts are required to give "greater deference to the determinations made by state courts than they were required to under the previous law." *Verser v. Nelson*, 980 F. Supp. 280, 284 (N.D. Ill. 1997) (quoting *Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th Cir. 1997)).

A state court's determination of an issue will be sustained under § 2254(d)(1), unless it is "contrary to" clearly established, controlling Supreme Court precedent, or it is an "unreasonable application" of that law.  These are two different inquiries, not to be confused, nor conflated, as the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362 (2000), saying:

13

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States." (Emphases added.)

*Williams*, 529 U.S. at 404 (emphasis added).  The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Id*. at 412; *see Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Likewise, a state-court determination can be an "unreasonable application" of

clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing legal
> rule from this Court's cases but unreasonably applies it to the facts of
> the particular state prisoner's case. Second, a state-court decision also
> involves an unreasonable application of this Court's precedent if the
> state court either unreasonably extends a legal principle from our
> precedent to a new context where it should not apply or unreasonably
> refuses to extend that principle to a new context where it should apply.

*Id*. at 407; *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001).  The question of

whether a particular application was "reasonable" turns not on subjective factors, but

on whether the application of Supreme Court precedent at issue was "objectively

unreasonable."  The question is not whether the state court "correctly" decided the

issue, but whether its determination was "reasonable," *even if incorrect.  See Bell v.

Cone*, 535 U.S. 685, 694 (2002).

The trial record in this case reveals that the trial court and lawyers engaged in

a detailed *voir dire* of the venire, both publicly, in open court, and privately, in

chambers.[4]  Upon completion of the *voir dire* and the excusing of some jurors for

---

[4] The record also reflects that the defendant was present during the private, individual *voir
dire*.  *See* Trial Record p. 567.

cause, the prosecution and defense each exercised fifteen peremptory strikes. Initially, the State struck fifteen jurors in the following order: Bonny Benefield (Juror 19), a white woman; Constance Harrison (Juror 128), a black woman; Beth Hummel (Juror 152), a white woman; Rose Lawyer (Juror 178), a white woman; Martha Lee (Juror 179), a black woman; Evelyn A. Mauldin (Juror 194), a white woman; Janice Thorson (Juror 297), a white woman; Floyd Curenton (Juror 68), a black man; Judy K. Vines (Juror 309), a white woman; Jimmy Gaines (Juror 100), a black man; Bertha Jones (Juror 166), a black woman; Billy Bentley (Juror 20), a black man; Richard Harris (Juror 126), a white man; Tyeshia Johnson (Juror 164), a black woman; and Jerald Pettit (Juror 236), a white man.  The defense raised an explicit *Batson* objection, contending that the State used seven of its fifteen strikes against black jurors due to their race.  That pattern of striking resulted in seven of twelve black venire members being removed, leaving five to serve on the petit jury.  The trial court required the prosecutors to state race-neutral reasons for each of the seven strikes, and found that only three could not be justified as race neutral.  As a result, the trial court overruled the State's strikes of Bertha Jones, Billy Bentley, and Tyeshia Johnson, returning them to the trial jury.  The trial court then instructed the prosecution to

exercise three more strikes in lieu of those overruled.[5]   Expressing reluctance to exercise additional strikes, the State then struck Patricia Binkley (Juror 22), a white woman; Doris Sayers (Juror 266), a white woman; and Anita Linder (Juror 182), a white woman.   Thus, of the fifteen strikes exercised by the State and not overruled, eleven were against women, for a percentage of more than 73% female out of the strikes used.   If one counts *all* strikes exercised by the State, including those overruled on race grounds, the State used thirteen of eighteen strikes (72%) against women.

Although no objection was lodged at the trial court level that the State exercised its strikes in a gender-discriminatory manner, the trial judge made detailed findings concerning the *Batson* race objection, some of which shed light on the motives of the prosecutors.   The trial court wrote as follows:

_____

[5] Alabama uses a "strike down" system of jury selection.  This requires that a certain number of strikes be exercised in order to reduce the jury pool to the final number serving on the trial jury.  Unlike the peremptory strike system used in federal court and other states, in which strikes may or may not be exercised, the "strike down" system mandates that all strikes be exercised.  This may require a party to strike an otherwise acceptable juror.  In the *Batson/J.E.B.* context, this may also increase the *appearance* of discriminatory striking because the striking party is forced to choose jurors to strike even when there is no desire to remove the juror.  Whatever the race or gender of jurors struck in this manner, it cannot be said that the striking party did so out of purposeful discrimination.  For this reason, it is more difficult to conclude that a *prima facie* showing of discriminatory striking exists merely from the relative numbers of blacks versus whites or women versus men removed from the venire.  Some of those removed were removed for no more reason than that the "strike down" system *required* additional strikes to be exercised.  The last three strikes exercised by the State in this case are an example of that.  The prosecution was reluctant to exercise more strikes, but the trial court insisted because of the need to "strike down" to the proper jury size.

Venire called up from jury assembly — 42 principal jurors and 16 alternates for total of 58 venire persons (initially planned for 22 alternates but space limitations precluded more than 16).

After extensive voir dire, strikes for cause, and agreed upon strikes, the next panel of 42 included twelve black persons —

State strikes seven blacks, *Powers* motion heard in chambers — State gives race neutral reasons for striking 128 a B/F, Ms. Harrison — son treated in the mental health community with positive results, had been juror in a hung jury criminal case, expressed no hard feelings towards man who killed her husband; race neutral reasons are given for striking # 179, B/F, Ms. Lee, a woman who expressed inability to participate in sequestrated jury because of sole caretaker of three small children, ages 12, 10, and 8 — no surrogate caretaker available; race neutral reasons re # 68, a B/M Mr. Curenton are given, likewise expressed problems with sequestration, is on medication, had previously voted not guilty in a criminal jury trial; race neutral reasons given for striking # 100, a B/M, Mr. Gaines, only juror who stated he had  bad experience with law enforcement officer — officer took bullits [sic] from his pistol, would not return bullits [sic], juror complains to chief of police & had gone to school with the mayor — case at bar features an *Edwards v. Arizona* "confession," veracity of law enforcement officer is critical on question of voluntariness — jurors, white and black, who have had bad experience with law enforcement are peremptorily struck in all criminal cases conducted by undersigned.

With reference to Ms. Harrison above # 128, it is noted that white jurors # 297, Ms. Thorson, whose sons are receiving positive treatment in the "mental medical" community via use of ritilyn [sic, Ritalin] was struck as was white f/m #19 Ms. Benefield via her experiences in the mental medical community —

It must be noted that case at bar features the "insanity" or severe mental disease or defect defense & that Defense will offer testimony of a mental health specialist(s) as well as medical records from mental health professionals —

18

With reference to Ms. Lee above # 179 re problems with 3 small children & sequestration — note that white jurors # 194 Ms. Mauldin, expressing problems with sequestration due to children ages 13 & 15 & white f/m Judy Vines # 309, expressing problems with sequestration due to 10 yr. old daughter performance at a school function were struck by State — Defense struck other jurors with sequestration problems such as w/m Mr. Bacon, # 10; # 181 w/f Sallie Lewis, # 249 Mr. Quinn; jurors eliminated from principal panel by agreement because of sequestration problems include # 333 Lee Williams w/f w/sick child, husband unable to care for child; B/F Carolyn Harris, children with chicken pox; # 27, Ms. Briscoe, problems with children unattended at night; # 186 w/F Edith Long, heart patient; w/F Ms. Hicks, 15 yr. old son unattended at night — father travels.

Undersigned requested attys to strike sequestration problem type jurors —

Further it is noted that each of the aforementioned black vernirepersons struck by the State were individually voir dired concerning their special subject areas: experience in the mental/medical field, experiences in the criminal justice system, sequestration problems, problems with law enforcement.

State peremptory strikes of B/F # 166, Ms. Jones; # 20 B/M Mr. Bentley &  B/F # 164 Ms. Johnson — all are placed back in the jury pool & thus will sit on the petit jury of twelve.

State substitutes with striking three white vernirepersons —

Thus, petit jury that will hear the case is comprised of

Five Black females
Three Black males
One White female
Five White males

19

State's alternate juror is white male # 236, defense alternate is # 34, a white female[6],

Therefore eight Black jurors are projected to deliberate at close of the case —

See Trial Clerk's Record, pp. 5-11.

On direct appeal to the Alabama Court of Criminal Appeals, petitioner raised, but did not argue, the same *Batson* race objection.  At page 35 of his appeal brief, the following claim is asserted as a heading, but with absolutely no argument accompanying it.  *See* Tab R-32, p. 35.[7]  The Alabama Court of Criminal Appeals addressed the issue as a race-discrimination *Batson* claim, saying:

The appellant further contends that the trial court erred in allowing the state to strike black prospective jurors without providing race-neutral reasons.  The appellant makes no argument in his brief concerning this issue, except to cite it as an issue;  however, because this case involves the death penalty, this court is obliged under Rule 45A,

---

[6]  This reference to the alternate jurors is confusing.  Although this written finding by the trial judge suggests that Jurors 236 and 34 would sit as alternates, a strike sheet at page 142 of the Trial Clerk's Record indicate that they were struck.  In any event, it does not appear that either alternate participated in deliberations.

[7]  At page 35 of his appeal brief, the following claim is asserted as a heading, but with absolutely no argument accompanying it:

THE COURT ERRED IN ALLOWING BLACK VENIREPERSONS TO BE STRUCK BY THE PROSECUTION'S USING PEREMPTORY STRIKES TO EXCLUDE THEM FROM THE JURY FOR NON-RACE NEUTRAL REASONS

Tab R-32, p. 35.

20

Ala. R. App. P., to review this issue under the plain error doctrine.  The plain error doctrine states:

> "In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

In *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court held that black prospective jurors could not be struck from a black defendant's jury based solely on their race.  The United States Supreme Court extended its ruling in *Batson* to apply to white defendants in *Powers v. Ohio,* 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991);  to civil cases in *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991);  and to defense counsel in criminal cases in *Georgia v. McCollum,* 505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992).  The Alabama Supreme Court held in *White Consolidated Industries, Inc. v. American Liberty Insurance Co.,* 617 So. 2d 657 (Ala.1993), that *Batson* applies to the striking of white prospective jurors.  In 1994, the United States Supreme Court extended *Batson* to apply to gender in *J.E.B. v. Alabama,* 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994).

> "A defendant claiming a *Batson* violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. *Jackson v. State,* 594 So. 2d 1289 (Ala. Cr. App.1991).  Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes.   *Carter v. State,* 603 So. 2d 1137 (Ala. Cr. App.1992)."

*Stokes v. State,* 648 So. 2d 1179, 1180 (Ala. Cr. App.1994).

This court had held that "[u]nder *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the clear, specific, and legitimate race-neutral reason must be related 'to *the particular case to be tried.*'"   *Lane v. State,* 625 So. 2d 1178, 1181 (Ala. Cr. App.1993), quoting *Ex parte Branch,* 526 So. 2d 609, 623 (Ala.1987) (emphasis in *Branch*).   However, the United States Supreme Court recently in *Purkett v. Elem,* 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), defined the term "legitimate reason."   The Court stated:

> "The Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike 'must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges,' *Batson,* 476 U.S., at 98, n. 20, 106 S. Ct., at 1724, n. 20 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981)), and that the reason must be 'related to the particular case to be tried,' 476 U.S., at 98, 106 S. Ct., at 1724.   See [*Elem v. Purkett*] 25 F. 3d [679], at 682, 683 [(8th Cir. 1994)].   This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith.   *What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection.   See Hernandez [v. New York,* 500 U.S. 352*]* at 359, *[*111 S. Ct. 1859*]* at 1866, *[*114 L. Ed. 2d 395 (1991)]*;   cf. Burdine, supra,* at 255, 101 S. Ct., at 1094 *('The explanation provided must be legally sufficient to justify a judgment for the defendant* ')."

(Emphasis added.)

Since the release of *Purkett* a party's burden of proving that strikes were not violative of *Batson* is not as great as it was before the release of *Purkett.*

22

In this case the appellant contends that the state's strikes of four black prospective jurors violated *Batson*.   The prosecutor stated that she struck prospective juror number 128 because the prospective juror served as a juror on a prior criminal case that resulted in a hung jury. Also, she gave as another reason for striking this prospective juror the fact that his son had been treated for a psychiatric illness, and the appellant was raising the insanity defense.    These reasons are nonviolative of *Batson*.   See *Watkins v. State,* 551 So. 2d 421 (Ala. Cr. App.1988), and *Freeman v. State,* 651 So. 2d 576 (Ala. Cr. App.1994).

The prosecutor stated that she struck prospective juror number 179 because the juror indicated that service on the jury would be a hardship if the jury was sequestered because she had three children for whom she was responsible during the day.   A prospective juror's indication that service on a jury would be a hardship is a legitimate reason for striking that person.   *Harvey v. State,* 579 So. 2d 22 (Ala. Cr. App.1990).

The prosecutor stated that she struck prospective juror number 68 because sequestration would be a hardship for him.   The prospective juror was on medication that he took at home.   Additionally, the prospective juror had served on a prior criminal jury that had returned a not guilty verdict.   These explanations for striking the prospective juror are legitimate reasons.   *Harvey;  Williams,* supra.

Finally, the prosecutor stated that she struck prospective juror 100 because he had had a prior bad experience with law enforcement.   The prospective juror had previously complained to the chief of police.   A prospective juror's dissatisfaction with law enforcement constitutes a valid reason for striking that person.   *Gaston v. State,* 581 So. 2d 548 (Ala. Cr. App.1991).

The trial court found that the state's reasons for striking the prospective jurors were race-neutral.   We will reverse a trial court's ruling that no *Batson* violation occurred only if the ruling is "clearly erroneous."   *Williams v. State,* 634 So. 2d 1034 (Ala. Cr. App.1993). The trial court's ruling in this case was not clearly erroneous.

*Trawick v State*, 698 So. 2d 151, 156-158 (Ala. Crim. App. 1995). Clearly, the Alabama Court of Criminal Appeals did not read petitioner's claim as asserting a *gender*-discrimination claim. Neither the trial court judge, nor the Alabama Court of Criminal Appeals was presented with the necessity of evaluating whether petitioner had stated a *prima facie* showing of gender-based striking and, consequently, neither undertook to examine whether the strikes were gender-neutral.

Petitioner focused on *gender* discrimination for the first time in his petition for writ of *certiorari* in the Supreme Court of Alabama. *See* Tab R-37, p. 1. Despite this, the Alabama Supreme Court appears to have addressed the *J.E.B.* gender-discrimination claim on the merits, rather than finding it procedurally defaulted. The question presented here is whether the Alabama Supreme Court's conclusion that petitioner failed to make a *prima facie* showing of gender discrimination in jury selection, so as to require the State to articulate gender-neutral reasons for its strikes, was "contrary to," or an "unreasonable application of," clearly established United States Supreme Court precedent existing at the time of the Alabama Supreme Court's decision. This court finds that it was not.

First, the findings of fact made by the Alabama Supreme Court are not unreasonable in light of the record in this case. It is true that the State used its first seven consecutive strikes to remove women from the jury, and eleven of its fourteen

24

strikes against women,[8] but, beyond this showing, there is nothing else to establish gender bias in the state's pattern of strikes.  There is nothing in the *voir dire* questioning — either the types of questions asked by the state prosecutors, or their pattern of questioning — that suggests any differential treatment of female venire members by the prosecution.  Petitioner has not attempted to offer any "clear and convincing evidence"[9] that refutes the conclusion by the Supreme Court of Alabama that no conduct by the prosecutor, except the manner in which the strikes were exercised, demonstrates prejudice by the prosecutor.  Thus, this court must accept and defer to these findings of fact by the state court.

Further, the Alabama Supreme Court clearly applied the correct Supreme Court precedent to this issue, relying on *J.E.B.*, *Powers*, and other cases in the *Batson* line.  Likewise, the requirement that the defendant first is required to make a *prima facie* showing of discrimination before the prosecution is forced to articulate race-neutral reasons is well-established.  In *Hernandez v. New York*, 500 U.S. 352 (1991), the Supreme Court explained:

---

[8]  Whether the State exercised fourteen or fifteen strikes is unclear.  Both petitioner and the Alabama Supreme Court refer to fourteen, but a strike sheet at page 142 of the Trial Clerk's Record (Tab R-1, p. 142) seems to show that fifteen strikes were exercised.

[9]  *See Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 2325 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'").

In *Batson,* we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. 476 U.S., at 96-98, 106 S. Ct., at 1722-1724. The analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. *First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.* Id., at 96-97, 106 S. Ct., at 1722-1723. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race- neutral explanation for striking the jurors in question. Id., at 97-98, 106 S.Ct., at 1723-1724. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Id., at 98, 106 S. Ct., at 1723.

*Id.* at 358-359 (emphasis added). In *J.E.B.*, the Supreme Court repeated the allocation of the burdens of proof, requiring the challenging party first to make a *prima facie* showing of gender discrimination before the striking party must proffer gender-neutral reasons. "As with race-based *Batson* claims, a party alleging gender discrimination must make a *prima facie* showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144-145 (1994); *see also Purkett v. Elem*, 514 U.S. 765 (1995). Thus, the Alabama Supreme Court's analysis of this question clearly was not "contrary to" established Supreme Court precedent in the sense that the state court applied the wrong rule. The correct rule was applied.

A state-court determination can be "contrary to" controlling Supreme Court precedent in another way, if "the state court confronts facts that are materially

indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Surveying Supreme Court precedent existing at the time, the Alabama Supreme Court's determination that petitioner failed to make a *prima facie* showing of gender discrimination is problematic. In essence, the state supreme court concluded that petitioner's showing that the prosecution used eleven of its fourteen strikes against women, including its first seven consecutive strikes, was not a sufficient *prima facie* showing of sex discrimination under *Batson* and *J.E.B.* Several Supreme Court cases, however, indicate that such a pattern of striking, within the petitioner's case alone, may be enough to make a *prima facie* showing. For example, in *J.E.B.*, the very case stating the rule against gender discrimination in jury selection, the Court examined whether the prosecution's use of nine of its ten peremptory strikes against men was constitutional. In *Powers v. Ohio*, 499 U.S. 400 (1991), the Court found that the prosecution used seven of ten peremptory strikes to remove black jurors in a case against a white defendant. In *Ford v. Georgia*, 498 U.S. 411 (1991), the Court seemed to find a *Batson* violation when the prosecution used nine of ten strikes to remove black jurors in a case against a black defendant accused of raping and murdering a white woman. Likewise, in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991), the use of two of three peremptory challenges to

27

remove black jurors in a civil case by a black plaintiff appeared to be sufficient.  On the surface, therefore, these cases seem to suggest that the Alabama Supreme Court confronted facts not materially different from the facts in these cases, yet reached the opposite conclusion:  that no *prima facie* showing was made by evidence of eleven of fourteen strikes being used against women.

The strictures of § 2254(d), however, require the court to very carefully examine the basis of the state court's ruling in light of Supreme Court precedent existing on the date of the state-court decision.  Indeed, as mentioned already, the statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005);  *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005). Thus, for a state-court determination to be "contrary" to "clearly established" Supreme Court precedent, the precedent must exist as *holdings* in Supreme Court decisions, not merely *dictum*.

None of the Supreme Court cases existing at the time of the Alabama Supreme Court's decision *holds* that the pattern of striking that occurred in the present case was a sufficient *prima facie* showing of discrimination to trigger the second step in

28

the *Batson* analysis.  In *J.E.B.*, for example, the state courts had held that *Batson* simply did not extend to gender-based strikes.  Consequently, neither the state courts nor the Supreme Court had the opportunity to assess whether a *prima facie* showing of discrimination occurred.  For that reason, the Supreme Court remanded the case for further proceedings, including assessment of the *Batson* analysis.  In *Ford v. Georgia*, the question was whether the Georgia Supreme Court's promulgation of a procedural rule could bar consideration of a *Batson* claim.  As in *J.E.B.*, the courts had not had the opportunity to determine whether a *prima facie Batson* violation occurred.  In *Powers* and *Edmonson*, the courts again had categorically denied application of *Batson* to the proceedings before them.  In *Powers*, the trial court denied that a white defendant had standing to challenge the striking of black jurors, and in *Edmonson*, the trial court held simply that *Batson* did not apply to civil proceedings.  Once again, neither lower court attempted to determine whether a *prima facie* showing of discrimination in a particular pattern of striking had been made and, thus, that precise issue was neither before, nor explicitly decided by, the Supreme Court.  Stated differently, none of these cases *hold* that a particular factual pattern of exercising peremptory strikes was sufficient to establish a *prima facie* showing of discriminatory striking.  Consequently, it cannot be said that any particular fact pattern in relation to jury striking was "clearly established" Supreme Court precedent

29

to which the Alabama Supreme Court's decision was contrary. Thus, again, the Alabama Supreme Court's resolution of this issue was not "contrary to" established Supreme Court precedent.[10]

Nor can the court say that the Alabama Supreme Court's resolution of this claim was "objectively unreasonable." Regardless of whether the state supreme court correctly determined that a *prima facie* case of gender discrimination had not been shown, its conclusion is not plainly and objectively unreasonable. As noted earlier, other than the fact that the prosecutors used eleven of their fourteen strikes against females, in the "totality of the relevant facts"[11] relating to jury selection, nothing else suggested a discriminatory animus. Nothing in the *voir dire* questioning indicated a bias against women. Indeed, given that petitioner was charged with the kidnaping and murder of a *young woman*, it is difficult to imagine why the prosecution would have had a tactical or strategic reason for wanting to remove women from the trial jury. Compare, for example, so many of the other cases in the *Batson* line. In *J.E.B.*, a paternity prosecution, the State struck *men*, seeking to seat as many women as possible, obviously due to the nature of the case. Likewise, in *Ford v. Georgia*, 498

---

[10] The Supreme Court's recent decision in *Johnson v. California*, 545 U.S. 162 (2005), does not change this result, as it came after the Alabama Supreme Court's decision.

[11] *Batson v. Kentucky*, 476 U.S. 79, 94, 96 (1986); *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 2325 (2005).

U.S. 411 (1991), the prosecution used nine of ten strikes to remove black jurors in a case against a black defendant accused of raping and murdering a white woman. One of the factors tending to support a *prima facie* showing is whether the strikes seem to correlate with a prosecutor's stereotypical view of how certain groups of jurors might view the case. In this case, there is no such correlation; there is no reason to assume that the prosecutor wanted to strike female jurors in a case in which a man is accused of kidnaping and murdering a young woman. Such strategic and tactical considerations are plainly part of the "totality of the relevant facts" concerning the prosecutor's conduct. But in the absence of apparent strategic or tactical reasons for a certain pattern of striking, the correlation with discrimination is reduced, and the *prima facie* showing becomes more questionable.

Also, it should be noted that, even without the *J.E.B.* objection being stated, there were obvious gender-neutral reasons for the State to strike many of the female jurors who were removed. Several (Lee, Mauldin, and Vines) expressed concerns about being sequestered, because they had minor children to care for — a fact that could have interfered with their attention to the case. Others (Benefield, Harrison, and Thorson) indicated that they had positive experiences with mental-health treatment for themselves or family members. Because the defendant was asserting a mental-health defense, the prosecution might have worried that such jurors would

31

be more favorably disposed to such a defense. Yet another juror (Binkley) revealed that she worked at the School of Health Behavior at the UAB College of Public Health, which might concern the prosecution due to the defendant's mental-health defense. Although these gender-neutral reasons were never articulated by the prosecution in response to a *J.E.B.* motion, they were known to the trial court. These facts fit within the "totality of the relevant facts" used by the trial court and the Alabama Supreme Court in assessing whether a *prima facie* showing could be made. In light of these reasons for striking certain female jurors, the state courts might reasonably conclude that a *prima facie* showing of purposeful gender discrimination was not, and could not be, made.

Additionally, one of the prosecutors — indeed, the prosecutor exercising the final three strikes against women — was a woman. This relevant fact also tends to undermine an initial finding of a *prima facie* showing of gender discrimination. These factors do not establish that the Alabama Supreme Court correctly determined that a *prima facie* showing was not made, but they do tend to show that the court's conclusion was not "objectively unreasonable."

Thus, having concluded that the Alabama Supreme Court's determination that petitioner failed to make a *prima facie* showing of gender discrimination in striking was not "contrary to," or "an unreasonable application of," Supreme Court precedent

32

in this area, the state court's resolution of this claim is entitled to deference under §

2254(d).  Federal *habeas* relief is not warranted on this claim.

**Claim II** — *Use of Inculpatory Statements*

Petitioner has alleged three distinct, but interrelated claims for relief based

upon the admission of certain inculpatory statements.  He alleges that:

a.   The use of his statements violated the Fourth Amendment because there was no probable cause to arrest petitioner prior to his interrogation.  (Paragraph 14 of the petition).

b.   The use of his statements violated the Fifth Amendment because he requested and was denied access to a lawyer during interrogation.  (Paragraphs 15-17 of the petition).

c.   The use of his statements violated the Fifth Amendment because they were induced by promises from police interrogators, making the statements involuntary.  (Paragraph 18 of the petition).

Before trial, petitioner filed a motion to suppress the statements (*see* Tab R-1,

pp. 79-87), in which he asserted as the only basis for suppression that promises were

made to induce him to make the statements, thereby rendering them involuntary.  The

trial court conducted a suppression hearing on July 26, 1993.  At the hearing, both a

police investigator and petitioner testified that, after his October 26, 1992 arrest,

petitioner had invoked his right to legal assistance during questioning and

questioning had ceased.  Thereafter, however, petitioner directed his mother to

contact the investigator, because petitioner wanted to talk to him.  When the police

33

investigator went to the jail on October 29, 1992, petitioner indicated that he wanted to make a statement under certain conditions, specifically that he would be charged with a capital offense, that he would be sentenced to the electric chair, that the news coverage of the case would be kept to a minimum, and that the case would be expedited as much as possible. (*See* Tab R-5, pp. 126-127). The trial court denied the motion to suppress with respect to petitioner's inculpatory statement made on October 29, 1992.

In his initial brief on direct appeal to the Alabama Court of Criminal Appeals, petitioner argued that his statements were used in violation of the Fifth Amendment because they were induced by promises made to him by police interrogators. (*See* Tab-32, pp. 13-19). There is no mention of the assertion that the statements were tainted by a violation of the Fourth Amendment. In resolving this claim, the court of criminal appeals wrote:

> The appellant initially contends that evidence of his confession should have been suppressed. Specifically, he contends that his confession was not voluntary because, he says, he confessed only after he placed certain conditions on his agreement to confess that he was promised would be met. He asserts that he confessed only after he was promised that the case would be a capital case and there would be a minimum of publicity.
>
> At the suppression hearing, Lieutenant Steven Greene, of the Jefferson County Sheriff's Department, testified that he took the appellant's statement on five occasions. In the fourth statement, which

was introduced at trial, the appellant confessed to murdering Gash. Greene testified that before he made the statement the appellant was advised of his *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), rights, and that no threats or promises were made in order to get the appellant to make a statement.  Greene further testified that he did not promise that he could or would meet the conditions set by the appellant.

The appellant himself testified at the suppression hearing that the officers did not promise that any "conditions" would be met before he made his statement.

All extrajudicial statements are deemed involuntary.  If the statement is to be received as evidence, the state has the burden of proving, by a preponderance of the evidence, that the statement was voluntary and that the accused was advised of his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 522, 93 L. Ed. 2d 473 (1986).  *See also Coral v. State*, 628 So. 2d 954 (Ala. Cr. App. 1992); *Jackson v. State*, 562 So. 2d 1373 (Ala. Cr. App. 1990).

The appellant does not argue that he was not advised of his constitutional rights as articulated in *Miranda*.  Thus, our inquiry centers on whether the appellant's statement was voluntary.  To determine whether a statement is voluntary, this court must examine the "totality-of-the-circumstances." *Boulden v. Holman*, 394 U.S. 478, 89 S. Ct. 1138, 22 L. Ed. 2d 433 (1969); *Fikes v. Alabama*, 352 U.S. 191, 77 S. Ct. 281, 1 L. Ed. 2d 246 (1957).

Here, the appellant maintains that his giving the statement was conditioned on the granting of certain requests that he outlined to police. As the state contends, a similar issue was addressed by this court in *Siebert v. State*, 555 So. 2d 772 (Ala. Cr. App.), aff'd, 555 So. 2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S. Ct. 3297, 111 L. Ed. 2d 806 (1990).  In *Siebert*, this court stated:

> "The appellant also argues that his statements should
> not have been allowed into evidence because, he says, they

were involuntary; specifically, he says they were conditioned on Captain Hurst's alleged promise that he would not be asked certain questions concerning 'details' of the murders. Captain Hurst, however, testified that appellant told him that he would admit to the killings, but would not go into any details until he got back to Alabama, a condition to which Captain Hurst agreed. Appellant now claims that Captain Hurst's agreement to this condition constituted a 'promise' or inducement for his statement, thereby rendering his statements involuntary and inadmissible.

"The question of undue influence in obtaining admissions or confessions is determined by an examination of all attendant circumstances, with the inquiry focusing on whether the accused's free will and rational intellect were overborne at the time of his confession. *Hubbard v. State*, 500 So. 2d 1204, 1220 (Ala. Cr. App.), aff'd, 500 So. 2d 1231 (Ala. 1986), cert. denied, 480 U.S. 940, 107 S. Ct. 1591, 94 L. Ed. 2d 780 (1987); *McCammon v. State*, 499 So. 2d 811, 815 (Ala. Cr. App. 1986); *Seawright v. State*, 479 So. 2d 1362, 1367 (Ala. Cr. App. 1985); *Agee v. State*, 465 So. 2d 1196, 1198 (Ala. Cr. App. 1984). 'The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure.' Seventeenth Annual Review of Criminal Procedure, 76 GEO.L.J. 676 (1988). 'If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced.' *Townsend v. Sain*, 372 U.S. 293, 307, 83 S. Ct. 745, 754, 9 L. Ed. 2d 770 (1963). 'The types of promises which may make a defendant's statement involuntary are, e.g., promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, the disclosure of incriminating evidence to the accused, and silence in response to the defendant's offer to talk if his statement

would not be used against him.' *Siebert v. State*, [562 So. 2d 586 (Ala. Cr. App. 1989)].  However, this court has made it clear that a statement 'is not rendered involuntary by a promise of benefit that was solicited freely and voluntarily by the defendant himself.' *Rowe v. State*, 421 So. 2d 1352, 1355 (Ala. Cr. App. 1982); *Eakes v. State*, 387 So. 2d 855, 860 (Ala. Cr. App. 1978).

> "Although appellant has attempted to transform Captain Hurst's actions into a promise of benefit or inducement, it is readily apparent from the testimony that this was simply a condition placed by the defendant on the extent of his confession at that time.  Captain Hurst neither promised appellant anything nor induced him in any way. He was merely acknowledging the terms which the appellant had unilaterally imposed.  Appellant had the right to remain silent.  He also had a right to limit any statement which he [chose] to make.  Captain Hurst was only honoring this right.  Any benefit which may have accrued from this agreement was solicited freely and voluntarily by the appellant himself, and thus, failed to render his confession involuntary.   Accordingly, the trial court correctly received the offered portions of appellant's confession into evidence."

*Siebert*, 555 So. 2d at 776-77.

This court will not reverse a trial court's ruling on the voluntariness of a statement unless it is "'manifestly contrary to the great weight of the evidence.'" *Barbour v. State*, 673 So. 2d 461 (Ala. Cr. App. 1994), quoting *Malone v. State*, 452 So. 2d 1386, 1389 (Ala. Cr. App. 1984).  The trial court's ruling was not contrary to the great weight of the evidence.  The appellant's confession was correctly received into evidence.

*Trawick v. State*, 698 So. 2d 151, 154-155 (Ala. Crim. App. 1995).

Petitioner then sought review in the Supreme Court of Alabama, and there raised all three of the claims asserted now with respect to the admissibility of his statements. (*See* Tab R-37, pp. 34-40). The Alabama Supreme Court resolved the claims with the following opinion:

> Trawick next argues that his confession to Gach's murder was elicited after he had requested an attorney and in response to improper promises made to him by the police; thus, he argues that the confession should have been suppressed at trial, relying on *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

> To address these issues, we must note the following sequence of events from the record: Trawick gave several interviews to the Jefferson County Sheriff's Department personnel in October 1992. The first interview was not in direct relation to Gach's murder; rather, Trawick was brought in for questioning as part of the Department's investigation of several reported attempts by an unknown man to abduct women or to lure them into his vehicle. The police did not ask Trawick about Gach's murder, and no statements from the first interview were admitted at his trial.

> In a second interview, on October 26, 1992, Lt. Steven S. Green specifically asked Trawick whether he had had any involvement in Gach's abduction and murder; however, Trawick did not admit guilt at that time. During that interview, Lt. Green asked Trawick if he would take a polygraph test; Trawick replied, in part, "[I]f I'm either being charged with or, you know highly suspected of a murder, I need to get legal assistance all the same." The interview stopped, although a police officer did ask Trawick if he or his mother would object to a search of his residence.

> A third interview occurred on October 29, 1992, after Lt. Green received a telephone call from Trawick's mother, who told him that Trawick wanted to speak with him. Lt. Green went to the jail and asked

if Trawick wanted to see him.  Lt. Green again advised Trawick of his *Miranda* rights; Trawick then stated that he understood those rights, and he signed a waiver form.  Trawick gave an oral statement; he did not indicate that he wished to speak with an attorney before giving his statement.

During the third interview, Trawick told Lt. Green that he knew about Gach's murder and that he could tell Lt. Green what he needed to know to finish his investigation of the case.  Trawick indicated that he wanted to minimize the publicity about the case, for his mother's sake, but that he wanted to make sure that the case would be tried as a capital murder and that he would be sentenced to death.  Trawick did not ask to speak with an attorney.  Lt. Green told Trawick that he would set up a meeting between Trawick and an assistant district attorney, and the interview ended.

A fourth interview occurred later that day, when Trawick met with Lt. Green and another police officer, along with Deputy District Attorney Roger Brown.  After being advised of his Miranda rights, which he again waived, Trawick gave an oral statement, which was audiotaped, confessing to the abduction and murder of Stephanie Gach.  While giving the statement, Trawick reiterated that he wanted the case to be tried as a capital murder and that he wanted the death penalty.  Brown told Trawick that he would have to know the circumstances of the case before he could know whether Trawick could be tried for capital murder.

Trawick argues that, after he requested an attorney during the second interview, all questioning should have stopped until he was provided one.  Thus, because he was not provided with an attorney before giving the oral statements in the third and fourth interview, he argues that evidence of those statements should have been suppressed.

When a suspect expresses a desire to deal with the police only through counsel, the suspect should not be subject to further interrogation by the authorities until counsel has been made available, unless the suspect himself initiates further communication, exchanges,

or conversations with the police.  *Edwards v. Arizona*, *supra*.  The record shows that the second interview effectively ended after Lt. Green asked Trawick if he would take a polygraph test and Trawick indicated that he would want legal counsel before he would do so.  According to Trawick's own testimony in the pre-trial suppression hearing, he asked his mother the next day to tell Lt. Green that he wanted to make a statement.  When Lt. Green arrived at the jail, Trawick wanted to talk to him and, after being properly read his <u>Miranda</u> rights, he waived those rights and gave the statement.  The evidence clearly shows that Trawick himself initiated further communication with Lt. Green, after indicating in the second interview that he might want legal counsel;  thus, the statements that he gave in the third and fourth interviews were not given in violation of *Edwards v. Arizona*.

Trawick also argues that the assistant district attorney and the police promised him that, in return for his statement, they would assure that he would be expeditiously tried for capital murder, that he would be sentenced to death, and that they would keep news media coverage of the case to a minimum out of respect for Trawick's mother.  He contends that he gave his statement only after he was promised that these conditions would be met, and that his statements were thus coerced, in violation of his due process rights.

At the pre-trial suppression hearing, Lt. Green confirmed that, before giving his statement at the fourth interview, Trawick told the distract [sic] attorney and police officers that he wanted to be tried for capital murder and to receive the death penalty.  Lt. Green testified that Brown responded merely by saying that he would not know whether the case could be made capital until he knew the circumstances of it.  Brown also testified that he only told Trawick, in effect, that he did not know whether the case was a capital case because he did not know the facts.  At the pre-trial hearing on his motion to suppress the confession, Trawick himself testified that Brown and the police officers only "promised that they would listen" to his statement and that if the facts they heard in the statement fit the facts necessary for a capital case, then his case would be tried as such.

The kinds of promises that may make a defendant's statement involuntary are promises of leniency, promises to bring the defendant's cooperation to the attention of the prosecutor, and the disclosure of incriminating evidence to the accused and silence in response to the defendant's offer to talk if his statement would not be used against him. *Siebert v. State*, 562 So. 2d 586 (Ala. Cr. App. 1989), *affirmed*, 562 So. 2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S. Ct. 398, 112 L. Ed. 2d 408 (1990). There is no evidence that the police or the deputy district attorney made any promises of this sort to Trawick. The deputy district attorney's mere promise to listen to Trawick's statement of the facts of the case and to then to take whatever action was appropriate under the law as applied to those facts was merely a promise that he would do his job; certainly, it was no special privilege or favor for Trawick.

The true test for determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed so that the confession was not the product of a rational intellect and free will. *Ex parte Weeks*, 531 So. 2d 643 (Ala. 1988). The evidence, including Trawick's own testimony, shows that Trawick himself initiated the contact that led to his confession, that he legitimately waived his right to an attorney before confessing, and that he did so without the inducement of special promises of the sort described in *Siebert*. We therefore find no merit in his argument that his confession was not voluntary.

*Trawick v State*, 698 So. 2d 162, 175-176 (Ala. 1997).

## **II(a)** — *Admissibility under the Fourth Amendment*

Petitioner's first *habeas* attack on the admissibility of his inculpatory statement asserts that there was no probable cause to arrest him and, therefore, his October 29, 1992 statement was tainted by his illegal arrest three days earlier, on October 26, 1992. In response to this claim, respondents contend that it is procedurally defaulted,

that relief is barred by *Stone v. Powell*, 428 U.S. 465 (1976), and that the claim is meritless in any event.

It is clear that petitioner never raised a Fourth Amendment challenge to the use of his inculpatory statement until he sought *certiorari* review in the Alabama Supreme Court. Before that, petitioner's only contention was that his statement was involuntarily induced by promises made to him by police investigators. Although the Fourth Amendment claim is argued in petitioner's brief on *certiorari*, the Alabama Supreme Court did not address it at all, either on the merits or to reject it on procedural grounds. In that sense, no state court has ever expressly relied on a procedural ground to decline to consider the claim. *See Harris v. Reed*, 489 U.S. 255 (1989). In the absence of an express reliance on a procedural rule, the court can only conclude that the claim is exhausted, and that it was considered and rejected on the merits by the Alabama Supreme Court.

This court agrees that the rule in *Stone v. Powell* precludes *habeas* consideration of this claim. In *Stone*, the Supreme Court concluded that the costs associated with the suppression of evidence obtained in violation of the Fourth Amendment right to be free from unreasonable searches and seizures were too high to justify consideration of such an issue in the post-conviction context of a *habeas* petition, as long as the defendant was given a full and fair chance to litigate the issue

42

prior to trial.  The Court held that, when "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also United States v. Johnson*, 457 U.S. 537, 563 n.20 (1982) ("After *Stone v. Powell*, . . . the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, analogous federal cases under 28 U.S.C. § 2255, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims.");  *Withrow v. Williams*, 507 U.S. 680, 686 (1993) ("We simply concluded in *Stone* that the costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there.").  In *Cardwell v. Texas*, 461 U.S. 571 (1983) (*per curiam*), the Supreme Court extended the rule in *Stone* to confessions allegedly tainted by an illegal arrest.  *See Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987); *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989); *Peoples v. Campbell*, 377 F.3d 1208 (11th Cir. 2004).

In sum, insofar as a state prisoner had a full and fair opportunity to challenge the admissibility of his inculpatory statement, he may not subsequently raise the Fourth Amendment arrest issue in a federal *habeas* action.

In the present case, there is no dispute that petitioner had a full and fair opportunity to raise any issue he desired with respect to the admissibility of his October 29, 1992 statement. Indeed, petitioner did challenge it on Fifth Amendment voluntariness grounds, and obtained a hearing on that issue. Although the suppression hearing did not address the probable cause to arrest petitioner on October 26, 1992, that was only because petitioner did not raise that question in either his motion or at the hearing. He plainly had a full and fair opportunity to do so. Consequently, under *Stone* and *Cardwell*, the assertion that the October 29, 1992 statement was tainted by petitioner's illegal arrest fails to state a ground for *habeas* relief.

Even if the question could be considered, it is meritless. An illegal arrest without probable cause unquestionably can taint statements obtained from the defendant after the arrest, unless circumstances indicate that the taint has been attenuated by subsequent events. *Wong Sun v. United States*, 371 U.S. 471, 490 (1963) (holding that confession of defendant who had been illegally arrested, released on his own recognizance, and returned voluntarily several days later to make

44

incriminating statements need not be suppressed because the connection between the arrest and the statement had "'become so attenuated as to dissipate the taint'"); *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). "'[T]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct' are all relevant considerations in determining whether a confession is the fruit of an illegal detention." *Devier v. Zant*, 3 F.3d 1445, 1459 (11th Cir. 1993) (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

In this case, the court has little difficulty concluding that petitioner's October 29, 1992 statement was sufficiently attenuated from his alleged illegal arrest,[12] and that it was not the product of that arrest. First, the October 29, 1992, confession occurred three days after his arrest on October 26, 1992. The arrest was not an example of flagrant official misconduct. Petitioner was properly arrested for a possible parole violation that was being actively investigated. Petitioner was advised of his *Miranda* rights, and already had invoked his right to the assistance of counsel during interrogation; indeed, interrogation had been terminated effectively by petitioner's invocation of his right to counsel. Three days later, petitioner himself

---

[12] The court does not concede that the arrest was illegal. There is evidence in the record suggesting that petitioner was arrested for a possible parole violation in connection with using a gun in an attempt to coerce women into his car.

45

undertook to have his mother contact police investigators to request that they come to see him in the jail.  This indicates not only that petitioner's October 29, 1992, statement was the product of a free will and conscious choice by him, but also that he was not isolated from assistance, but in contact with his mother.  When officers arrived at the jail on October 29, 1992, petitioner engaged them in negotiations over the terms under which he would make a statement to them.  All of these factors indicate that there was no causal link between the purportedly illegal arrest and the confession three days later.  Circumstances and subsequent events had completely attenuated the taint of the supposedly illegal arrest and subsequent confession.  This claim does not merit *habeas* relief.

**II(b)** — *Edwards v. Arizona claim*

Petitioner's second claim related to the use of his October 29, 1992, inculpatory statement alleges that the statement was obtained in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), because it occurred after he invoked the right to counsel during interrogation.  In considering this claim on direct appeal, the Alabama Supreme Court found that petitioner initiated the interview with officers by having his mother contact police investigators, to tell them that petitioner wanted to speak to them.  Petitioner requested counsel during his second interview on October 26, 1992, at which time the interview was terminated without his having made any inculpatory statements to

46

police.  Three days later, petitioner asked his mother to tell police investigators that he wanted to speak to them.  When they arrived at the jail, investigators again administered *Miranda* warnings to petitioner, which he acknowledged.  During this third interview, he admitted kidnaping and murdering Stephanie Gach.  Petitioner's own testimony at the suppression hearing confirms this sequence of events.

The state court's determination that this confession did not violate *Edwards v. Arizona* is neither contrary to, nor an unreasonable application of, Supreme Court precedent.  In *Edwards* the Supreme Court held as follows:

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.  We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*.

*Id.* at 484-485 (emphasis added); *see also Minnick v. Mississippi*, 498 U.S. 146 (1990); *Oregon v. Bradshaw*, 462 U.S. 1039 (1983).  In a subsequent case, the Supreme Court reaffirmed the rule in *Edwards,* saying:

> The rule of the *Edwards* case came as a corollary to *Miranda's* admonition that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S., at 474, 86 S.Ct. at 1627-1628.  In such an instance, we had concluded in *Miranda*, "[i]f the interrogation continues without the presence of an

attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*, at 475, 86 S. Ct., at 1628. In *Edwards*, we "reconfirm[ed] these views and, to lend them substance, emphasize[d] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S., at 485, 101 S. Ct., at 1885. *We concluded that reinterrogation may only occur if "the accused himself initiates further communication, exchanges, or conversations with the police."* [Italics added].

*Arizona v. Roberson*, 486 U.S. 675, 680-681 (1988).

These cases make clear that, notwithstanding an invocation of the Fifth Amendment right to counsel that terminates a police interrogation, an accused may initiate further communication with police. If, during the re-initiated conversation, the accused makes a free and knowing waiver of his right to counsel, his subsequent inculpatory statements do not violate *Edwards*. That is precisely what occurred in this case, as determined by the Alabama Supreme Court. After terminating his interrogation on October 26, by invoking his right to counsel, petitioner then initiated further communication with police three days later, when he instructed his mother to tell police investigators that he wanted to talk to them. When police visited petitioner as he requested, they again advised him of his right to remain silent, and of his right to the assistance of counsel. Nonetheless, petitioner made a knowing and free decision to waive those rights and talk to police. The conclusion that these events,

48

and the subsequent use of petitioner's inculpatory statements on October 29, 1992, did not violate *Edwards* is neither contrary to, nor an unreasonable application of, Supreme Court precedent.   The resolution of this claim by the Alabama Supreme Court is entitled to deference under § 2254(d), and petitioner is not entitled to *habeas* relief on this claim.

### II(c) — *Voluntariness of inculpatory statements*

Petitioner's third claim relating to the admission of his confession alleges that his statement of October 29, 1992, was involuntarily induced by promises made to him by police.   Specifically, petitioner contends that police and an assistant district attorney promised him that:   (1) he would be charged with a capital offense; (2) he would be sentenced to the electric chair; (3) media publicity would be kept to a minimum; and (4) the case against him would be expedited.   These promises, he contends, constitute inducements to get him to speak, rendering his confession involuntary under the Fifth Amendment.

Again, the Alabama Supreme Court rejected this argument, finding that the only promises made to petitioner were to listen to his version of the facts, and then to charge him under those facts.   The state court noted that there were no promises of leniency or assistance.   Nothing said by state agents suggested to petitioner that speaking to police would be a benefit to him in relation to the crime or charges.   The

49

court observed that "[t]he deputy district attorney's mere promise to listen to Trawick's statement of the facts of the case and to then to [sic] take whatever action was appropriate under the law as applied to those facts was merely a promise that he would do his job; certainly, it was no special privilege or favor for Trawick." *Trawick v. State*, 698 So. 2d 162, 176 (Ala. 1997).

The Alabama Supreme Court correctly determined that petitioner's statement of October 29, 1992, — the only one used as evidence at trial — was not involuntarily made in violation of his Fifth Amendment privilege. This conclusion was neither contrary to, nor an unreasonable application of, Supreme Court precedent. The Supreme Court established a standard for Fifth Amendment "voluntariness" in *Colorado v. Spring*, 479 U.S. 564 (1987), saying that:

> A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda v. Arizona*, supra, at 444, 86 S. Ct., at 1612. The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986):
>
>> "First *the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.* Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced

50

choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

There is no doubt that Spring's decision to waive his Fifth Amendment privilege was voluntary. He alleges no "coercion of a confession by physical violence or other deliberate means calculated to break [his] will," *Oregon v. Elstad*, 470 U.S. 298, 312, 105 S. Ct. 1285, 1295, 84 L. Ed. 2d 222 (1985), and the trial court found none. His allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: "the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879, 6 L. Ed. 2d 1037 (1961) (opinion of Frankfurter, J.). Absent evidence that Spring's "will [was] overborne and his capacity for self-determination critically impaired" because of coercive police conduct, *ibid.; see Colorado v. Connelly*, 479 U.S. 157, 163-164, 107 S. Ct. 515, ___, 93 L. Ed. 2d 473 (1986), his waiver of his Fifth Amendment privilege was voluntary under this Court's decision in *Miranda*.

*Spring,* 479 U.S. at 573-574 (emphasis added).

The conclusion reached by the Alabama Supreme Court that the "promises" purportedly made to petitioner were not such as would overwhelm his power to make a free choice whether to speak to police is not contrary to, or an unreasonable application of, Supreme Court law. Consequently, the resolution of the claim is entitled to deference under § 2254(d), and petitioner is not due any relief.

**Claim III** — *Ineffective Assistance of Trial Counsel*

The petitioner has alleged fifteen claims of ineffective assistance by trial counsel. The United States Supreme Court has established a national standard for judging the effectiveness of criminal defense counsel under the Sixth Amendment. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court elaborated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

Further, in order to show ineffectiveness of counsel, the movant must demonstrate that his or her attorney's performance fell below "an objective standard of reasonableness," *id*. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. When making such an evaluation, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all

52

significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The effectiveness or ineffectiveness must be evaluated by consideration of the totality of the circumstances. *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983). The court must remember that a defendant in a criminal case has a constitutional right only to adequate counsel; he is not entitled to the very best legal representation. *Stone v. Dugger*, 837 F.2d 1477 (11th Cir. 1988).

The second requisite element in a claim of ineffective assistance of counsel is a showing of prejudice. Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant can obtain relief only if the error caused actual prejudice. *See Strickland v. Washington*, *supra*. Prejudice means a reasonable probability that the outcome of the proceeding would have been different had the errors not occurred.

Against this standard, the court will examine each of petitioner's fifteen distinct allegations of ineffective assistance.

### III(a) — *Inadequate defense funding*

Petitioner first contends that Alabama provides inadequate funding and compensation for capital defense attorneys and defense experts. (Paragraphs 20 to

24a of the petition).[13]  But, aside from the vague assertion that the compensation limits hindered petitioner's defense, the only specific allegation of a link between inadequate compensation and ineffective assistance charges that the compensation limits prevented counsel from retaining and using experts to explore petitioner's mental health history and other mitigating factors.  As these allegations appear independently as ineffectiveness Claims III(b). and III(c)., the question of whether counsel was ineffective in these ways due to inadequate funding, or other reasons, will be discussed in relation to those specifications.

Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might be to the attorneys, does not itself amount to ineffective assistance

---

[13]  At paragraph 23 of the petition, Trawick alleges that the severe caps on the amount of compensation paid to capital defense counsel amounts to an unconstitutional taking of property without just compensation, a violation of the separation-of-powers doctrine, and a violation of the Equal Protection Clause by discriminatorily denying indigent defendants their Sixth Amendment right to effective assistance of counsel.  As to the takings claim, petitioner has no standing to assert a claim for the loss of his *lawyers'* property.  Petitioner is not being denied just compensation; it is his lawyers who labor under the severe compensation caps, depriving *them* of fair compensation for *their* work.  Similarly, even if the compensation caps amount to a violation of the separation-of-powers doctrine (and the court does not believe that they do), petitioner has no standing to object to it.  As with the takings claim, it is his lawyers who suffer injury as a result of the violation, not petitioner, and they, not he, would have standing to assert such a claim.  Finally, petitioner's equal protection claim seems to assert that the compensation caps deprive him and other indigent defendants of equal protection because the caps result in a denial of effective assistance of counsel.  This pleads nothing more, however, than that he was deprived of effective assistance of counsel because he received ineffective assistance of counsel; a tautology at best.  In short, paragraph 23 adds nothing to the analysis of the claim that petitioner received ineffective assistance of counsel, which necessarily turns on counsel's actual performance at trial, not on what he *might* have done if he had had unlimited resources.

54

of counsel *unless* it contributes to actual errors or shortcomings in the performance of counsel.   The *Strickland* standard requires an analysis of specific errors or shortcomings by counsel.[14]   The *Strickland* Court wrote:

> A convicted defendant making a claim of ineffective assistance must identify *the acts or omissions* of counsel that are alleged not to have been the result of reasonable professional judgment.   The court must then determine whether, in light of all the circumstances, *the identified acts or omissions* were outside the wide range of professionally competent assistance.   In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Id.* at 690 (emphasis added).   Thus, the allegation that compensation caps hindered the ability of counsel to represent a capital defendant has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding. Only by examining specific errors or shortcomings can it be determined, first, that it was an error outside the broad scope of competence expected of counsel, and second, whether the error caused real prejudice to the defendant.   Consequently, as a  claim of ineffectiveness divorced from analysis of particular errors or omissions, the

---

[14]   Petitioner does not contend that *United States v. Cronic*, 466 U.S. 648 (1984), requires a different result.   The compensation caps are not the type of circumstances that make it unlikely that *any* lawyer could render effective assistance.   Indeed, despite the compensation limits in various states, counsel can and do provide effective representation of capital defendants.   Petitioner makes no contention that his case fits either of the two other *Cronic* circumstances — complete denial of counsel at a critical stage and the complete failure of counsel to subject the prosecution's case to meaningful adversarial testing.   *See  Bell v. Cone*, 535 U.S. 685 (2002).

assertion that the State of Alabama provides inadequate compensation for capital

defense counsel and experts fails to state a basis for *habeas* relief, and it is due to be

denied.

**III(b)** — *Inadequate investigation of mental health history*

At paragraph 25 of his Second Amended Petition, petitioner alleges that:

> Trial counsel failed to investigate adequately evidence of Mr. Trawick's mental illness and failed to present adequately such evidence at the guilt phase of his trial.  Mr. Trawick has suffered from a severe mental illness his entire life.  It has been well documented that from an early age, he has been diagnosed as suffering from paranoid schizophrenia.  Moreover, for the past twenty-five years psychiatrists have attempted to rehabilitate him with many different treatments ranging from anti-psychotic medication to electric shock treatment and even female hormones.  This evidence was not presented by counsel adequately.  Counsel did not conduct sensitive and detailed interviews with family members such as his mother, his sister, his cousins or his aunts and uncles, or even with other witnesses such as childhood friends, who could have provided information about Mr. Trawick's severe and longstanding mental illness.  In addition, counsel failed to secure and present adequately Mr. Trawick's institutional and medical records, including records from correctional facilities, hospital and the parole board, documenting his mental illness.  Counsel also failed to prepare adequately independent mental health experts to evaluate, diagnose and testify about Mr. Trawick's mental illness.  Because of these deficiencies, trial counsel failed to show the jury the severity of his mental illness, how longstanding it is, and how it rendered Mr. Trawick not guilty of capital murder.

Petitioner alleged the same claim at paragraph 11(A) of his Second Amended Rule

32 Petition in Alabama state court (Tab R-46, pp. 4-5), with the exception that, in the

state petition, he added the allegation that "But for counsel's ineffectiveness in this regard, there is a reasonable probability that the outcome of Mr. Trawick's trial would have been different." This additional allegation is missing from the federal *habeas* petition.

In reaching the conclusion that petitioner had not adequately pled this claim under the standard required by Rule 32.6(b) of the Alabama Rules of Criminal Procedure, the Rule 32 court explained:

> In paragraph 11(A) of the second amended petition, Trawick contends that trial counsel was ineffective for failing to investigate evidence of Trawick's mental illness and failing to present such evidence during the guilt phase of the trial. More specifically, Trawick asserts that trial counsel did not conduct "sensitive and detailed interviews" with "family members" who could have provided information about his "severe and longstanding mental illness." Trawick contends that trial counsel "failed to secure and present adequately [his] institutional and medical records, including records from correctional facilities, hospitals and the parole board, documenting his mental illness." Trawick contends that the mental health experts that he called as witnesses were not prepared adequately to testify. Trawick then contends that "[b]ecause of these deficiencies, trial counsel failed to the [sic] show the jury the severity of his mental illness, how longstanding it is, and how it rendered [him] not guilty of capital murder."
>
> Trawick did not plead any facts with the specificity required by ALA. R. CRIM. P. 32.6(b). The claim makes a list of conclusory allegations, but contains no supporting facts. For example, Trawick contends that trial counsel did not adequately present a guilt phase defense, but does not state any facts regarding how the evidence that was presented at the guilt phase was inadequate. He asserts that counsel

should have conducted "sensitive and detailed interviews" with "family members" who could have provided information about his mental illness, but does not state what information these interviews would have provided or which family members were not interviewed by trial counsel. The contention that trial counsel failed to secure Trawick's institutional and medical records does not include information regarding what records are being referenced and whether or not they are any different from the records presented at trial. Trawick contends that the mental health experts called as witnesses were not adequately prepared to testify, but does not state how their testimony or trial counsel's preparation was inadequate. Trawick concludes this claim by stating that but for the listed "deficiencies" he would have been found "not guilty of capital murder." He provides, however, no factual basis for this conclusory statement. There is no need to conduct an evidentiary hearing on the basis of these conclusory allegations and summary dismissal of this claim is warranted.

Moreover, the fact that trial counsel did present evidence to support the guilt phase defense of insanity, makes it even more incumbent on Trawick to allege specific factual allegations regarding how trial counsel's performance was ineffective. During his opening statement, trial counsel detailed the information that would be presented to the jury to support the insanity defense. R. 608-632. Trial counsel presented two mental health experts at the guilt phase of the trial, Dr. Kathleen Ronan and Dr. Alan Blotcky. Dr. Ronan, a psychologist on staff at Taylor Hardin Secure Medical Facility, was called as a witness by trial counsel to testify about Trawick's extensive mental health history. R. 915-966. Dr. Ronan, who was familiar with Trawick's voluminous medical file, testified that Trawick began his long history of psychiatric disturbances in 1968 when he struck a female co-worker in the head with a screwdriver and showed symptoms of confusion, memory loss, depression, and anxiety. R. 920-21. Dr. Ronan also told the jury that two years after this incident Trawick was referred to a Birmingham psychologist who made a diagnosis that Trawick was having a paranoid schizophrenic reaction with homicidal impulses. R. 923. This contact with mental health professionals continued unabated until the time of the crime in 1992. Dr. Ronan detailed for the jury that

during this time Trawick periodically received anti-psychotic medication, that Trawick received electric shock therapy while at Hillcrest Hospital, and that Trawick took Depo-Provera, a medication which reduced his sexual urges. R. 915-966. All of the records that Dr. Ronan had reviewed and specifically mentioned in her testimony was admitted into evidence. Supplemental record at 41-95. Dr. Blotcky, a psychologist in private practice in Birmingham, testified that Trawick does not know right from wrong and that he cannot distinguish facts from fantasy. R. 978. During the closing argument, Trawick's counsel argued that the jury find Trawick not guilty by reason of insanity. R. 1029-1037.

This claim is summarily dismissed because it has been insufficiently pleaded. The claim is based on factually unsupported allegations and conclusions. Therefore, Trawick has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), ALA. R. CRIM. P. Trawick has not presented a claim that would establish that trial counsel's performance was outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Nor has Trawick shown that there is a reasonable probability that the result of the trial would have been different.

*See* Tab R-62, pp. 9-13.

On appeal from denial of the Rule 32 petition, the Alabama Court of Criminal Appeals agreed that petitioner's claims of ineffective assistance of counsel were not properly pled. Rejecting petitioner's argument that his Rule 32 petition was sufficiently detailed to merit an evidentiary hearing, the court of appeals wrote:

The appellant's argument is without merit. "A petition is 'meritorious on its face' only if it contains a clear and specific statement of the ground upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a general statement concerning the nature and effect of those facts) . . . sufficient to show that the petition [sic] is

entitled to relief if those facts are true." *Ex parte Clisby*, 501 So. 2d 483, 486 (Ala. 1986). Moreover, the appellant's argument that an abundance of details would have been revealed at the evidentiary hearing is without merit. An evidentiary hearing is required only if the petition is "meritorious on its face." *Alderman v. State*, 647 So. 2d 28, 33 (Ala. Crim. App. 1994).

Tab R-63, p. 7. When the Alabama Supreme Court denied *certiorari* review, this became the final substantive discussion of the resolution of this claim.

In response to the present *habeas* petition, respondents press most vigorously the assertion that petitioner's claim is procedurally defaulted and, thus, cannot be considered on the merits.[15] Petitioner replies to this argument, however, that the purported procedural default grounded on the pleading-specificity requirements of Rules 32.3 and 32.6(b) is neither "independent" nor "adequate," and, in any event, he met the pleading requirements.[16]

---

[15] Alternatively, respondents also seem to assert that the claim was resolved on the merits by the state courts, which is entitled to deference under 28 U.S.C. § 2254(d). It is clear, however, that both the Rule 32 court and the Alabama Court of Criminal Appeals resolved the claim solely on the basis of inadequate pleading under Rule 32.6(b), Ala. R. Crim. P., and never reached the merits of the claim. Absent a determination of a claim "on the merits," § 2254(d) simply does not apply. *Wright v. Secretary for Dept. of Corrections*, 278 F.3d 1245, 1255-56 (11th Cir. 2002) ("In § 2254(d) Congress meant to, and did, mandate deference to state court adjudications on the merits of federal constitutional issues, and a decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed.") *cert. denied,* 538 U.S. 906 (2003); *Ventura v. Attorney General, Fla.*, 419 F.3d 1269, 1286 n.7 (11th Cir. 2005). Because the resolution of this claim rested solely on a procedural ground, there was no adjudication "on the merits," and § 2254(d) does not come into play.

[16] He also contends that the state courts did not expressly rely on this procedural bar, but considered the claim on the merits. If so, this court may also consider the merits of the claim under

A state procedural rule that precludes consideration of the merits of a claim is due to be honored only if it is both "independent" and "adequate." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). These issues are determined by reference to federal, not state, law.

A state procedural rule is "independent" when it "rests solidly on state law," and it "is not intertwined with an interpretation of federal law." *Judd v. Haley* 250 F.3d 1308, 1313 (11th Cir. 2001) (citing and quoting *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)).

A state procedural rule is "adequate" if it is "firmly established and regularly followed." *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005) ("In order to serve as the basis for a procedural bar in federal habeas proceedings, a state rule must be firmly established and regularly followed."); *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996); *Cochran v. Herring*, 43 F.3d 1404, 1408, *modified on reh'g*, 61 F.3d 20 (11th Cir. 1995); *see also Lee v. Kemna*, 534 U.S. 362, 376 (2002). This does not mean that the procedural rule must be applied rigidly in every instance, or that

---

*Harris v. Reed*, 489 U.S. 255 (1989). For the reasons explained in the preceding footnote, however, this court believes that the state courts expressly and exclusively relied on a procedural ground for rejecting the claim, and, thus, *Harris* does not authorize the court to ignore the procedural default and move on to the merits of the claim. *See also Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."), *cert. denied*, 513 U.S. 1061 (1995)

occasional failure to do so eliminates its "adequacy."   Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley* 250 F.3d 1308, 1313 (11th Cir. 2001).

In addition to the foregoing requirements, the "state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim to be considered adequate for the purposes of the procedural default doctrine." *Id.*

The question in this case, therefore, is whether the pleading-specificity requirement of Alabama Rule of Criminal procedure 32.6(b) was *both* "independent," *and* so "firmly established and regularly followed" when the Alabama Court of Criminal Appeals relied upon it to deny consideration of petitioner's claim in January 2002, that it is entitled to deference here.  If so, petitioner can obtain consideration of the merits of the claim only by showing either "cause and prejudice" to excuse the procedural default, or that this court's refusal to consider the claim will result in a "fundamental miscarriage of justice," in the sense that he is factually innocent either of the crime or of the death penalty itself.

First, there can be little question that the pleading-specificity requirement of Rule 32.6(b) is "independent" of federal law; indeed, it is explicitly grounded in the Alabama Rules of Criminal Procedure.  It does not require any reference to federal

62

law, nor does it involve an inevitable interpretation or construction of federal law. Second, it is clear that Alabama courts have regularly followed and applied this requirement of Rule 32.6(b) since well before petitioner's Rule 32 petition was filed in 1998. *See Wilson v. State*, 650 So. 2d 587 (Ala. Crim. App. 1994); *Johnson v. State*, 675 So. 2d 85 (Ala. Crim. App. 1995); *McNair v. State*, 706 So. 2d 828 (Ala. Crim. App. 1997); *Bryant v. State*, 739 So. 2d 1138 (Ala. Crim. App. 1998). The Alabama courts also have consistently applied Rule 32.6(b) in the interim, since petitioner's collateral petition was filed. *See Duncan v. State*, 925 So. 2d 245 (Ala. Crim. App. 2005); *Thomas v. State*, 908 So. 2d 308 (Ala. Crim. App. 2004); *Taylor v. State*, 879 So. 2d 1210 (Ala. Crim. App. 2003); *Burgin v. State*, 857 So. 2d 162 (Ala. Crim. App. 2002). Thus, the rule appears to be "firmly established and regularly followed."

The application of Rule 32.6(b) to this case does not involve some extraordinary use of the rule, nor is it unfairly used here. The requirement that facts supporting a claim be pled with specificity is particularly apt where petitioner does not deny that substantial evidence of his mental-health history was presented to the jury, but, instead, only alleges vaguely that it was not "adequately" investigated and presented. The factual basis for the assertion of inadequacy must be made clear. As the Rule 32 court explained, petitioner is required to allege *what* records trial counsel

failed to obtain and present, *what* information counsel failed to elicit in "sensitive" interviews with petitioner's family members, and *how* counsel failed to adequately prepare petitioner's two psychologists to testify.  Without these specific factual allegations, the respondents have no way of answering the petition, and the courts have no way of assessing what impact, if any, the alleged inadequacies had on the trial's fairness.

This court concludes, therefore, that the procedural default found by the Alabama state courts is both "independent" and "adequate," as those terms are defined by federal law, and due to be honored in this *habeas* proceeding.  The state rule is both "firmly established and regularly followed," and not unfairly applied in this case.  Because petitioner failed to comply with this state procedural rule, the claim is procedurally defaulted and cannot be considered on the merits without a showing by petitioner of either  "cause and prejudice" to excuse the default, or that this court's failure to consider the claim will result in a fundamental miscarriage of justice.

If a petitioner has procedurally defaulted on a constitutional claim, he is barred from litigating it in a federal *habeas corpus* proceeding unless he can show adequate "cause" for, and "actual prejudice" resulting from, the default.  *Wilson v. Jones*, 902 F.2d 923, 925 (11th Cir. 1990); *see also Engle v. Isaac*, 456 U.S. 107 (1982);

*Wainwright v. Sykes*, 433 U.S. 72 (1977).  The "cause *and* prejudice" test of *Engle*

*v. Isaac* and *Wainwright v. Sykes* is in the conjunctive; therefore, petitioner must

prove *both* cause *and* prejudice.  The United States Supreme Court summarized the

"cause" standard in the following manner:

> In *Wainwright v. Sykes*, 433 U.S. 72 (1977), this Court adopted
> the "cause and prejudice" requirement of *Francis v. Henderson, supra*,
> for all petitioners seeking federal habeas relief on constitutional claims
> defaulted in state court.  The *Sykes* Court did not elaborate upon this
> requirement, but rather left open "for resolution in future decisions the
> precise definition of the 'cause-and-prejudice' standard."  433 U.S. at
> 87.  Although more recent decisions likewise have not attempted to
> establish conclusively the contours of the standard, they offer some
> helpful guidance on the question of cause.  In *Reed v. Ross*, 468 U.S. 1
> (1984), the Court explained that although a "tactical" or "intentional"
> decision to forgo a procedural opportunity normally cannot constitute
> cause, *id*. at 13-14, "the failure of counsel to raise a constitutional issue
> reasonably unknown to him is one situation in which the [cause]
> requirement is met."  *Id*. at 14.  The Court later elaborated upon Ross
> and stated that "the existence of cause for a procedural default must
> ordinarily turn on whether the prisoner can show that some objective
> factor external to the defense impeded counsel's efforts to comply with
> the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488
> (1986).  We explained that "a showing that the factual or legal basis for
> a claim was not reasonably available to counsel, . . . would constitute
> cause under this standard."  *Ibid*.  (Citations omitted.)

*Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

Petitioner also must demonstrate that he was prejudiced; he must show "not

merely that the errors . . . created a *possibility* of prejudice, but that they worked to

his *actual* and substantial disadvantage, infecting his entire trial with error of

65

constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

On the other hand, a federal *habeas* court, will consider a procedurally defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent." *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, *Engle*, 456 U.S. at 135, and *Murray*, 477 U.S. at 496).

Here, petitioner has failed to show "cause and prejudice" to excuse his failure to plead this claim more specifically. He has failed to explain what has prevented him from pointing to specific facts showing that his trial counsel's investigation and presentation of evidence relating to his mental-health history was "inadequate." Further, he has not shown how he was prejudiced by the purported inadequacy. Petitioner must allege *and also demonstrate* that the supposed shortcomings of counsel made a difference in his case. Not only has he failed to allege with reasonable specificity how counsel was "inadequate," he has not shown how it made any difference in the outcome of his case. Finally, petitioner also has not alleged any facts, or attempted to make any showing, that he is factually innocent of the brutal murder with which he was charged. It would not be a fundamental miscarriage of

justice to enforce the procedural bar in this case.  This claim, therefore, is due to be denied.

### III(c) — *Inadequate investigation of mitigating circumstances*

Petitioner alleges the following in paragraph 26 of his Second Amended Petition:

> Trial counsel failed to investigate adequately mitigating evidence for Mr. Trawick's sentencing hearing before the jury and judge.  Many mitigating circumstances existed that trial counsel failed to investigate and present.  Mr. Trawick has suffered from a severe mental illness his entire life.  It has been well documented that from an early age, Mr. Trawick has been diagnosed as suffering from paranoid schizophrenia.  Moreover, for the past twenty-five years psychiatrists have attempted to rehabilitate him with many different treatments ranging from anti-psychotic medication to electric shock treatment and even female hormones.  This evidence was not presented by counsel adequately during the penalty phase of Mr. Trawick's trial.  Counsel did not conduct sensitive and detailed interviews with family members such as his mother, his sister, his cousins or his aunts and uncles, or with other witnesses such as childhood friends, who could have provided information about Mr. Trawick's severe and longstanding mental illness and other compelling mitigating evidence.  In addition, counsel failed to secure and present adequately Mr. Trawick's institutional and medical records, including records from correctional facilities, hospitals and from the parole board, documenting his mental illness.  Counsel also failed to prepare adequately independent mental health experts to evaluate, diagnose, and testify about Mr. Trawick's mental illness and other mitigating evidence.  Because of these deficiencies, trial counsel failed to the [sic] show the jury and the judge the severity of Mr. Trawick's mental illness, how longstanding it is, and how it should have been weighed heavily as mitigating evidence.

Petitioner alleged this same claim in virtually identical language at paragraph 11(B)

of his Second Amended Rule 32 Petition in Alabama state court (Tab R-46, pp. 5-6),

with the exception that, in his state petition, he added the allegation that: "But for

counsel's ineffectiveness in this regard, there is a reasonable probability that the

outcome of Mr. Trawick's sentencing hearing before the jury and judge would have

been different." This additional allegation is missing from the federal *habeas*

petition.

In reaching the conclusion that petitioner failed to plead this claim with

sufficient specificity under Rule 32.6(b) of the Alabama Rules of Criminal Procedure,

the Rule 32 court said:

> In paragraph 11(B) of the second amended petition, Trawick
> contends that trial counsel failed to investigate for mitigating evidence
> to present at the sentencing hearing before the jury and the trial judge.
> To support this claim, Trawick lists the same conclusory allegations that
> he made in paragraph 11(A) of the second amended petition.
>
> Trawick's trial counsel began the penalty phase of the trial by
> requesting that the jury consider the portions of Dr. Ronan's and Dr.
> Blotcky's testimony at the guilt phase relevant to sentencing issues. R.
> 1094. Additionally, trial counsel requested that the jury also consider
> the medical records generated by Dr. Miree and Dr. Logue. Trial
> counsel presented the testimony of Dr. James Mays, an assistant
> professor in the school of social work at the University of Alabama. R.
> 1102-1128. Dr. Mays's testimony was based upon his interviews with
> Trawick and of Trawick's family members and from his review of
> Trawick's psychiatric and prison records. Trawick's mother also
> testified at the sentencing phase before the jury. R. 1128-1133. She

stated that she recognized early that her son needed professional psychiatric help because he did not know how to show emotions. R. 1130. The examples she provided were that her son never cried, even when his father died, a person to whom Trawick was very close. Id. Due to her belief that Trawick was emotionally restricted, Mrs. Trawick took him to Dr. Elmore, a child psychiatrist. Id. Trawick's trial counsel did not present additional testimony at the sentencing hearing before the trial judge but the trial judge did consider letters from Gay Trawick, Trawick's wife, and from Trawick himself. R. 1221.

This claim is summarily dismissed because it has been insufficiently pleaded. The claim is based upon unsupported factual allegations and conclusions. In fact, this claim merely restates the same litany of items stated in the previous paragraph. Therefore, Trawick has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule 32.6(b), ALA. R. CRIM. P. Trawick has not presented a claim that would establish that trial counsel's performance was outside, "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Nor has Trawick shown that there is a reasonable probability that the result of the trial would have been different.

Tab R. 62, pp. 13-14. The Alabama Court of Criminal Appeals concluded that consideration of the claim on the merits was barred by petitioner's procedural failure to allege the claim with requisite specificity, as required by Rule 32.6(b). (*See* Tab R. 63, p. 6).

Respondents assert in the instant action that this claim of ineffective assistance of counsel — grounded as it is on the somewhat vague allegation that counsel failed to investigate and present "adequately" mitigating evidence — is procedurally defaulted and cannot be considered on the merits. For all the reasons explained in the

preceding section of this opinion, the court finds that Rule 32.6(b)'s specificity requirement is an "independent" and "adequate" state procedural rule for purposes of the procedural-default doctrine, and that petitioner procedurally defaulted this claim by failing to plead it with the necessary specificity in state court.   As demonstrated in this case, the Alabama rule is more than mere semantics or hyper-technical.   Petitioner acknowledges that his attorneys investigated and presented extensive mental-health evidence as mitigating circumstances.  He alleges facilely that they simply failed to do so "adequately," without ever attempting to identify specific facts showing faults or shortcomings in either their investigation or presentation of this evidence.  Without some factually explicit explanation of what his attorneys did, or failed to do, that made their representation "inadequate," courts analyzing such claims are placed in the very position that *Strickland v. Washington*, 466 U.S. 668 (1984), says they must avoid; that is, second-guessing the decisions of counsel after the fact.  *Strickland* very clearly mandates that courts are to presume that the actions of counsel were reasonable, and that court review of counsel's representation should be "highly deferential."  *Id*. at 689; *Jones v. Campbell*, 436 F. 3d 1285, 1293 (11th Cir. 2006).  Absent some clear explanation by petitioner about how his attorneys "inadequately" investigated and presented mitigating evidence — something more and different from what they, in fact, did — the court may not

70

speculate about the factual basis of the claim.  Consequently, the failure to plead such a claim with factual specificity undermines the very heart of the *Strickland* analysis. Simply put, there is no *Strickland* claim for the court to consider when the petitioner fails to plead sufficiently the facts underlying his assertion that counsel failed to do something "adequately."  Such an assertion simply is too vague to state a *Strickland* claim.

Having found that this claim is procedurally defaulted, petitioner may obtain consideration of it on the merits only if he can show "cause and prejudice" to excuse the default, or that refusal to consider the claim would result in a fundamental miscarriage of justice.  To prove the latter, petitioner must show that he is factually innocent of either the crime or the death sentence, and he has not attempted either. Petitioner also has not attempted to show "cause and prejudice" to excuse the default. Consequently, the court finds that this claim is due to be denied as procedurally defaulted.

**III(d)** — *Failure to investigate and object to gender discrimination in jury selection*

Petitioner alleges at paragraph 27 of the Second Amended Petition that his lawyers rendered constitutionally ineffective assistance because they failed to object

to discrimination against women by the State's prosecutors when exercising jury strikes.[17]  Paragraph 27 states:

> Trial counsel failed to object adequately to the state's gender discrimination in its use of peremptory challenges. *J.E.B.*, 511 U.S. 127. Counsel should have argued that a prima facie case of discrimination existed.  Counsel should have argued that the fact that the prosecution used eleven of its fourteen peremptory strikes against women was sufficient to show a prima facie case under state and federal law.  *See Allen v. State*, 659 So. 2d 135 (Ala. Crim. App. 1994) (remand required where state used eleven of fifteen peremptory strikes against men). Counsel should also have argued that there was a prima facie case because the prosecution used *all* of its first seven strikes against women. *See Ex parte Jackson*, 516 So. 2d 768, 773 (Ala. 1986) (Houston, J., concurring in result) (pattern indicating systematic exclusion shown by fact that ten out of first eleven strikes used against blacks).  Counsel should also have argued that the prosecutors in Jefferson County have a history of discriminatory jury selection.  *See, e.g., Ex parte Bankhead*, 625 So. 2d 1146 (Ala. 1993) (reversing capital conviction from Jefferson County because of *Batson* violation); *Ex parte Williams*, 571 So. 2d 987 (Ala. 1990) (reversing conviction from Jefferson County because of *Batson* violation); *Miesner v. State*, 665 So. 2d 978 (Ala. Crim. App. 1995) (reversing conviction from Jefferson County because of *Batson* violation); *Hodge v. State*, 665 So. 2d 959 (Ala. Crim. App. 1995) (affirming  Jefferson County Circuit Court finding a *Batson* violation); *Richmond v. State*, 590 So. 2d 384 (Ala. Crim. App. 1991) (reversing conviction from Jefferson County because of *Batson* violation).  Counsel should also have argued that the prosecution treated male and female venire members differently despite the fact that they shared the same characteristics.  The state's discriminatory use of its peremptory strikes resulted in a predominantly male petit jury of seven men and five women.  There is no question that a prima facie case

---

[17]  As a claim of ineffective assistance of counsel, this claim is distinct from the gender-discrimination/*Batson* claim alleged as Claim I in the Second Amended Petition.

of gender discrimination existed, and counsel was ineffective for failing to make a *J.E.B.* objection.

Petitioner asserted this same claim, *verbatim*, at paragraph 11(C) of his Second Amended Rule 32 petition in state court.  (Tab R. 46, pp 6-8).  The Rule 32 court concluded that this claim of ineffective assistance failed to comply with the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.  The court also noted that petitioner had not "shown that there is a reasonable probability that, if trial counsel had filed an objection based upon *J.E.B. v. Alabama*, 511 U.S. 127 (1994), the result of the trial would have been different."  (Tab R. 62, pp 14-17).  The Alabama Court of Criminal Appeals agreed, and concluded further that this claim was barred from consideration by the rule in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000),[18] that there could be no ineffective assistance of counsel if the underlying issue to which counsel failed to object was considered under the plain error rule on direct appeal and found not to be error or objectionable.  (*See* Tab R. 63, pp. 7-8).

The basis of the state courts' decision on this claim of ineffective assistance of counsel is not so much a procedural default as it is a finding that petitioner failed to state a claim.  Citing *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), the

---

[18]  *But see Ex Parte Taylor*, ___ So. 2d ___, 2005 WL 2403729 (Ala. 2005), in which the Alabama Supreme Court rejected and overruled the rationale of *Williams*.

state courts concluded that there could be no claim of ineffective assistance based on counsel's failure to object to something that was not objectionable, as found on direct appeal of the case. Certainly, the Alabama Supreme Court considered and rejected on direct appeal petitioner's gender discrimination in jury selection claim, finding that he had failed to show a *prima facie* case of discrimination. That being the case — that is, that no illegal gender discrimination occurred — it could not be said that counsel was ineffective in failing to object to it.

Regardless of whether this court agrees with the state courts' reasoning, or finds that, under federal law, such a rule is not "adequate" for procedural-default purposes, the claim simply is meritless. At the time petitioner's lawyers were striking the jury for his trial, March of 1994, the Supreme Court had yet to extend the race-based rule of *Batson* to gender discrimination in jury selection. That occurred about a month later, on April 19, 1994, when the Supreme Court announced its decision in *J.E.B. v. Alabama*, 511 U.S. 127 (1994). The Sixth Amendment right to effective assistance of counsel assures criminal defendants that they will be represented by competent counsel, not the very best counsel. *See Stone v. Dugger*, 837 F.2d 1477 (11th Cir. 1988). Counsel are not required to be creative, or to anticipate all developments in the law, in order to meet the wide range of competence expected of attorneys. For example, in *Baldwin v. Johnson*, 152 F.3d 1304 (11th Cir. 1998), the

74

Eleventh Circuit held that counsel was not ineffective for failing to anticipate the Supreme Court's decision in *Batson* itself. Similarly, counsel in this case cannot be said to have rendered representation outside the broad range of competence expected for attorneys because they did not anticipate that the Supreme Court would extend the rationale of *Batson* to gender-based jury strikes. Prior to *J.E.B.*, that was a much debated question, and one that arguably could have been decided either way.

Even if counsel could be faulted for failing to make a *J.E.B.* objection in March of 1994, petitioner has not shown any evidence of prejudice from their failure to do so and, thus, cannot prove the second prong of the *Strickland* standard for ineffective assistance of counsel. First, it must be remembered that, even if counsel had made the objection, there is no evidence indicating whether the trial court would have found a *prima facie* showing to require the prosecution to state its gender-neutral reasons for its strikes. This is particularly true in light of the fact that, at the time of the jury selection, the Supreme Court had not announced *J.E.B.* There is no indication suggesting that the trial court itself would have extended *Batson* to gender-based strikes in the absence of a Supreme Court directive to do so. Further, even if the trial court had found a *prima facie* showing of gender-based strikes, the prosecution stated gender-neutral reasons for many of its strikes, as discussed in more detail under Claim I, above. The jury that was seated contained seven men and five

75

women, hardly a gender-skewed jury.  Most importantly, in the context of the

evidence against petitioner, it is inconceivable that a more balanced jury — or even

one dominated by women — would have made a difference in the outcome of either

the finding of guilt or the sentencing recommendation.  In short, there simply is no

reason to believe that counsel's failure to raise a *J.E.B.* objection would have resulted

in any difference in the case, and, thus, petitioner suffered no prejudice.  Compare

*Baldwin v. Johnson*, 152 F.3d 1304 (11th Cir. 1998), where the court of appeals

explained:

> Even if we assume that Baldwin's trial counsel rendered ineffective
> assistance in failing to challenge the prosecutor's use of peremptory
> strikes, Baldwin has not demonstrated any prejudice therefrom.
> Although "[w]e would have more confidence in the verdict had it been
> delivered by a constitutionally composed jury, with both black and white
> members[,]" overwhelming evidence supported Baldwin's conviction in
> this case.  *Jackson v. Herring*, 42 F.3d 1350, 1362 (11th Cir.), cert.
> denied, 515 U.S. 1189, 116 S. Ct. 38, 132 L. Ed. 2d 919 (1995).  Having
> conducted a thorough review of the record, however, "we cannot
> conclude there is a 'reasonable probability that, but for counsel[s'] . . .
> errors, the result of the proceeding would have been different.'"
> *Jackson*, 42 F.3d at 1362 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct.
> 2052) (alteration in original); ....

*Baldwin*, 152 F.3d at 1315-16.  The same is true here.  Consequently, this claim of

ineffective assistance of counsel is due to be denied.

### III(e) — *Failure to adequately challenge statements made to police*

Paragraph 28 of petitioner's Second Amended Petition reads as follows:

76

Trial counsel failed to challenge adequately the constitutionality of the statements obtained by law enforcement officers and used against Mr. Trawick at trial.  The state coerced statements from Mr. Trawick and unconstitutionally used them against him at his capital trial.  Counsel failed to adequately argue that law enforcement officers violated Mr. Trawick's rights under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), because an officer admitted that he continued to interrogate Mr. Trawick after he requested counsel.  (R. 75)  Counsel also failed to adequately argue that law enforcement officers obtained statements from Mr. Trawick by making improper promises to him.  (R. 128); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  Mr. Trawick did not give the statements freely and voluntarily and counsel failed to adequately present evidence and make arguments that the use of these involuntary statements against him violated his right against self-incrimination and his rights to due process and a fair trial.

Petitioner asserted this same claim, *verbatim*, at paragraph 11(D) of his Second Amended Rule 32 Petition in state court.  (Tab R. 46, p. 8).  The Rule 32 court concluded that this claim of ineffective assistance failed to comply with the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, and that the underlying substantive issue had been found meritless on direct appeal.  The Alabama Court of Criminal Appeals agreed, and concluded further that this claim was barred from consideration by the rule in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), that there could be no ineffective assistance of counsel if the underlying issue to which counsel failed to object was considered under the plain error rule on direct appeal and found not to be error or objectionable.  (*See* Tab R. 63, pp. 7-8).

77

For all the reasons explained in earlier sections of this opinion, the court finds that Rule 32.6(b)'s specificity requirement is an "independent" and "adequate" state procedural rule for purposes of the procedural-default doctrine, and that petitioner procedurally defaulted this claim by failing to plead it with the necessary specificity. Without some factually explicit explanation of what his attorneys did or failed to do that made their representation "inadequate," courts analyzing such claims are placed in the very position that *Strickland v. Washington* says they must avoid; that is, second-guessing the decisions of counsel after the fact.  *Strickland* very clearly mandates that courts are to presume that the actions of counsel were reasonable, and that the review of counsel's representation is "highly deferential."  466 U.S. at 689; *see also Jones v. Campbell*, 436 F. 3d 1285, 1293 (11th Cir. 2006).  Petitioner acknowledges that his attorneys sought to suppress the statements (*see* Tab R. 1, pp. 79-87); he merely contends they did not do so "adequately," without attempting to explain the nature of that inadequacy.  Absent some clear explanation by petitioner as to exactly how his attorneys "inadequately" challenged the statements petitioner made to law enforcement officers — something more and different from what his attorneys, in fact, did — the court may not speculate about the factual basis of the claim.  Consequently, the failure to plead such a claim with factual specificity undermines the very heart of the *Strickland* analysis.  Simply put, there is no

*Strickland* claim for the court to consider when the petitioner fails to plead sufficiently the facts underlying his assertion that counsel failed to do something "adequately."  It is simply too vague to state a *Strickland* claim.[19]

Having found that this claim is procedurally defaulted, petitioner may obtain consideration of it on the merits only if he can show "cause and prejudice" to excuse the default, or if he shows that this court's refusal to consider the claim would result in a fundamental miscarriage of justice.  To prove the latter, petitioner must show that he is factually innocent of either the crime or the death sentence, but he has not attempted to show either.  Petitioner also has not attempted to show "cause and prejudice" to excuse the default.  Consequently, the court finds that this claim is due to be denied as procedurally defaulted.

### III(f) — *Failure to examine adequately state mental-health expert*

At paragraph 29 of his Second Amended Petition, petitioner alleges that:

Trial counsel inadequately examined the state's witnesses including but not limited to the state's mental health expert Kathleen Ronan.  (R. 955-

---

[19]  The court has no occasion to consider whether the rule stated in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), is "adequate" under federal law to form the basis of a procedural default, and the court expresses no opinion on that point.  However, for the same reasons expressed in *Ex parte Taylor*, ___ So. 2d ___, 2005 WL 2403729 (Ala. 2005), the court has concerns whether the *Williams* rule, even if still the law in Alabama, is "adequate" as a basis for a procedural default.

962) Counsel should have cross examined Kathleen Ronan,[20] for example, to bring out facts about Mr. Trawick's mental illness and life history that would have proven that mitigating circumstances existed. Because of these deficiencies, trial counsel failed to show the jury and the judge the severity of Mr. Trawick's mental illness, how longstanding it is, and how it should have been weighed heavily as mitigating evidence.

Petitioner asserted this same claim, *verbatim*, at paragraph 11(E) of his Second Amended Rule 32 Petition in state court. (Tab R. 46, p. 8-9). The Rule 32 court concluded that this claim of ineffective assistance also failed to comply with the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, and the Alabama Court of Criminal Appeals agreed. (Tab R. 63, p. 5).

For all the reasons explained in the preceding sections, the court finds that Rule 32.6(b)'s specificity requirement is an "independent" and "adequate" state procedural rule for purposes of the procedural-default doctrine, and that petitioner procedurally defaulted this claim by failing to plead it with the necessary specificity. Without some factually explicit explanation of what his attorneys did or failed to do that made their representation "inadequate," courts analyzing such claims are placed in the very

---

[20] This claim is somewhat confusing. Dr. Ronan was the Certified Forensic Examiner employed at the state's Taylor Hardin Secure Medical Facility who evaluated petitioner and filed a report concerning his competence to stand trial. Petitioner's attorneys called Dr. Ronan as an adverse witness during their defense case. The instant claim of ineffective assistance does not question the decision to call Dr. Ronan as a witness, but, instead, asserts that petitioner's trial attorneys were ineffective because they failed to cross-examine her "adequately."

position that *Strickland v. Washington* says they must avoid; that is, second-guessing the decisions of counsel after the fact.  *Strickland* very clearly mandates that courts are to presume that the actions of counsel were reasonable, and that the review of counsel's representation is "highly deferential."  466 U.S. at 689; *see also Jones v. Campbell*, 436 F. 3d 1285, 1293 (11th Cir. 2006).  Petitioner acknowledges that his attorneys examined Ronan; he merely contends they did not do so "adequately," without attempting to explain the nature of that inadequacy.  Absent some clear explanation by petitioner about how his attorneys "inadequately" questioned Ronan about petitioner's mental health — something more and different from what they, in fact, did — the court may not speculate about the factual basis of the claim.  Consequently, the failure to plead such a claim with factual specificity undermines the very heart of the *Strickland* analysis.  Simply put, there is no *Strickland* claim for the court to consider when the petitioner fails to plead sufficiently the facts underlying his assertion that counsel failed to do something "adequately."  It is simply too vague to state a *Strickland* claim.

Having found that this claim is procedurally defaulted, petitioner may obtain consideration of it on the merits only if he can show "cause and prejudice" to excuse the default, or if he shows that refusal to consider the claim would result in a fundamental miscarriage of justice.  To prove the latter, petitioner must show that he

81

is factually innocent of either the crime or the death sentence, and he has not attempted to show either.  Petitioner also has not attempted to show "cause and prejudice" to excuse the default.  Consequently, the court finds that this claim is due to be denied as procedurally defaulted.

**III(g)** — *Failure to object adequately to inflammatory photographs*

Paragraph 30 of the Second Amended Petition alleges the following:

> Trial counsel failed to object adequately to the introduction of improper evidence, particularly inflammatory photographs.  Photographs or videotapes that serve little or no purpose except to arouse the passion, prejudice, or sympathy of the jury should be excluded from evidence.  At trial, the state introduced autopsy slides and other pictures of the victim after she was killed.  (R. 662-63, 897-903) Showing the jury these slides and pictures seriously prejudiced Mr. Trawick, and trial counsel failed to object adequately to them.  Counsel should have argued that photographs that "serve little or no purpose except to arouse the passion, prejudice, or sympathy of the jury" should be excluded from the evidence.  *Ott v. Smith* 413 So. 2d 1129, 1132 (Ala. 1982).  Counsel should also have argued that the photographs that are more prejudicial than probative cannot be admitted at trial.  *Caylor v. State*, 353 So. 2d 8 (Ala. Crim. App. 1977).  Counsel should also have argued that the introduction of cumulative and prejudicial photographs is not only a violation of state law, but that it also infringes on Mr. Trawick's rights to due process and a fair trial.  *Futch v. Dugger*, 874 F. 2d 1483, 1487 (11th Cir. 1989).

Petitioner asserted this same claim, *verbatim*, at paragraph 11(F) of his Second Amended Petition under Rule 32 of the Alabama Rules of Criminal Procedure.  (Tab R. 46, p. 9).  The Rule 32 court concluded that this claim of ineffective assistance also

failed to comply with the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.  The Alabama Court of Criminal Appeals agreed and concluded that this claim was barred from consideration by the rule in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), that there could be no ineffective assistance of counsel if the underlying issue to which counsel failed to object was considered under the plain error rule on direct appeal and found not to be error or objectionable.  (*See* Tab R. 63, pp. 5-6).

Unlike the issues discussed in preceding sections, where petitioner simply left the court in the dark about what he contends trial counsel should have done better or differently, here he specifically states that counsel's objection to the allegedly inflammatory photographs was "inadequate" because counsel failed to argue that the photographs lacked any purpose other than to arouse passion and prejudice, and that the probative value of the photographs was outweighed by the prejudice they caused. He also notes that counsel's objection was "inadequate" because it did not invoke petitioner's constitutional rights to due process and a fair trial, in addition to state rules-of-evidence grounds.  Thus, this court has a more difficult time agreeing with the state courts' conclusion that this ground failed to meet the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, or that such was an "adequate" and "independent" state-law ground for disposing of

83

the claim.  For purposes of applying the procedural-default doctrine, this court cannot say that the state-court resolution of this claim was "adequate" under federal law.

Nevertheless, turning to the merits of the claim, petitioner's claim of ineffective assistance on this basis is meritless.  As explained previously, the standard for assessing ineffective assistance of counsel under *Strickland v. Washington* is highly deferential to counsel's trial decisions.  It must be shown that no competent attorney would have made the same choice or mistake under the circumstances, and that the professionally unreasonable error by counsel prejudiced the defense.  In this case, counsel's failure to object to the introduction of the photographs identified by the petitioner caused no prejudice to the defense because the photographs were properly admissible.

Although the actual photographs are not part of the record presented to this court, they are adequately described in the testimony found in the record.  Beginning at page 652 in the trial transcript, a police detective described various photographs of the crime scene, leading up to Exhibits 7 through 11, all of which are photographs of the condition and positioning of the victim's body as it was found at the crime scene.  Plainly, such photographs, while undoubtedly lurid, had real evidentiary value, and were not offered merely to arouse the passion and prejudice of the jury.  Similarly, beginning at page 897 of the trial transcript, Exhibits 39 through 47 were

offered and displayed to the jury.  These exhibits were photographs taken by the medical examiner before and during the autopsy of the victim.  As with the earlier photographs, these had true evidentiary value by portraying the victim's wounds and cause of death.[21]  Although counsel did not object to the introduction of either set of photographs, their admission was not improper, and did not deprive the petitioner of due process or a fair trial.  Such photographs are common evidence in murder prosecutions.  There simply is no indication that this limited number of photographs was offered for anything other than legitimate evidence.  Defense counsel therefore were not ineffective for failing to object to their admission.

> **III(h)** — *Failure to object adequately to proceedings outside the petitioner's presence*

---

[21] Photographs of a crime victim taken after the alleged homicide or assault, such as autopsy photographs, *can be* extremely prejudicial.  Nevertheless, they are admissible if they tend to illustrate or elucidate some relevant issue, such as "the identity of the victim, the manner of death, the murder weapon," *United States v. DeParias*, 805 F.2d 1447, 1453 (11th Cir. 1986) ("Photographs of homicide victims are relevant in showing the identity of the victim, the manner of death, the murder weapon, or any other element of the crime."), or if they corroborate (or dispute) other evidence in the case. *Id.* (approving admission of photographs of badly decomposed body of murder victim for the reason, among others, that they corroborated the testimony of a witness "whose credibility was central to the government's case").

The "gruesomeness" of a photograph becomes objectionable only when there is distortion of two kinds:  (1) *distortion of the subject matter*, as where necrotic or other surgery causes exposure of nonprobative views (*e.g.*, massive mutilation); or (2) *focal or prismatic distortion*, where the position of the camera *vis-a-vis* the scene or object to be shown gives an incongruous result (*e.g.*, a magnification of wound to eight times its true size). *See, e.g.*, *Acklin v. State*, 790 So.2d 975, 997-98 (Ala. Crim. App. 2000); *Wesley v. State*, 32 Ala. App. 383, 26 So. 2d 413 (Ala. Ct. App. 1946). *See also* II Charles W. Gamble, McElroy's Alabama Evidence § 207.01(2), at 1023 (5th ed. 1996) (collecting cases).

At paragraph 31 of the Second Amended Petition, petitioner alleged that counsel was ineffective because they failed to object to two pretrial hearings "during which the parties outlined the case against Mr. Trawick" and "discussed the admissibility of parts of Mr. Trawick's statement." He specifically identifies these proceedings as occurring at pages 142 and 161 of the trial transcript.

Petitioner asserted this same claim, *verbatim*, at paragraph 11(G) of his Second Amended Petition under Rule 32 of the Alabama Rules of Criminal Procedure. (Tab R. 46, pp. 9-10). The Rule 32 court concluded that this claim of ineffective assistance was barred from review under the reasoning in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), because the underlying issue had been considered on direct appeal under the plain error rule and found meritless. The court reasoned that there could be no ineffective assistance of counsel if the basis for counsel's failure to object was not error or objectionable. The Alabama Court of Criminal Appeals agreed. (Tab R. 63, pp. 5-6).

Regardless of whether this court finds the grounds enunciated by the Alabama Court of Criminal Appeals to be "adequate" under federal law for purposes of procedural default, this claim is meritless. The transcript of proceedings shows that the trial court conducted a pretrial motions hearing, beginning at page 138 and continuing to page 181, at which the petitioner was present the entire time. At pages

86

141 and 162, the trial court acknowledged that the attorneys met with the court in conference before the hearing, and that petitioner was not present during that conference. The trial judge described the conference this way:

> THE COURT: Mr. Trawick, I won't ask you to say anything but I would like to tell you that we talked — Ms. Petro is here and Mr. Russell, the prosecution team, Mr. Del Grosso is here and Mr. Walker was here and we talked for a few minutes before you were brought down from the jail facility and had an informal discussion and it was very productive in terms of outlining what one might expect the trial to concern in terms of time, and so forth.
>
> What we will do now on the record is somewhat rehash what was said summarily just a few minutes ago. I have got my court file here and I see on the 15th of February Mr. Del Grosso and Mr. Walker filed a motion to call Dr. Ronan as an adverse witness. There's no problem with that. I would prefer to call her a Court's witness, but you may cross-examine Dr. Ronan, as the state may.

(Tab R. 6, p. 142). Later in the same hearing, still with petitioner present, the trial judge stated:

> THE COURT: Let's go to the statement. We talked, Mr. Trawick, at some length, much of our discussion we discussed the concept of redaction or elimination of what the Court might deem to be inadmissible evidence. That means that would apply essentially, most significantly, to the statements made prior to the 29th of October, starting at 11:42 in the morning, I think. Many of your comments to the officers included remarks about collateral offenses. So, to cut this to the essence of what I want to say, Mr. Russell and Ms. Petro have adopted the strategy of going straight to the statement of the 29th of October at 11:42 in the morning. And even that statement has a point that — paragraph or so that should be redacted. That's cured, though, by the State has

elected [sic] in their case in chief to go to the taped portion of the afternoon session only, is that right, Don?

      MR. RUSSELL: Yes, sir.

(Tab R. 6, pp. 161-162).

The constitutional right to be present during all critical stages of trial arises from the Sixth Amendment right to confront one's accusers. *See United States v. Vasquez*, 732 F.2d 846 (11th Cir. 1984). "The confrontation clause guarantees the accused the right to be present in the courtroom at every stage of his trial." *Id*. at 848; *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *Lewis v. United States*, 146 U.S. 370 (1892).

Nevertheless, that right does not extend to in-chambers conferences involving the judge and lawyers and dealing with legal or trial-management issues. In *United States v. Vasquez*, 732 F.2d 846 (11th Cir. 1984), the Eleventh Circuit rejected a similar claim where the scope of the defendant's cross examination by the prosecution was discussed with counsel, but not defendant, during a chambers conference. The Court wrote:

> The right to be present at every stage of trial does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed. *See United States v. Howell*, 514 F.2d 710, 714 (5th Cir.), cert. denied, 423 U.S. 914, 96 S. Ct. 220, 46 L. Ed. 2d 143 (1975). In *Howell*, the Court stated that

the defendant had no right to be present at a conference with the judge and a juror on the subject of the attempted bribery of the juror, or at an *in camera* conference with the judge and all counsel in the case at which the earlier conference was discussed. *Id.* The Court concluded that these *in camera* conferences were not critical stages in the trial proceedings and therefore the defendant had no right to be present. *Id.*; *see also United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir. 1971), cert. denied, 405 U.S. 922, 92 S. Ct. 959, 30 L. Ed. 2d 793 (1972) (defendant has no right to be present at *in camera* conference on evidentiary matters when his lawyer was present at the conference). Similarly, we conclude that a bench conference, attended by appellant's counsel and called to discuss an evidentiary matter relative to appellant's own cross-examination, is not a critical stage of the trial proceedings at which appellant has a right to be present.

*Vasquez*, 732 F.2d at 848-849. *See also In re Shriner,* 735 F.2d 1236, 1241 (11th Cir. 1984) ("Shriner had no constitutional right to be present at the bench during conferences that involved purely legal matters, nor does the absence of recorded bench conferences constitute a constitutional deprivation unless it renders our review impossible.") (citation omitted).

The conference described in the record of this case was similar to that in *Vasquez*. The trial court judge met with counsel while waiting for petitioner to be brought to the courtroom by deputies, and discussed such administrative matters as how long the trial would take, the sequence of witnesses, and the proper redaction of a statement by the petitioner to be offered by the prosecution.[22]   Although the

---

[22] The admissibility of the statement already had been resolved by a ruling on petitioner's motion to suppress the statement.  The conference dealt with the separate evidentiary question of

conference dealt with evidentiary matters, it was not a critical stage of the trial.   No

evidentiary rulings were made, although counsel reached agreement about certain

evidentiary disputes.   In any event, all of the matters discussed in the conference were

then "rehashed" on the record with the petitioner present.   In the end, there simply

was no violation of petitioner's Sixth Amendment confrontation right.   Consequently,

counsel's failure to object to the conference was not ineffective assistance.

> **III(i)** — *Failure to object adequately to court's failure to transcribe bench conferences*

At paragraph 32 of the Second Amended Petition, petitioner alleges that:

> Trial counsel failed to object adequately to the trial court's failure to transcribe all of the proceedings.   At Mr. Trawick's trial, crucial bench conferences were not transcribed, (R. 293, 727, 967), and there is no transcript of Mr. Trawick's confession that was admitted into evidence, (R. 728, 737).   Trial counsel should have objected to the failure to transcribe all proceedings.

Petitioner asserted this same claim, *verbatim*, at paragraph 11(H) of his Second

Amended Petition under Rule 32 of the Alabama Rules of Criminal Procedure.   (Tab

R. 46, p. 10).   The Rule 32 court concluded that this claim of ineffective assistance

also failed to comply with the pleading and specificity requirements of Rules 32.3 and

32.6(b) of the Alabama Rules of Criminal Procedure, and the Alabama Court of

Criminal Appeals agreed.   (Tab R. 63, p. 5).

---

eliminating arguably irrelevant and prejudicial parts of the statements.

Regardless of whether this court finds the grounds enunciated by the Alabama Court of Criminal Appeals to be "adequate" under federal law for purposes of procedural default, this claim is meritless.   The failure to transcribe bench conferences results in a constitutional violation only if it hinders the defendant's right to appellate review.   *In re Shriner,* 735 F.2d at 1241 ("[T]he absence of recorded bench conference [does not] constitute a constitutional deprivation unless it renders [appellate] review impossible.").  The function of the transcript is to provide a record for appellate review.  Thus, petitioner must establish that the failure to record these conferences deprived him of meaningful appellate review, and he simply has not shown that. None of the bench conferences at the pages specifically identified by petitioner resulted in any prejudice to his right to a fair trial.  As a result, counsel's failure to object to the off-the-record proceedings was not ineffective assistance of counsel.

At page 293, during the *voir dire* of the jury pool, lawyers were asking prospective jurors about the sex and ages of their children.  The following transpired:

> THE COURT: Let me ask you a question, Kitt [one of the defense lawyers].  Don [one of the prosecutors], come up here, please.
>
> (Whereupon, the attorneys approached the bench and there was a brief off-the-record discussion out of the hearing of the reporter,

> after which the following was had and done
> before court and jury:)
>
> THE COURT: What we were talking about, to save a lot of
> time, at some point I will ask you each to write your name on a little
> piece of scratch paper and just tell us about the kids' ages and gender,
> if you will. And that will save us a whole lot of time.

(Tab R. 7, pp. 293-294). Here, the subject of the bench conference is reported immediately afterward. The court simply discussed with counsel a quicker procedure for obtaining information about the gender and age of the prospective jurors' children. The subject of the conference was so innocuous, and so readily apparent, that the absence of a transcript of it did not deprive petitioner of meaningful appellate review, nor was counsel ineffective for failing to object to the lack of a transcript.

At pages 966 and 967 of the trial transcript, Dr. Kathleen Ronan, a Certified Forensic Examiner employed by the State, but called as an adverse witness by the defense, was being cross-examined by the prosecutor about her written report on the petitioner's competency to stand trial when the following transpired:

> Q.    Let me ask you this: Dr. Ronan, in your summary and
> recommendations at the bottom of page twenty-seven in that statement
> down there, is that what Jack Trawick told you? That entire paragraph
> starting at the bottom of the page, summary and recommendation.
>
> A.    He reported —
>
> MR. DEL GROSSO:    I would ask —

THE COURT: Yes, we have got to talk about that.  If you want to go into this in detail we can talk about it.

(Whereupon, the attorneys approached the bench and there was a brief off-the-record discussion out of the hearing of the reporter, after which the following was had and done before court and jury:)

THE COURT: Any other questions of Dr. Ronan?

MR. RUSSELL: No other questions.

MR. DEL GROSSO: No questions.

(Tab R. 11, pp. 966-968).  Although the record does not disclose the words spoken during the bench conference, it is obvious that the discussion benefitted petitioner by precluding the prosecution from going into certain statements petitioner had made to Dr. Ronan during her evaluation of him.[23]  Far from prejudicing petitioner's right to a fair trial, the off-the-record conference benefitted him; and, thus, counsel's failure to object to the absence of a transcript was not ineffective assistance of counsel.

Finally, at pages 727, 728, and 737, the prosecution offered into evidence two *tape-recorded* statements made by the petitioner during police questioning.  While

---

[23]  At page 27 of Dr. Ronan's evaluation report, she stated, "Mr. Trawick did report that if he is convicted and given a life without parole sentence, he will harm or kill a DOC [Department of Corrections] staff in order to get the death sentence."  See Supplemental Record on Appeal, Vol. 2, p. 321.  The off-the-record conference prevented the prosecution from bringing out this statement.  Although the transcript does not reveal what was said during the bench conference, it is obvious that counsel objected to the prosecution revealing this statement, at least during the guilt phase of the trial, and the trial court sustained it.

93

the tape recordings were played to the jury, the court reporter did not attempt to transcribe them.  Both of the actual tape recordings, however, were made part of the record for appellate review purposes as trial Exhibits 56 and 57.  (*See* Tab. R. 10, pp. 724-728 and 734-737).  Plainly, the lack of a transcript of the contents of the recordings did not deprive petitioner of a full, fair, and meaningful appellate review, because the actual tapes were part of the record.  Instead of the court reporter attempting to transcribe the tapes as they played, subject to all the errors of transcription that can occur, the original recordings were simply made exhibits.  This preserved petitioner's right to appeal, and counsel was not ineffective for failing to object to the court not ordering the court reporter to take down the contents of the recordings as they played.

> **III(j)** — *Failure to object adequately to prejudicial comments by prosecutor*

The Second Amended Petition for writ of *habeas corpus* alleges at paragraph 33 that:

> Trial counsel failed to object adequately to a variety of prosecutorial comments and actions which deprived Mr. Trawick of a fair trial and sentencing.  For example, at the suppression hearing, the prosecutors on more than one occasion resorted blatantly to leading their witnesses in order to establish the admissibility of Mr. Trawick's statements. (R. 74-75) In addition, the prosecutors deprived Mr. Trawick of a fair trial by insisting that the jury focus not on the defendant's culpability but rather on the victim's death.  Twice during closing arguments the prosecutor

exhorted the jury not to forget her, (R. 1025), and to "think of her, think of this young girl and what she went through before she died at his hands." (R. 1028)  Remarks as to suffering undergone by the victim were certainly calculated to inflame the jury.  The prosecutors also denied Mr. Trawick his rights to due process and a fair trial.  Mr. Trawick's lawyers failed to object adequately to those instances of prosecutorial misconduct.

This claim was raised, *verbatim*, in paragraph 11(I) of the petitioner's Second Amended Rule 32 petition, and apparently resolved on the merits without an evidentiary hearing.  (Tab R. 46, p. 10).  The Alabama Court of Criminal Appeals commented:  "The trial court also found to be without merit the appellant's argument that trial counsel was ineffective for failing to raise the issue of prosecutorial misconduct."  (Tab R. 63, p. 6).

On appeal from denial of Rule 32 relief, the Alabama Court of Criminal Appeals wrote the following about this claim:

> The appellant argues that the trial court erred in rejecting one of his  ineffective assistance of counsel claims on the merits without conducting an evidentiary hearing.  Specifically, he argues that counsel's failure to adequately object to prosecutorial misconduct which included "leading their witnesses in order to establish the admissibility of Mr. Trawick's statements", [sic] and "exhorting the jury not to forget [the victim], and to 'think of her, think of this young girl and what she went through before she died at his hands.'"

> The trial court, in denying the claim, [sic] on its merits stated:

> "[T]he part of the transcript referenced by Trawick, [T]R. 74-75, does not support the allegation that the prosecutor

95

was 'blatantly leading' Lt. Greene in order to establish the admissibility of Trawick's statements.    Rather, the prosecutor is reading from Trawick's second statement taken by Lt. Greene to show the chronology of events when Trawick asked for counsel which stopped the interrogation. [T]R. 74-75.    The prosecutor was not asking leading questions as Trawick's second amended Rule 32 petition incorrectly asserts.

* * *

"Trawick has not established that trial counsel's failure to make a 'leading the witness' objection constituted deficient performance or that he was prejudiced by trial counsel's performance.    Nor has he shown that trial counsel's performance was outside 'the wide range  or [sic] reasonable professional assistance,' *Strickland*, 466 U.S. at 689, or that there is a reasonable probability that, if trial counsel had made these objections, the result of the trial would have been different."

Additionally, the record reveals that the trial court found that trial counsel objected and moved for a mistrial in response to the prosecutor's statement in closing argument to never "forget" the victim. In response to the prosecutor's argument admonishing the jury to remember the victim's suffering prior to her death, the trial court stated as follows:

"'A prosecutor's statement must be viewed in the context of all the evidence presented and in the context of the complete closing arguments to the jury.' *Roberts v. State*, 735 So. 2d 1244, 1253 (Ala. Crim. App. 1997), aff'd 735 So. 2d 1270 (Ala.).  Moreover, 'statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' *Bankhead v, State*,

96

> 585 So. 2d 97, 106 (Ala. Crim. App. 1989).  In addition,
> this court instructed the jury before the lawyers began their
> closing  arguments  that  'what  counsel  says  is  not
> evidence.'"

Additionally, the trial court found that the appellant had failed to meet
the two prongs of *Strickland v. Washington*, 466 U.S. 668 (1984), i.e.,
that counsel's performance was deficient and that he was prejudiced
thereby, because the prosecutor's remarks were not inappropriate, and
merely "a comment on the horrible crime and what the victim must have
suffered."

> Because the trial court presided over both the appellant's Rule 32
> hearing and his trial, and made detailed findings of fact denying the
> claim on the merits, an evidentiary hearing was not required for a
> resolution of this claim.  See *Ex parte Hill*, 591 So. 2d 462, 463 (Ala.
> 1991) ("[A] judge who presided over the trial or other proceedings and
> observed the conduct of the attorney at the trial or other proceeding need
> not hold a hearing on the effectiveness of those attorneys based upon
> conduct he observed.")

(Tab R. 63, pp. 10-12).

Because the state courts resolved this claim on the merits, the determination

made by them is entitled to deference under 28 U.S.C. § 2254(d), unless it is clearly

contrary to, or an unreasonable application of, Supreme Court precedent.  *See*

*Williams v. Taylor*,  529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133,

(2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223,

1241 (11th Cir. 2001).  "[A] state court's factual determinations are presumed correct

unless rebutted by clear and convincing evidence."  *McNair v. Campbell*, 416 F.3d

1291 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)),  *cert. denied,* 126 S. Ct. 1828

(2006).  This standard of review is strict, and federal courts are required to give

"greater deference to the determinations made by state courts than they were required

to under the previous law." *Verser v. Nelson*, 980 F. Supp. 280, 284 (N.D. Ill. 1997)

(quoting *Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th Cir. 1997)).

Having reviewed the record, and particularly those portions cited by petitioner,

this court cannot say that the determination made by the state courts is either contrary

to, or an unreasonable application of, Supreme Court precedent.  The court also

agrees that no evidentiary hearing was necessary to resolve the claim, because the

alleged instances of prosecutorial misconduct were recorded plainly in the record.

Whether they constituted true misconduct could be judged from the record, and there

was no need to examine facts outside the record.  Thus, the fact-finding was not

unreasonable.

The state courts found that there was no objectionable misconduct by the

prosecution, or at least misconduct that had any significant impact on the fairness or

outcome of the trial.  That being the case, counsel's failure to object to the alleged

instances of misconduct was either not professionally unreasonable, or resulted in no

prejudice under the *Strickland* test.  Petitioner is entitled to no relief on this claim.

**III(k)** — *Failure to request adequately certain jury instructions*

98

At paragraph 34 of the Second Amended Petition, petitioner alleged that trial counsel rendered ineffective assistance because they failed to request "adequately" certain jury instructions regarding the definition of "reasonable doubt," the definition of "clear and convincing evidence," the consequences of a "not guilty by reason of mental disease or defect" verdict, and the lesser-included offense of non-capital murder.  Paragraph 34 reads:

> Trial counsel failed to request adequately jury instructions regarding the proper definitions of reasonable doubt and clear and convincing standards.  Because of this, the trial court never gave the jury a definition of clear and convincing evidence, and failed to inform the jury that clear and convincing evidence is a lower standard than reasonable doubt.  That is, the trial court never adequately explained Mr. Trawick's burden to the jury, and never even told the jury that his burden of proof was lower than the state's.  Counsel also failed to request an instruction as to the consequences of a not guilty verdict — that if Mr. Trawick were acquitted by reason of mental disease or defect, the state would immediately commence commitment proceedings to confine Mr. Trawick to a psychiatric hospital.  Counsel also failed to request an instruction on the lesser included offense of non-capital murder.

This same claim was presented, *verbatim*, at paragraph 11(J) of the Second Amended Rule 32 Petition.  (Tab R. 46, pp. 10-11).  The Rule 32 court concluded that this claim of ineffective assistance failed to comply with the pleading and specificity requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. The Alabama Court of Criminal Appeals agreed, and concluded further that the claim was barred from consideration by the rule in *Williams v. State*, 783 So. 2d 108 (Ala.

99

Crim. App. 2000): *i.e.*, there could be no ineffective assistance of counsel if the underlying issue on which counsel failed to object was considered under the plain-error rule on direct appeal and found not to be error or objectionable. (*See* Tab R. 63, pp. 5-6).

Regardless of whether this court finds the grounds enunciated by the Alabama Court of Criminal Appeals to be "adequate" under federal law for purposes of procedural default, this claim is meritless. On direct appeal, the Alabama Supreme Court addressed some of the questions raised concerning jury instructions this way:

> Trawick next raises a series of issues challenging the propriety of several instructions the trial court gave the jury. We note from the outset that these issues are raised for the first time in Trawick's brief to this Court; they were not preserved before the trial court. We therefore review these issues only within the confines of the plain error rule, and we again note that this rule is to be applied to correct errors solely in those circumstances in which a miscarriage of justice would otherwise result. *Ex parte Taylor*, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S. Ct. 928, 133 L. Ed. 2d 856 (1996).

> Trawick argues that the trial court failed to properly instruct the jurors that he was required to prove by "clear and convincing evidence" his defense of not guilty by reason of mental disease or defect. Trawick contends that this failure left the jury to believe that he had to meet the higher standard of proving his mental disease or defect beyond a reasonable doubt and thus sabotaged his defense.

> The record shows that the trial court gave the following jury instruction as to Trawick's defense of not guilty by reason of mental disease or defect:

"By entering his plea of not guilty by reason of severe mental disease or defect, the defendant does assume the burden of proving by clear and convincing evidence to the reasonable satisfaction of you jurors, one, that at the time of the commission of the alleged acts constituting all or essential elements of the crime for which he is charged, that he was suffering from a severe mental disease or defect. And two, that as a result of such severe mental disease or defect, he either was unable to appreciate the nature and quality of his acts or was unable to appreciate the wrongfulness of his acts.

"Whether or not the defendant was suffering from such severe mental disease or defect is for you people to determine from all of the evidence to your reasonable satisfaction. In making the determination of whether or not defendant Trawick here, at the time of the commission of the crime charged, was unable to appreciate the nature and quality or wrongfulness of his acts, the law provides some guidance to you in this respect.

"The phrase 'severe mental disease or defect' does not include an abnormality of the mind which is manifested only by repeated criminal or otherwise antisocial conduct. That is to say this: any repeated criminal or other antisocial conduct of the defendant standing alone does not constitute sufficient evidence that he suffered from a severe mental disease or defect."

We note that the instruction in the *Alabama Pattern Jury Instructions: Criminal*[,] defining the defense of mental disease or defect[,] does not contain any definition of the clear and convincing evidence standard to be applied in cases where the defendant asserts that defense. The instruction set out above is, in essence, the same as the pattern instruction as to the defense of mental disease or defect that is contained in the *Alabama Pattern Jury Instructions*. Taken as a whole, the instructions given by the trial court properly defined how the jury

was to weigh the evidence of Trawick's alleged mental disease or defect. The trial court clearly stated that the jurors needed only to find to their "reasonable satisfaction" that such a disease or defect existed in order to find Trawick not guilty, and we find nothing in this that would have misled the jury as to the standard of proof that Trawick was required to meet in order to establish his defense.

Trawick also argues that the trial court improperly failed to instruct the jury as to what the consequences for him would be if they found him not guilty by reason of mental disease or defect. He states that the trial court should have told the jury that such a verdict would mean that he would be confined to a mental hospital, perhaps for the rest of his life. He speculates that, without this instruction, the jury "may well have believed" that a verdict of not guilty by reason of mental disease or defect, like a regular verdict of not guilty, would result in his complete freedom. He concludes that the instruction left the impression that he would be left to go free and unfettered if the jury found him not guilty by reason of mental disease or defect and thus impermissibly influenced the jury to find him guilty.

We find no error in the trial court's silence as to the consequences for Trawick if the jury returned a verdict of not guilty by reason of mental disease or defect. On the contrary, its silence was entirely proper; it was not within the jury's sphere of concern to determine what these consequences would be, and statements as to such consequences should not be thrown into a case to influence the verdict, *Ivery v. State*, 686 So. 2d 495 (Ala. Cr. App. 1996), citing *Boyle v. State,* 229 Ala. 212, 154 So. 575 (Ala. 1934).   The trial court correctly refrained from making statements regarding those consequences.

Trawick next argues that in instructing the jury the trial court erroneously defined "reasonable doubt," as that term is used in regard to the standard of proof, as "an actual substantial doubt," and that this violated *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990).  In *Cage*, the United States Supreme Court reversed a criminal conviction because the Court concluded that the trial court's instruction impermissibly suggested a higher degree of doubt than is

required for acquittal under the reasonable doubt standard established by *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Trawick likens the instruction given in this case to that at issue in *Cage,* and he concludes that his conviction likewise must be reversed.

In *Cage*, the trial court instructed, in pertinent part, that reasonable doubt "must be such doubt as would rise to a grave uncertainty [and that] it is an actual substantial doubt. It is a doubt that a reasonable man can entertain. What is required is not an absolute or mathematical certainty, but a moral certainty." 498 U.S. at 40, 111 S. Ct. at 329. The United States Supreme Court held that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for an acquittal under the reasonable doubt standard. The Court determined that these words, when considered with the reference to "moral certainty" rather than evidentiary certainty, could have led a reasonable juror to believe that a finding of guilty could be based on a lesser degree of certainty.

The portion of the jury instruction to which Trawick now objects is as follows:

"I am going to suggest to you that proof beyond a reasonable doubt would be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own personal affairs."

Trawick argues that this statement lowered the burden of proof because, he says, it "guid[ed] the jurors' understanding about the State's burden in terms of their own personal affairs." We do not agree; on the contrary, we find that the statement effectively highlighted the high degree of proof that was necessary to prove Trawick's guilt, by describing it in a way that made it more personal for the jurors. Moreover, in the balance of its instruction, the trial court consistently emphasized the presumption of Trawick's innocence, the burden the State had in overcoming this presumption, and the definition of "reasonable doubt" as a product of the jury's common sense and reason.

103

We find no error in the court's definitions of the reasonable doubt standard and the State's burden of proof.

*Trawick v. State*, 698 So. 2d 162, 171-173 (Ala. 1997).

Although the claim now before this court is whether trial counsel were ineffective for failing to raise objections to the court's instructions at trial, the Alabama Supreme Court dealt with the propriety of the instructions now claimed to be objectionable. In resolving those underlying claims, the determinations made by the Alabama Supreme Court are entitled to deference under 28 U.S.C. § 2254(d), even with respect to the now-pending ineffective-assistance claims, unless they are clearly contrary to, or an unreasonable application of, Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). "[A] state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 126 S. Ct. 1828 (2006). This standard of review is strict, and federal courts are required to give "greater deference to the determinations made by state courts than they were required to under the previous law." *Verser v. Nelson*, 980 F. Supp. 280, 284 (N.D. Ill. 1997) (quoting *Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th Cir. 1997)).

104

**III(k)(*i*)** — *reasonable doubt*

Turning first to the reasonable-doubt instruction, the court cannot say that the conclusions reached by the Alabama Supreme Court were either "contrary to," or an "unreasonable application of," Supreme Court precedent. Petitioner first points to the language in the instruction that defined the standard of proof beyond a reasonable doubt as "proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own personal affairs." No Supreme Court precedent has addressed similar language used to define or describe "reasonable doubt." In *Cage v. Louisiana*, 498 U.S. 39 (1990), the constitutional concern was equating "reasonable doubt" with a "substantial" doubt creating "grave uncertainty" as to the guilt of the accused. Later, in *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court found nothing wrong with defining "reasonable doubt" in terms of "actual and substantial doubt" when those terms relate to the *existence*, rather than the *quantum*, of doubt. Unlike *Cage*, and even *Victor*, the instruction in this case emphasized the high level of certainty jurors must possess in order for the state's evidence to meet the reasonable doubt standard of proof. The instruction in this case does not attempt to quantify whether a juror's doubt is "reasonable." Rather than undermining the reasonable doubt standard by suggesting that the doubt must be "substantial," or create a "grave uncertainty," the contested

instruction[24] focused the jury's attention on the high level of certainty required before the state's evidence can be said to be sufficient for a conviction.

Under § 2254(d), the Alabama Supreme Court's conclusion that the instruction used in this case did not violate the defendant's constitutional rights is entitled to deference if it is not "contrary to," or "an unreasonable application of," Supreme Court precedent.   Because there is no Supreme Court precedent addressing a reasonable doubt instruction similar to this, it cannot be said that the Alabama Supreme Court's resolution was contrary to it, or an unreasonable application of Supreme Court doctrine.   The finding by the Alabama Supreme Court that the instruction *was not error* necessarily means that counsel was not ineffective in failing to object to the instruction.[25]   Stated another way, if the instruction was correct, the lack of an objection caused no prejudice under *Strickland*.

---

[24] The instruction read in pertinent part, "proof beyond a reasonable doubt would be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own personal affairs."

[25] This is not the same rationale used by the Alabama Court of Criminal Appeals in *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000).   In that case, the court of appeals concluded that if a substantive issue merely passed the plain-error standard, there could be no prejudice under *Strickland* for ineffective-assistance purposes.   This case is different.   Here, the Alabama Supreme Court applied not merely the plain-error rule, but affirmatively determined that the instruction was not erroneous.   Presumably, the state appellate court would have found the same thing about the instruction whether considered under plain-error review or preserved-error review.   Thus, if the instruction was not error — *i.e.*, it correctly stated the standard the jury was to apply — counsel's failure to object caused no prejudice because there never was any error to preserve.

Furthermore, the absence of any Supreme Court precedent suggesting that the language used here raised constitutional concerns means that counsel had no reason to make an objection. *Strickland* is very deferential to counsel: errors must be so egregious that it can be said defense counsel were not acting as Sixth Amendment counsel when the mistake was made. The mistake must be so professionally unreasonable that it is beyond the scope of competence expected of counsel. Here, there was no Supreme Court case law suggesting to counsel that the use of language similar to this instruction created constitutional issues. It was, thus, not professionally unreasonable for counsel to fail to object to the instruction — they had no reason to suspect anything was wrong with it.

### III(k)(*ii*) — *clear and convincing*

The same reasoning applies to petitioner's claim that his attorneys were ineffective for failing to object to the lack of an instruction defining the "clear and convincing" standard of proof that applied to petitioner's defense of not guilty by reason of mental disease or defect. The Alabama Supreme Court concluded that the instruction given was proper, and there is no U.S. Supreme Court precedent suggesting otherwise.

Furthermore, the absence of an objection by counsel actually led to an advantage for petitioner. Although the trial court initially described the burden of

107

proof he must meet on the mental-disease defense as "clear and convincing evidence," the court later told jurors that the proof need only meet their "reasonable satisfaction," a somewhat less onerous burden of proof. *Cf. Hayes v. Luckey*, 33 F. Supp. 2d 987, 994 (N.D. Ala. 1997) (Smith, J.) (concluding that "clear and convincing evidence" is a higher standard for gauging the persuasive effect of evidence than either a "preponderance of the evidence," or the traditional Alabama phraseology of the preponderance standard, "sufficient evidence to 'reasonably satisfy' the jury"). Thus, by not objecting and insisting on a more precise definition of "clear and convincing evidence," counsel's failure actually resulted in submitting the mental-disease defense to the jury on a lesser standard of proof than petitioner otherwise would have faced. Therefore, the failure to object caused no prejudice to the petitioner's defense.

### III(k)(*iii*) — *not guilty by reason of mental disease or defect*

Next, petitioner argues that his trial attorneys were ineffective because they did not insist that the trial judge explain to the jury that a finding of "not guilty by reason of mental disease or defect" would *not* have caused petitioner to be freed, but to be civilly committed. The Alabama Supreme Court concluded that the trial court's silence on this point was completely proper, because the jury played no role, and should not consider such consequences; "statements as to such consequences should

108

not be thrown into a case to influence the verdict."  This conclusion is not contrary to, or an unreasonable application of, Supreme Court law.  Petitioner has cited no Supreme Court case holding or suggesting that, when a capital defendant asserts an insanity defense, due process or the Eighth Amendment requires that the jury be told about the civil consequences of returning a verdict on that defense.  Absent clearly established law from the Supreme Court, it cannot be said that the resolution of this claim was "contrary to," or an "unreasonable application" of, Supreme Court precedent.  Thus, for the reasons explained above, counsel's failure to insist that the trial court judge explain to the jury the consequences of such a verdict was not ineffective assistance.

### III(k)(*iv*) — *lesser included offense*

Finally, trial counsel did not render ineffective assistance when failing to request a lesser-included-offense instruction on non-capital murder.  The evidence at trial more than plainly established that petitioner abducted the victim and then killed her, by strangling and bludgeoning her with a hammer.  The capital offense with which he was charged required the state to prove an intentional killing during the course of a first-degree kidnaping. Two ways in which *Alabama Code* § 13A-6-43 (1975) defines first-degree kidnaping are when a person "abducts another person with intent to . . . (4) Inflict physical injury upon him, or to violate or abuse him sexually;

[or] (5) Terrorize him or a third person . . ."  The evidence in this case more than plainly established that petitioner abducted the victim with the intent to injure her, sexually abuse her, or, at least, terrorize her — any one of which is sufficient to establish the requisite elements of first-degree kidnaping for purposes of the capital statute.  There simply was no factual or evidentiary basis for instructing the jury on a lesser or different charge.

On direct appeal, the Alabama Supreme Court considered the question of whether petitioner was entitled to a lesser-included-offense instruction.  That court, considering the question under the plain-error standard because it had not been raised at trial, found that the evidence did not support any charge other than an intentional killing during a first-degree kidnaping.  This finding is entitled to a presumption of correctness here, as it is neither "contrary to," nor an "unreasonable application of," clearly established Supreme Court precedent.  The Alabama Supreme Court wrote:

> A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge.  *Anderson v. State*, 507 So. 2d 580 (Ala. Cr. App. 1987).  Trawick confessed that he first kidnapped, then murdered, his victim;  this confession was properly admitted into evidence at trial.  No reasonable interpretation of the evidence contained in the record would contradict Trawick's confession and support an inference that he killed Gach before he put her into his van;  thus, there is no merit in Trawick's argument on this issue.

*Ex parte Trawick*, 698 So. 2d 162, 177 (Ala. 1997).  *See also Hopper v. Evans*, 456

U.S. 605, 611 (1982) ("Due process requires that a lesser included offense instruction

be given *only* when the evidence warrants such an instruction.") (emphasis in

original); *Ritter v. Smith*, 726 F.2d 1505, 1509 (11th Cir. 1984) (same).  Indeed, at trial

petitioner did not dispute that he kidnapped the victim before killing her; instead, his

defense was insanity.  There was no evidentiary basis for a different or lesser charge

and, thus petitioner would not have been entitled to a lesser-included-offense

instruction even if one had been requested.  Petitioner therefore suffered no prejudice

from counsel's failure to request one.  Without prejudice, there was no ineffectiveness

under *Strickland*.

New paragraph

        None of petitioner's specifications of ineffectiveness with respect to jury

instructions has merit.  Thus, this claim of ineffective assistance does not warrant

*habeas* relief and must be denied.

        **III(l)** — *Failure to move adequately for a change of venue*

        Petitioner alleges the following at paragraph 35 of his Second Amended

Petition, petitioner alleges the following:

> Trial counsel failed to move adequately the trial court to change the
> venue of the trial.  Counsel should have argued that Mr. Trawick was
> entitled to a trial by an impartial jury "free from outside influences,"
> *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966), and that due process
> mandates a change in venue when there is pervasive, inflammatory pre-

111

trial publicity, *Rideau v. Louisiana*, 373 U.S. 723 (1963), as there was in this case.  Counsel failed to argue adequately that both the written and the broadcast media extensively covered the tragic murder and the investigation and Mr. Trawick.  (R. 178-180) Counsel also failed to adequately argue that over forty of the jurors in the jury pool had heard about the case.  Counsel failed to argue adequately that a venue change was required under both state and federal law.

This claim was asserted, *verbatim,* as claim 11(K) in his Second Amended Rule 32 Petition.  (*See* R-46, p. 92).  On appeal from denial of the Rule 32 petition, the Alabama Court of Criminal Appeals affirmed, concluding that the claim was unsupported by any factual allegations and, therefore, inadequate under the pleading-specificity requirements of Rules 32.3 and 32.6(b).

At the outset, it appears the claim is procedurally defaulted.  But even if not, his attorneys were not constitutionally ineffective.  Petitioner concedes that his attorneys, in fact, filed and pressed a motion for change of venue.  The issue was raised on direct appeal as well, at which time the Alabama Court of Criminal Appeals wrote the following:

> The appellant further contends that the trial court erred in denying his motion for a change of venue.  The appellant alleged that extensive pretrial publicity rendered it impossible for him to obtain a fair trial in Jefferson County.

> The record indicates that the appellant produced a copy of only one newspaper article in support of his motion for a change of venue.  The article appeared in the November 27, 1993, edition of the Birmingham Post-Herald.  The appellant's trial began on March 21,

112

1994.  The appellant's counsel stipulated that only two articles were printed after the first article — one appearing on January 2, 1994, and one on January 30, 1994.  The appellant admits that there was no news coverage for more than one and one-half months before his trial began.

Moreover, of the 58 potential jurors in the venire panel, 17 indicated that they had heard nothing about the case.  The potential jurors were questioned individually, and only one was struck for cause based on pretrial publicity.  In denying the appellant's motion, the trial court stated:

> "I disagree vehemently.  [J.M.] is the only juror who cannot set aside his impressions and bring us a fair verdict and he was struck for cause.  We talked to all of these people individually.   These people impressed me as very conscientious people that will indeed abide by the Court's instructions and set aside whatever impressions they may have formed and bottom their verdict on the case in court.  And I will be repeating that throughout the course of the litigation."

The Alabama Supreme Court has issued explicit guidelines for a trial court's determination of a motion for a change of venue based on pretrial publicity.

> "In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity.  *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966);  *Franklin v. State*, 424 So. 2d 1353 (Ala. Crim. App. 1982).  Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.  *Anderson v. State*, 362 So. 2d 1296, 1298 (Ala. Crim. App. 1978).  As the Supreme Court explained in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961):

113

"'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'

"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the *voir dire* examination.' *Anderson v. State*, 362 So. 2d 1296, 1299 (Ala. Crim. App.1978)."

*Ex parte Grayson*, 479 So. 2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 (1985).

The appellant has not satisfied the requirements set forth in *Grayson*. The venire panel was examined individually and there was no evidence that the prospective jurors remaining after one juror was struck for cause could not try the case based solely on the evidence presented at trial. The trial court did not err in denying the motion for a change of venue.

*Trawick v. State*, 698 So. 2d 151, 155-156 (Ala. Crim. App. 1996). Although the claim now before the court is concerned with the effectiveness of trial counsel in making these arguments, rather than the merits of the venue arguments themselves,

114

the findings of fact made by the state courts still are binding on this court in this context.  *See* 28 U.S.C. § 2254(d).

Petitioner has offered nothing to show what more trial counsel could have done to press the change of venue.  Indeed, in the brief he filed in this action, petitioner says the following concerning how the motion was presented in the trial court:

> In support of his motion, Mr. Trawick detailed both newspaper articles and accounts of television broadcasts that not only provided explicit details about the crime, but also reported that police officers had obtained inculpatory statements from Mr. Trawick.  (C. 46).  The trial court, however, declined to order a change of venue.  Mr. Trawick renewed his motion during jury selection after *voir dire* revealed that more than forty of the fifty-eight prospective jurors in his venire had heard about the case.  (R. 561.)  The trial court again declined to order a change of venue.  (R. 563.)
>
> In his motion, Mr. Trawick showed that both the *Birmingham News* and the *Birmingham Post-Herald*, the two major newspapers in the Birmingham metropolitan area and Jefferson County at large, frequently published articles about Mr. Trawick on their front pages, often with prominent banner headlines and photographs.  (C. 45-46.)  Both newspapers began providing intensive coverage when Ms. Gach's body was discovered, and maintained it through Mr. Trawick's arrest and until his trial began.  (C. 46.)  The Birmingham metropolitan area television stations[,] Channel 6, Channel 13, and Channel 42[,] also provided extensive coverage of Mr. Trawick's case.  (C. 46.)  Each station offered prominent feature stories on Mr. Trawick's case.  Id.

Petitioner's Brief (Doc. 23), pp. 105-106.  Petitioner's own description of the manner in which his motion for change of venue was presented and litigated makes clear that trial counsel pressed the motion vigorously, marshaling evidence in support of it, and

renewing the motion during jury selection, based on the answers obtained from venire members.  In this action, petitioner has pointed to nothing that he claims they failed to do, or that they could have done better.  Although he contends the motion for change of venue was not presented "adequately," he has not identified how it was inadequate.  Without some showing of a professionally unreasonable error or failure by counsel, petitioner cannot meet the *Strickland* standard.  Furthermore, for the reasons discussed below at Claim X by the Alabama Court of Criminal Appeals, petitioner was not prejudiced by the pretrial publicity surrounding his case; thus, he fails to meet the "prejudice prong" of the *Strickland* test as well.  Accordingly, this claim is meritless and due to be denied.

### III(m) — *Failure to move adequately for recusal of the trial judge*

At paragraph 36 of the Second Amended Petition, it is alleged that:

Trial counsel failed to move adequately the trial judge to recuse himself. The trial judge at Mr. Trawick's capital trial had previously prosecuted a murder case as a deputy district attorney that is closely related to Mr. Trawick's current case.  The case is related because the victim in that case is someone about whom Mr. Trawick had allegedly made incriminating statements.  (R. 15-18, 146-151).  Moreover, the defendant in the case the judge prosecuted was acquitted, (R. 16), thus providing more of a reason for the judge to be interested in securing the conviction for that murder.  These facts created an appearance of bias and trial counsel failed to argue adequately that the judge should have recused himself.  In addition, counsel failed to argue adequately that the judge should have recused himself because he went to high school with Mr. Trawick.

116

This claim was asserted, *verbatim*, as claim 11(L) in his Second Amended Rule 32 Petition.  (*See* R-46, p. 93).  On appeal from denial of the Rule 32 petition, the Alabama Court of Criminal Appeals affirmed, concluding that the claim was unsupported by any factual allegations and, therefore, was inadequate under the pleading-specificity requirements of Rules 32.3 and 32.6(b).

It appears that this claim is procedurally defaulted.  But even if not, petitioner concedes that trial counsel filed a motion for the trial judge to disclose possible bases for recusal, and to urge him to recuse himself due to his participation as a prosecutor in a case involving the murder of Betty Jo Richards.  (*See* Tab R-1, pp. 88-93).  The motion was denied, but the issue was not raised on direct appeal.  Petitioner now argues that trial counsel did not "adequately" argue the motion, and that this was so professionally unreasonable as to be ineffective assistance.  Petitioner has not identified how counsel might have more adequately argued the motion, nor has he pointed to any prejudice that undermines confidence in the outcome of the case.

Keeping in mind that the instant claim focuses on *counsel's* alleged inadequacy, the following comment by the Eleventh Circuit is illuminating:

> In light of the Canons governing judicial conduct, we do not believe that an attorney conducting a reasonable investigation would consider it appropriate to question a judge, or the court personnel in the judge's court, about the judge's lack of impartiality.  Canon 3E(1) requires a judge to *sua sponte* disqualify himself if his impartiality might

117

reasonably be questioned.  The Commentary to Canon 3E(1) provides
that a judge should disclose on the record information which the judge
believes the parties or their lawyers might consider relevant to the
question of disqualification.   We conclude that both litigants and
attorneys should be able to rely upon judges to comply with their own
Canons of Ethics.   A contrary rule would presume that litigants and
counsel cannot rely upon an unbiased judiciary, and that counsel, in
discharging their Sixth Amendment obligation to provide their clients
effective professional assistance, must investigate the impartiality of the
judges before whom they appear.  Such investigations, of course, would
undermine public confidence in the judiciary and hinder, if not disrupt,
the judicial process — all to the detriment of the fair administration of
justice.

*Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995) (footnotes omitted).  This

passage makes clear that counsel cannot be faulted for failing to undertake a more

probing investigation of the trial judge's impartiality.  Counsel simply have no Sixth

Amendment duty to investigate the possibility of judicial bias.  It falls to the trial

judge himself, pursuant to his own allegiance to his oath and controlling canons of

judicial ethics, to determine whether he should recuse.  Although the failure of a

judge to recuse under circumstances calling for such action may violate the

defendant's right to due process before an impartial tribunal, defendant's *counsel*

cannot be faulted  for not more vigorously pressing for a judge's recusal.  Placing on

counsel some Sixth Amendment duty to be relentless in the pursuit of recusal would

have the same detrimental effect on the administration of justice identified by the

Eleventh Circuit in *Porter*.   Having brought to the trial judge's attention the

possibility of the need for recusal, counsel fulfilled whatever Sixth Amendment duty they had.  There was no ineffectiveness.

Even if counsel had a Sixth Amendment duty to do more than bring the possibility of recusal to the judge's attention, the allegations here simply do not mandate the recusal of the judge who presided at trial.  First, petitioner contends that Judge Hard had been a prosecutor in a case involving the murder of Betty Jo Richards.  Although that case did not involve petitioner, and did not result in a conviction of that defendant, it is alleged that petitioner confessed to killing Richards: thus, according to petitioner, giving Judge Hard an interest in the outcome of his trial for the murder of Stephanie Gach.  Plainly, Judge Hard had no personal or financial interest in the outcome of this case.  The speculation that he had an interest arising out of his prosecution of *someone else* for the murder of another person is nothing more than remote speculation, and certainly not one for which counsel can be faulted for not pursuing.  Ineffective assistance under *Strickland* focuses on whether counsel's decisions and actions were "professionally unreasonable," and it was simply not professionally unreasonable for counsel to do no more than raise this issue with the judge.

Petitioner also argues that his trial attorneys were ineffective because they did not seek recusal on the basis that Judge Hard attended high school with petitioner.

119

There is no allegation that they knew each other in high school and, even if they did, that alone would not warrant recusal. Particularly in small towns and rural settings, judges are frequently called upon to judge the cases of people they know. If that alone were a ground for recusal, the wheels of justice — which grind slowly, in order to grind exceedingly fine — would grind to a stop. Something more — bias — must be alleged and shown, and petitioner has not alleged that shared high school experiences caused Judge Hard to be biased against him. Thus, it was not professionally unreasonable for counsel to fail or refuse to seek recusal on this ground. This claim of ineffective assistance is due to be denied.

### III(n) — *Failure to object to capital sentencing as part of a pattern of racial bias*

Petitioner alleges at paragraph 37 of his Second Amended Petition that his attorneys were ineffective because they did not object to his capital sentence as the product of a racially biased system. He alleges:

> Trial counsel failed to object to the imposition of the death penalty in this case because it was imposed as part of a pattern of racial bias. The victim in this case was a member of the white community in Jefferson County. The death penalty was sought and imposed against Mr. Trawick because of the victim's race and status in the community. Had the victim in this case been poor or black, petitioner would not now be under a sentence of death. The death penalty is sought in Jefferson County and the State of Alabama in an arbitrary and capricious fashion and pursuant to a racially discriminatory pattern. Counsel failed to

argue that, for these reasons, Mr. Trawick's death sentence is unconstitutional.

This claim was asserted, *verbatim,* as claim 11(M) in his Second Amended Rule 32 Petition.  (*See* R-46, p. 93).  On appeal from denial of the Rule 32 petition, the Alabama Court of Criminal Appeals affirmed, concluding that the claim was unsupported by any factual allegations and, therefore, inadequate under the pleading-specificity requirements of Rules 32.3 and 32.6(b).

To begin, the claim is procedurally defaulted, and petitioner has not shown cause and prejudice to excuse the default.  But even if the claim was not procedurally defaulted, counsel were not ineffective for failing to raise this ground as a basis for avoiding the death sentence.  Counsel were faced with a case in which a white man was accused of kidnaping and murdering a white woman.  On its face, counsel had no reason to believe that racial bias played any role whatsoever in the prosecution of petitioner's case.  Absent some evidence that racial bias played some part in *his* conviction and sentence, petitioner cannot establish that his conviction and sentence violated the Equal Protection Clause.  *See McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1987) (holding that, to establish that petitioner's death sentence was rendered in violation of the Equal Protection Clause, petitioner "must prove that the decisionmakers in his case acted with discriminatory purpose," and concluding that

the petitioner's claim failed because he "offer[ed] no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence"); *see also Meeks v. Moore*, 216 F.3d 951, 967 (11th Cir. 2000). More to the point, absent such proof, petitioner cannot show that counsel's failure to raise this issue resulted in any prejudice to him.

The argument now advanced by petitioner is that he should not have received the death penalty because the system disproportionately imposes the death penalty upon murderers whose victims are neither poor nor black. He makes the truly perverse and cruel allegation that, "[h]ad the victim in this case been poor or black, petitioner would not now be under a sentence of death," as if the law countenances some license to murder poor and black victims. The converse of his argument is that petitioner should not be sentenced to death precisely *because* his victim was white. It is not surprising that trial counsel either did not recognize, or chose to forego, such a truly abominable argument. There simply is no proof — alleged, shown, or imagined — that the race of this victim played any part whatsoever in the assessment of the death penalty on petitioner. It was not professionally unreasonable for counsel not to advance this argument, nor is there any probability that it would have changed the outcome of the case if it had been made. This claim of ineffective assistance is due to be denied.

### III(o) — *Cumulative ineffective assistance*

Petitioner's final claim of ineffective assistance of trial counsel, found at paragraph 38 of the Second Amended Petition, is the contention that all of the individual allegations of ineffectiveness discussed above cumulatively combined to create ineffectiveness where none of the individual allegations did so.  For the reasons already addressed at length above, none of petitioner's individual allegations of ineffectiveness cast doubt on the constitutional adequacy of his trial representation. Merely combining insufficient allegations of ineffectiveness does not cause the sum to ripen into a genuine claim.  Without a showing that he suffered prejudice as a result of some professionally unreasonable act or omission of counsel, petitioner cannot meet the *Strickland* standard.  Nor may petitioner stitch together questionable acts or omissions by trial counsel that are factually and logically unrelated to any harm to his defense in order to show some overarching ineffectiveness of counsel. The two-pronged *Strickland* test is very clear: to prevail, petitioner must show both a professionally unreasonable act or omission by counsel, and, that such act or omission caused sufficient prejudice to the petitioner's defense to undermine confidence in the outcome of the proceeding.  Because he has failed to meet that test with respect to his several individual claims of ineffectiveness, looking at the collection of allegations as a whole adds nothing.  This claim also is without merit.

**Claim IV** — *Brady/Giglio Violation*

At paragraph 39 of the Second Amended Petition, petitioner alleges a violation

of his constitutional right not to be denied access to favorable or exculpatory

evidence.  The petition alleges:

> Law enforcement and prosecuting officials did not make available to the
> defense the complete prosecution file in violation of federal
> constitutional requirements.  Exculpatory material and crucial mitigating
> evidence were [sic] withheld in violation of *Brady v. Maryland*, 373
> U.S. 83 (1963), including evidence that the state's psychological
> evaluation was the product of an institution that was biased against Mr.
> Trawick.  Specifically, mental health professionals who were part of the
> evaluation team at Taylor Hardin were investigated for improper
> conduct related to Mr. Trawick's evaluation, and evidence of the
> investigation was never disclosed to defense counsel.  In this case,
> disclosure of the suppressed evidence would have made a different
> result reasonably probable.  The state's withholding of this information
> denied Mr. Trawick his rights to due process, a fair trial and a reliable
> sentencing proceeding in violation of the Fifth, Sixth, Eighth, and
> Fourteenth Amendments to the United States Constitution.  *Kyles v.
> Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667
> (1985); *Green v. Georgia*, 442 U.S. 95 (1979).  The state court
> adjudication of this claim resulted in a decision that was contrary to, and
> involved an unreasonable application of, clearly established United
> States Supreme Court precedent.

In response to this claim, respondents contend that it is procedurally defaulted, and

that its rejection by the state courts was not contrary to, or an unreasonable

application of, Supreme Court precedent.  *See* Respondents' Brief (Doc. 14), pp. 77-

79.

124

This claim was raised in petitioner's Rule 32 petition, where it was rejected by the trial court without a hearing.  Affirming denial of Rule 32 relief, the Alabama Court of Criminal Appeals wrote the following:

> The appellant argues in his second amended petition that "[l]aw enforcement and prosecuting officials did not make available to the defense the complete prosecution file in violation of state and federal requirements in capital cases."  In support of his argument, the appellant contends that the exculpatory material and crucial mitigating evidence were withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence that the state's psychological evaluation was the product of an institution that was biased against him.  Additionally, he claims that mental health professionals who were part of the evaluation team at Taylor Hardin were investigated for improper conduct related to the appellant's evaluation, and evidence of the investigation was never disclosed to defense counsel.  Additionally, the appellant argues that the trial court's denial of his discovery request prevented him from proving his *Brady* claim.

> In summarily dismissing this claim, the trial court stated the following:

>> "Three elements must be proven in order to establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  These elements include: (1) the prosecutor's suppression of evidence, (2) the favorable character of the suppressed evidence for the defense; and (3) the materiality of the suppressed evidence.  *Brady*, 373 U.S. 87.  Trawick does not allege that he can meet any of these requirements.  Trawick has therefore not alleged facts that, if proved, would entitle him to relief and no further proceedings are warranted.

>> "Moreover, Trawick's allegations do not amount to a *Brady* claim because he had not asserted that the

Jefferson County District Attorney's Office ever had possession of the requested file or information, but suppressed it.  A file in possession of Taylor Hardin Secure Medical Facility cannot be imputed constructively to the prosecution.  *See Weeks v. Jones*, 26 F.3d 1030 (11th Cir. 1994) (Even though Bryce Hospital is a state hospital, the information contained in a Bryce Hospital file cannot be imputed constructively to the prosecution).  In addition, there has been no showing that Trawick himself would not have had knowledge of the 'improper conduct' relating to his psychological evaluation.  Trawick does not allege that he can establish any of the elements of proving a *Brady* claim.  He has not met either the burden of pleading imposed by Rule 32.3 or the specificity requirements of Rule' [sic] 32.6(b), Ala. R. Crim. P.  Trawick's *Brady* claim is therefore summarily dismissed.

An examination of the record supports the trial court's summary dismissal of this claim.

Lastly, the appellant's claims that the trial court's denial of his discovery request prevented him from proving his *Brady* claim is unsupported by the record and without merit.  More particularly, the record reveals that the appellant had personal knowledge of the facts regarding the Taylor Hardin investigation because the investigation began at his request and concerned his relationship with a nurse at Taylor Hardin Secure Medical Facility.  Because the appellant, however, failed to sufficiently plead any facts supporting a *Brady* claim, the trial court was correct in finding that the claim was barred pursuant to Rule 32.3 and 32.6(b), Ala. R. Crim. P.

*See* Tab R-63, pp. 9-10.

Petitioner now contends that the state courts' resolution of this claim is not entitled to a presumption of correctness because it is "based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254((d)(2).  He points out that the state courts did not conduct an evidentiary hearing on the claim, and that the factual matters recited by those courts comes not from evidence, but from the statements and representations of counsel.

The record reflects, at Tab R-49, that the Rule 32 court conducted a hearing on January 3, 2001, at which petitioner and counsel were present.  Although no evidence or testimony was presented at that time, the following statements and representations were made to the court:

> THE COURT:     Have y'all gotten together and discussed the protocol this morning?  Ever how you want to proceed is fine with me.
>
> MR. SUSSKIND: We haven't discussed protocol.   The Court on December 12 dismissed all the claims in our petition, so there's nothing else standing before the Court.  I just want to say a couple of comments about that for the record.
>
> THE COURT:     You have the floor.

(Tab R-49, p. 2)

* * *

> [MR. SUSSKIND]:     In addition, there's a Brady claim that's been dismissed.   The reason for the dismissal is

127

that the information we were seeking related to a discovery dispute. We have filed a motion for a court order getting access to an investigator's file at Taylor Hardin, the law enforcement branch at Taylor Hardin that investigated some wrongdoing related to Mr. Trawick's stay there prior to trial. We asked for access to those files. The Court denied access for two reasons.

One, that the information is not in the possession of the district attorney's office. Under Alabama law Brady material doesn't have to be in possession of the district attorney's office. All state agencies are imputed to have information.

Second, that the information in this file was developed after Mr. Trawick's trial. Our position on that is that the Brady information was in the possession of State actors at the time of Mr. Trawick's trial. This investigative file investigated the incident or incidents. We're not sure what they are. Mr. Crenshaw [counsel for Respondents] spoke to the folks over there. There is a file. There was an investigation. We think we're entitled. The file in and of itself is discoverable in that it will lead to information that is Brady material. Simply because the file was developed, reports were written, an investigation was conducted after Mr. Trawick's trial doesn't negate the fact that the incident happened before. We're entitled to get access to information to substantiate our Brady claim.

(Tab R-49, pp.3-4).

* * *

[MR. CRENSHAW]   Now, if I could respond to the Brady v. Maryland claim that has been raised. Your Honor, the way I understand the claim is that there's some allegation that Trawick had improper contact, maybe even a sexual contact with a nurse while he was being evaluated at Taylor Hardin before the trial occurred in this case, which would have been at some point in 1994. Apparently whatever happened came to light — and I'm basing this upon a conversation I did have with the investigator at the Department of Mental Health — but the only way this came to light was Trawick wrote a letter to Taylor Hardin where he made these allegations. Again, according to what I have been told, that letter was written at a point a year and half after the trial happened. Apparently an investigation was conducted. I don't know whether any of the allegations were substantiated or not.

Now, this allegation that just because Taylor Hardin is a state agency that any information at Taylor Hardin is imputed to the trial prosecutor is not supported by any case law whatsoever. Just because Taylor Hardin is a state agency doesn't mean that any document that it contains has to be imputed to the prosecutor. Any DA's office or any attorney general's office is separate and apart from Taylor Hardin. When the attorney general's office discovers any information from Taylor Hardin it needs court orders just like I'm sure the DA's office does. The people at Taylor Hardin don't call up the DA offices or the attorney general's office and give them information that they don't give to the other side. The suggestion being made that Taylor Hardin somehow is a law enforcement agency is just not

129

supported, just as files that the Department of Transportation have shouldn't be imputed to any kind of criminal prosecution. Just as files retained by the Department of Human Resources.

Now, in the motion to reconsider, Trawick's lawyers have submitted some cases that they claim stand for the proposition that the files contained at Taylor Hardin should be imputed to the prosecutor. I just want to distinguish those very briefly.

(Tab R-49, pp. 11-13).

* * *

[MR SUSSKIND] With respect to the Brady claim, Mr. Crenshaw revealed for the first time something that we didn't know, that the investigation was about sexual contact. He appears to have more information than we do about the claim. All the arguments that he made would go to the merits of the claim. He's basically defending the Brady allegation before the Court based on information that we don't have access to. State agents do have access to. Mr. Crenshaw has access to. The information is in existence. We think we should be given an opportunity to prove our claim and not have to — this Court not to rely solely on the assertion, not in evidence, of Mr. Crenshaw to reject our Brady claim. There is information out there. He suggested the only way this information came to light was through Mr. Trawick. Well, that's a defense to the claim on the merits. We should first be able to get access to the information so that we can develop the claim. If he wants to defend against it later, he obviously has the opportunity to do that.

130

The State asserted that there's no case law whatsoever to support our position that Taylor Hardin, a secure medical facility, is not a State agent with respect to Brady claims, and then tried to distinguish McMillan v State, for example, where the Court of Criminal Appeals clearly held that the appellant's rights in that case were violated because Taylor Hardin, a secure medical facility, had information about a co-defendant, not even about the defendant himself, containing exculpatory information that was in existence prior to trial, and that it was a violation of the defendant's due process rights for that not to have been disclosed.

(Tab R-49, pp. 20-21).

\* \* \*

[MR. CRENSHAW]:   Mr. Trawick is only being denied an opportunity to present evidence because the Rule 32 petition is so deficient that it doesn't warrant any further proceedings.  That's the main point in all of this, especially with these claims that have been dismissed because the same grounds were raised.  They're being dismissed because Your Honor can make a decision based upon what is already in the record.  The allegations contained in the Rule 32 position [sic] don't warrant any further proceedings.  Evidentiary hearings in these cases are not automatic.  A petition has to be meritorious on its face.  Under Alderman versus State, which is a Court of Criminal Appeals decision, to be meritorious on their face they have to — each claim has to contain a clear, specific statement with a full factual disclosure of each of those claims.  In these

131

claims that Your Honor has dismissed as a matter of law, because the same grounds are raised in this Rule 32 petition that the Alabama Supreme Court has already rejected, Your Honor is just saying that those claims don't warrant any further proceedings, and that Your Honor can go ahead and rule on that claim and evidentiary hearing is warranted.

Now, on this Brady claim, Trawick knows what happened. Trawick knows what allegations he made. The Rule 32 petitioner himself can certainly tell his lawyer what allegations he made. If Mr. Susskind is claiming that he's surprised by some kind of information, he needs to turn to the person at his left and ask him what he alleged in any letter that he wrote to the Department of Mental Health. The elements of a Brady claim, they all have to be met, is that there has to be suppression, favorable information, and that this favorable information has to be material to the outcome of the case. None of those elements are met by anything that's alleged on this particular Brady claim. We don't even have to get past the first element of suppression. Suppression hasn't been established. There has been no allegation that the prosecutor knows anything about anything, or that the prosecutor knew anything about what was happening at Taylor Hardin.

Your Honor, I also want to point out in the record, in Dr. Runin's [Ronan's] report, she was the psychologist who evaluated Trawick before trial and wrote a pretty lengthy report as contained in the trial record, and that's Volume II of the supplemental record, Page 312. She notes in her report that Trawick became rapidly, heavily, emotionally invested in one of the nurses at this facility. So, you

know, whatever that means.  You know some of this was known before trial.  Again, whatever did happen is known to Trawick himself.  Again, there has been absolutely no allegation that the prosecutor, trial prosecutor in this case suppressed information.

(Tab R-49, pp. 23-25).

* * *

[MR. SUSSKIND]        The same argument I would like to make with respect to the Brady claim.  All the arguments Mr. Crenshaw is making goes to the merits of the claim.  I can't respond to anything he's saying because I don't have access to the information.  I still haven't heard any reason why we shouldn't be given the investigator's file.  If there's nothing in there that's Brady material, than I assume we wouldn't be able to prove a Brady claim.  If we could just get access to this file which exists.  The Court earlier had granted us access generally to this kind of file.  We submitted that order to the investigator who we contacted at Taylor Hardin.  He said he needed a more specific order.  That's the only reason we asked for another order.  It was the second one that was rejected by the Court.   The investigator informed us he would be willing to turn over the file.  All he wanted was the court order.  This is not something that is costly to the State, or time-consuming to the State, it's a very simple matter.  There's no way that I can respond without access to this file.  If Mr. Crenshaw is right, that there's absolutely no Brady material in the file, then we won't be

> able to prove our claim.  We should at least be
> given the opportunity to try.

(Tab R-49, pp. 27-28).

Although it probably is true that the statements made by counsel do not constitute "evidence" within the meaning of § 2254(d)(2), the transcript clearly reflects why the Rule 32 court declined to conduct an evidentiary hearing on the *Brady* claim: *i.e.*, the claim was insufficiently pled to justify a hearing.  While alleging that exculpatory evidence was withheld at the time of trial, petitioner identifies the nature of the evidence only by saying:

> Specifically, mental health professionals who were part of the evaluation team at Taylor Hardin were investigated for improper conduct related to Mr. Trawick's evaluation, and evidence of the investigation was never disclosed to defense counsel.  In this case, disclosure of the suppressed evidence would have made a different result reasonably probable.

Plainly, the fact that this allegation was made indicates that petitioner and his attorneys became aware of the investigation at some point, yet they were not candid with either the state courts or this court about the source and limitations of that information.  They did reveal that they knew enough about the investigation to make it the centerpiece of a *Brady* claim, but they did not reveal that it was petitioner himself who was the source of their knowledge.  If petitioner informed them of the existence of the investigation, he also could have informed them that he precipitated

the investigation by writing a letter complaining about something that happened during his evaluation, and that the investigation did not begin until more than a year and half after petitioner's trial. In pleading his Rule 32 motion in state court, petitioner did not deny that he was aware of the investigation, or that the investigation came long after the trial was complete, and, therefore, did not exist as "exculpatory" or "favorable" information that could have been revealed during trial.

*Brady v. Maryland* does not authorize a free-wheeling, untethered romp through prosecution files based on nothing more than the hope of turning up something that can be made into a claim. Particularly in the *habeas* context, where an extant conviction is being challenged, the petitioner must  allege with some specificity the nature of the alleged favorable information and its materiality. The same pleading deficiency that existed in his Rule 32 petition defeats petitioner's *Brady* claim in this action. He has not alleged the nature of the allegedly "exculpatory" or "favorable" information that was not disclosed at trial. Without that allegation, the court cannot assess whether the information was material or, indeed, even existed at the time of trial. Plainly, there was no *Brady* violation for failing to disclose the existence or fruits of an investigation that did not even take place until long *after* petitioner's trial. If he alleges that some favorable or exculpatory information actually existed at the time of trial, he must allege what it was, or else his

*Brady* claim is nothing more than a hope that something might turn up if he is allowed to conduct enough discovery.   Neither a hearing nor *habeas* relief is warranted on such vague, conclusory, and insubstantial allegations.  *See Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir. 1978).  This claim is due to be denied.

      **Claim V** — *Juror Misconduct*

      Beginning at page 22 of the Second Amended Petition, petitioner alleges that he was deprived of the right to exercise peremptory challenges, the right to challenges for cause, and the right to an impartial jury because two jurors failed to accurately answer *voir dire* questions.  At paragraph 41, petitioner alleges:

> Two jurors at Mr. Trawick's trial failed to disclose important information about victimization in response to the trial court's question, "[H]ave any of you ever been the victim of a crime or any member of your family or any friends ever been a victim of crime?" (R. 249.)  One juror failed to disclose that he was the victim of an armed robbery several years before trial.  Another juror failed to disclose that his sister-in-law had been murdered just a few years before Mr. Trawick's trial.

He alleged this same claim at paragraphs 37 and 38 of his Second Amended Rule 32 Petition.  The Alabama Court of Criminal Appeals affirmed the finding by the Rule 32 court that this claim was procedurally barred from consideration because it could have been raised at trial and on direct appeal, but was not.  *See* Tab R-63, p. 4; Ala. R Crim.P. 32.2(a)(3) and (5).  Petitioner explicitly alleges here that the state courts' resolution of this claim was contrary to, or an unreasonable application of, clearly

136

established Supreme Court precedent.  Further, and more to the point, petitioner contends that the procedural bar identified by the state courts is not regularly followed and, therefore, not binding on this court.  He does not offer any showing of "cause and prejudice" to excuse the default.

The Alabama Rule 32 court and the Alabama Court of Criminal Appeals both concluded that the assertion of this claim by petitioner was barred from consideration by Rule 32.2(b)(3) and (5), which preclude post-conviction consideration of any claim that could have been, but was not, asserted at trial or on direct appeal.  As a matter of federal law, federal *habeas* courts will not consider or grant relief with respect to claims procedurally defaulted under "independent and adequate" state procedural rules.  *See Wainwright v. Sykes*, 433 U.S. 72, 85-86 (1977); *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006).  To be "independent and adequate," the state procedural rule violated by a petitioner must be "firmly established" and "regularly followed" in the state court system.  *See Siebert*, 455 F3d at 1271;  *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005).  The determination of whether a state procedural rule is "independent and adequate" is a question of federal law. *See Lee v. Kemna*, 534 U.S. 362 (2002);  *Baker v. Holt*, No. 05-13984, 2006 WL 1130811 (11th Cir. Apr. 27, 2006).  A rule is not "firmly established" if it is novel, or one that cannot be gleaned from existing law.  "Novel procedural requirements or those of

137

whose existence the defendant could not reasonably be deemed to have been apprised, cannot be permitted to thwart review of cases seeking vindication in state courts of federal constitutional rights." *Hansbrough v. Latta*, 11 F.3d 143, 146 (11th Cir. 1994).

This court has serious questions about whether application of the Rule 32.2(a)(3) and (5) limitations on collateral relief were firmly established and regularly followed at the time of petitioner's trial and subsequent proceedings.  As noted above, to have a preclusive effect in federal *habeas* proceedings, the state's procedural requirement must be one that a criminal defendant reasonably could know about, and, more importantly, comply with in having his claim considered.  In this case, that means that it must have been reasonably possible for petitioner to know in 1994 that he had to present his juror-misconduct claim at trial, or on direct appeal, in order to comply with Rule 32.2(a)(3) and (5).  While it is true that the substance of Rule 32.2(a)(3) and (5) predated petitioner's trial (and provided as a general proposition that claims not presented at trial and on direct appeal could not be considered in a post-conviction Rule 32 proceeding), these provisions were not *clearly* applied to the claims relating to jurors' failure to answer *voir dire* questions until 2000 — long after petitioner's trial.  Alabama law did not become reasonably clear on that point until September 1, 2000, the date on which  the Alabama Supreme Court handed down its

138

decision in *Ex parte Pierce*, 851 So. 2d 606 (Ala. 2000). As the Alabama Court of Criminal Appeals subsequently stated:

> The Alabama Supreme Court in *Ex parte Pierce*, 851 So. 2d 606 (Ala. 2000), recognized that a juror-misconduct claim may be procedurally barred in a Rule 32 petition. The Supreme Court stated: "Although Rule 32.1(e) [newly discovered evidence] does not preclude [the petitioner's] claim, Rule 32.2(a)(3) and (5) would preclude [the petitioner's] claim if it could have been raised at trial or on appeal." 851 So. 2d at 614.

*Jenkins v. State*, No. CR-97-0864, 2005 WL 3120110, at *2 (Ala. Crim. App., Nov. 23, 2005).

Indeed, all of the cases applying Rule 32.2(a)(3) and (5) preclusion grounds to claims that a juror failed to answer correctly during *voir dire* have come since 2000, even though the trials in these cases occurred much earlier. *See Ex parte Dobyne*, 805 So. 2d 763 (Ala. 2001); *Jenkins v. State*, *supra*; *Duncan v. State*, 925 So. 2d 245 (Ala. Crim. App. 2005); *McGahee v. State*, 885 So. 2d 191, 203 (Ala. Crim. App. 2003) *cert. denied*, 885 So. 2d 230 (Ala. 2004).

Further, in each of these instances, unlike the present case, the petitioner was afforded the opportunity to try to prove by a preponderance of the evidence that it was not reasonably possible to assert the claim at trial and on appeal because the underlying facts — *i.e.*, the falsity of the juror's answers — could not be sooner discovered.

139

In the present case, however, the Rule 32 court expressly *denied* petitioner an evidentiary hearing.  In doing so, that court wrote:

> There is one procedurally barred claim raised by Trawick that warrants further discussion.  In Claim I at page 22-23 of the second amended petition, Trawick contends that one juror failed to disclose that he was a victim of an armed robbery "several years before trial," and that another juror failed to disclose that his sister-in-law had been murdered "just a few years" before trial.  This Court notes that this claim was not raised in the initial Rule 32 petition or in the amended Rule 32 petition.  Apparently Trawick's present counsel interviewed jurors after the amended Rule 32 petition was filed in March 1999 and before the second amended petition was filed in December 2000.  Trawick has not alleged that the information pleaded in this claim could not have been discovered in time to raise in a motion for new trial.  Trawick must make a showing that this information could not have been discovered in time to raise it at trial or in a motion for new trial, otherwise this claim is procedurally barred. [Citation omitted].  Because Trawick has made no such allegation, this claim is procedurally barred.

*See* Rule 32 Court's *Order Summarily Denying Trawick's Rule 32 Petition*, dated March 21, 2001, pp. 35-36.

The outcome of this case in state court, perhaps, may be understood best in light of the language of Rule 32.3, which states:

> The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

It appears that the Rule 32 court concluded that petitioner failed in his "burden of pleading . . . facts necessary to entitle [him] to relief," in that he never pleaded any facts showing *why* he was not able to present his juror-misconduct claim at trial and on direct appeal.  Stated another way, he failed to plead (and thus could not prove) facts showing that neither he nor his trial attorneys could reasonably have discovered or obtained the information necessary to allege the *voir dire* misconduct, either during trial, in a motion for new trial, or on direct appeal.  It is not clear, however, whether such a failure should be regarded as a procedural default under Rule 32.3 (relating to pleading), or under Rule 32.2(a)(3) and (5) (relating to claims not raised at trial and on direct appeal).  Moreover, this is not a mere academic point since the state courts explicitly relied on Rule 32.2(a)(3) and (5), and this court is not allowed to rest its decision on a different procedural rule or ground.  *See Peoples v. Campbell*, 377 F.3d 1208, 1234-35 (11th Cir.  2004).

In any event, the clear thrust of the state courts' resolution of this claim is that petitioner never attempted to explain why he waited until December 2000, in his Second Amended Rule 32 Petition, to assert for the very first time this claim that jurors failed to answer correctly at *voir dire* and, without that explanation, the claim was barred by Rule 32.2(a)(3) and (5).  This is an "independent and adequate" state procedural ground for resolution of the claim, and it is, therefore, procedurally

141

defaulted here. As petitioner has not attempted to offer a "cause and prejudice" explanation for the default, it cannot support *habeas* relief.

Alternatively, even if the claim were not procedurally defaulted, it is meritless. Although criminal defendants certainly have a federal constitutional right to a fair and impartial jury, subsidiary to which is the right to receive truthful and complete *voir dire* answers from prospective jurors, the fact that a juror may fail to fully answer a *voir dire* question does not result automatically in a new trial. The United States Supreme Court established the standards to be used in analyzing such a case in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), holding that:

> to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id*. at 556. As further elaborated by the Eleventh Circuit, the second prong of this test requires a showing of "actual bias" on the part of the juror. The court of appeals explained:

> We now turn to the second prong of the *McDonough* test: whether a correct response would have provided a valid basis for a challenge for cause. A party who seeks a new trial because of non-disclosure by a juror during voir dire must show actual bias. *United States v. Tutt*, 704

> F.2d 1567, 1569 (11th Cir.), cert. denied, 464 U.S. 855, 104 S. Ct. 174,
> 78 L. Ed. 2d 156 (1983).  Actual bias may be shown in two ways: "by
> express admission or by proof of specific facts showing such a close
> connection to the circumstances at hand that bias must be presumed."
> *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (citations
> omitted).

*United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984).

Even assuming, therefore, that petitioner could prove that one juror failed

dishonestly to disclose that he was a victim of an armed robbery "several years before

trial," and that another juror failed dishonestly to disclose that his sister-in-law had

been murdered "just a few years" before trial, these facts show neither an express

admission of bias by either juror, nor "such a close connection to the circumstances

at hand that bias must be presumed."  While this would establish that the two jurors

were, indeed, crime victims, or related to crime victims, it would not show that either

was actually biased *against* the petitioner or *in favor of* the prosecution.  The

circumstances of the crimes they experienced were not shown to be similar to, or

connected with, those charged against petitioner; and, there was no showing of how

recent or remote in time they were.  In short, merely asserting that a juror is, or was

related to, a crime victim does not necessarily mean that the juror had "actual bias"

such that he could be removed for cause.

Because petitioner has not shown that he was deprived of his right to an impartial jury, his claim that two jurors failed to answer completely or correctly *voir dire* questions put to them is meritless.

**Claim VI** — *Improper Jury Instructions*

Petitioner alleges that he was deprived of due process of law because the trial court improperly instructed the jury in five different ways, each of which will be discussed separately below.

**VI(a)** — *Reasonable doubt instruction*

Petitioner first contends that the trial court incorrectly instructed the jury on the definition of "reasonable doubt." At Paragraphs 54-56 of the petition, he alleges that the trial court's jury instructions misdefined the concept of "reasonable doubt," making the prosecution's burden of proof easier than required by *In re Winship* 397 U.S. 358 (1970). This claim was raised by petitioner on direct appeal and addressed by the Alabama Supreme Court.

Much the same issue was addressed above as Claim III(k), alleging ineffective assistance. There, petitioner alleged that his trial attorneys were ineffective for the very reason that they failed to object to the trial court's instruction on the definition of "reasonable doubt." This court already has concluded, in that context, that the Alabama Supreme Court's resolution of the issue of whether the instruction ran afoul

144

of *Cage v. Louisiana*, 498 U.S. 39 (1990), was not contrary to, or an unreasonable application of, Supreme Court precedent.  The same is true here.  The state trial judge's "reasonable doubt" instruction was not erroneous and, consequently, it was not objectionable for purposes of ineffective assistance.  Thus, because the Alabama Supreme Court's resolution of this claim was neither contrary to, nor an unreasonable application of Supreme Court law, this claim is meritless and due to be denied.

**VI(b)** — *Mental illness proved by* "*clear and convincing evidence*"

Petitioner next contends that the trial court erred when it instructed the jury that petitioner's claim of mental disease or defect as a defense must be proven by "clear and convincing evidence."  At Paragraph 58 of the petition, he alleges that the trial court erroneously instructed the jury that petitioner's mental health defense had to be proven by "clear and convincing evidence," not merely a preponderance.  This issue was raised by petitioner on direct appeal and considered by the Alabama Supreme Court.

This issue is somewhat similar to the petitioner's ineffective-assistance-of-counsel claim  addressed by the court as part of petitioner's Claim III(k), but there is a fundamental difference.  In this claim, petitioner argues that requiring a defendant to prove the defense of mental disease or defect by "clear and convincing evidence" creates an unconstitutionally heavy burden of proof, depriving the defendant of due

145

process of law.  By contrast, petitioner acknowledges that his trial attorneys objected to the court's use of the "clear and convincing evidence" standard, but he contends that, after the court overruled their objections, counsel were ineffective because they failed to request the court to instruct the jury on the *definition* of "clear and convincing evidence."  Thus, what is at issue here is the more fundamental claim that the "clear and convincing evidence" burden of persuasion for insanity defenses is unconstitutional.

On direct appeal, petitioner argued that application of this burden of persuasion violated the petitioner's rights under the Due Process Clause of the Fourteenth Amendment.  (*See* Tab R-32, p. 30).  This claim, properly understood, was not addressed by the Alabama Supreme Court, which focused its discussion entirely on the correct *definition* of the adjectival phrase "clear and convincing," and not on the question of whether the standard was an unconstitutionally heavy burden of proof for insanity defenses.  Thus, while petitioner exhausted his present due process claim by raising it on appeal, the Alabama Supreme Court did not resolve the claim now before this court for purposes of the presumption of correctness under § 2254(d).[26]

---

[26] Of course, if this court's interpretation of the proceedings and issues addressed in the state courts is mistaken, and the Alabama Supreme Court did address this claim on its merits, the subsequent discussion makes clear that the resolution of the claim by the Alabama Supreme Court was not contrary to or an unreasonable application of United States Supreme Court precedent, which would also preclude *habeas* relief.

146

Regardless, the claim is meritless.  Since at least 1952, the United States
Supreme Court has upheld the constitutionality of state laws requiring a defendant to
prove an insanity defense beyond a reasonable doubt — a standard even higher and
more onerous than the "clear and convincing" standard at issue here.  In *Leland v.
Oregon*, 343 U.S. 790 (1952), the Supreme Court upheld against constitutional attack
an Oregon statute that required defendants to prove insanity as a defense by "proof
beyond a reasonable doubt."  The Court explained:

> Today, Oregon is the only state that requires the accused, on a plea of
> insanity, to establish that defense beyond a reasonable doubt.  Some
> twenty states, however, place the burden on the accused to establish his
> insanity by a preponderance of the evidence or some similar measure of
> persuasion.  While there is an evident distinction between these two
> rules as to the quantum of proof required, we see no practical difference
> of such magnitude as to be significant in determining the constitutional
> question we face here.  Oregon merely requires a heavier burden of
> proof.

*Id*. at 798.  *Leland* has been cited as authority by the Supreme Court itself as recently
as this year, in *Clark v. Arizona*, ___ U.S. ___, 126 S. Ct. 2709 (June 29, 2006), and
*Dixon v. United States*, ___ U.S. ___, 126 S. Ct. 2437 (June 22, 2006).  In *Clark*, the
court cited *Leland* for the proposition that "a jurisdiction may place the burden of
persuasion on a defendant to prove insanity as the applicable law defines it, whether
by a preponderance of the evidence *or to some more convincing degree*."  *Clark*, 126
S. Ct. at 2731 (emphasis added).

147

Moreover, it must be observed that the federal statute dealing with the defense of insanity in federal prosecutions also requires the defendant to prove the defense by "clear and convincing evidence."  *See* 18 U.S.C. § 17(b).  Numerous courts have upheld the constitutionality of this allocation of the burden of persuasion.  As the Eleventh Circuit observed in *United States v. Freeman*, 804 F.2d 1574 (11th Cir. 1986),

> [t]he Supreme Court . . . has repeatedly reaffirmed the *Leland* holding. *See Rivera v. Delaware*, 429 U.S. 877, 97 S. Ct. 226, 50 L. Ed. 2d 160 (1976) (request to overrule *Leland* dismissed for want of substantial federal question); *see also Jones v. United States*, 463 U.S. 354, 368 n. 17, 103 S. Ct. 3043, 3051 n. 17, 77 L. Ed. 2d 694 (1983) (citing *Leland* with approval); *Engle v. Isaac,* 456 U.S. 107, 122 n. 23, 102 S. Ct. 1558, 1568 n. 23, 71 L. Ed. 2d 783 (1982) (citing *Leland* with approval); *Patterson v. New York*, 432 U.S. 197, 207, 97 S. Ct. 2319, 2325, 53 L. Ed. 2d 281 (1977) (citing *Leland* with approval); *Williams v. Wainwright*, 712 F.2d 1375 (11th Cir. 1983) (indicating that a state may make insanity an affirmative defense to be proved by defendant).

*Id.* at 1576.  The *Freeman* court concluded: "Therefore, *Leland* compels a holding that the aspect of the Insanity Reform Act of 1984 requiring a defendant to prove insanity by clear and convincing evidence is constitutional."

Finally, this court is unpersuaded by petitioner's invocation of *Cooper v. Oklahoma*, 517 U.S. 348 (1996), which determined that Oklahoma's procedural rule requiring a defendant to prove his *mental incompetency to stand trial* by clear and convincing evidence was unconstitutional.  Distinguishing *Patterson v. New York,*

148

432 U.S. 197 (1977), the Court in *Cooper* observed that a defendant's right to not be compelled to stand trial while mentally incompetent (and, thus, unlikely to be able to invoke other fundamental trial rights) stands on different grounds from a statutory defense to a crime. The same is true here. The issue of a person's competence to understand the nature of the criminal proceedings against him implicates the viability of all of the other trial rights a defendant may invoke and, thus, has a much more profound effect upon the ability of the accused person to claim his constitutionally-protected rights. The defense of insanity, however, stands like any other statutory defense subject to the quantum of proof allocated to the defendant.

Accordingly, the trial court's instruction to petitioner's jury that he must prove his defense of mental disease or defect by clear and convincing evidence was not only consistent with Alabama law, as explicated by the Alabama Supreme Court on direct appeal, but it also did not violate the petitioner's federal due process rights. This claim is meritless and due to be denied.

### VI(c) — *No instruction on the consequences of acquittal on the defense of mental disease*

At Paragraphs 59 and 60, petitioner alleges that he was deprived of a fair trial and due process of law because the trial court failed to instruct the jury that, if petitioner were found not guilty by reason of a mental disease or defect, the State

would commence proceedings to have him civilly committed.  On direct appeal, the

Alabama Supreme Court rejected this claim, saying:

> We find no error in the trial court's silence as to the consequences for
> Trawick if the jury returned a verdict of not guilty by reason of mental
> disease or defect.  On the contrary, its silence was entirely proper; it was
> not within the jury's sphere of concern to determine what these
> consequences would be, and statements as to such consequences should
> not be thrown into a case to influence the verdict, *Ivery v. State*, 686 So.
> 2d 495 (Ala. Cr. App.1996), citing *Boyle v. State*, 229 Ala. 212, 154 So.
> 575 (Ala. 1934).   The trial court correctly refrained from making
> statements regarding those consequences.

*Ex parte Trawick*, 698 So. 2d 162, 172 (Ala. 1997).

Petitioner cites *Beck v. Alabama*, 447 U.S. 625, 637 (1980), and *Simmons v*

*South Carolina*, 512 U.S. 154 (1994), in support of his argument that, unless the

jurors were informed about the proceedings that would follow an acquittal on insanity

grounds, they would likely convict him out of fear that an insanity acquittal would

result in his release to freedom.

The Alabama Supreme Court's resolution of this issue was neither contrary to,

nor an unreasonable application of, United States Supreme Court precedent.  First,

petitioner cites no Supreme Court case expressly holding that, in death-penalty

prosecutions, the jury must be instructed that the defendant will be civilly committed

if found not guilty by reason of mental disease or defect.  Both *Beck* and *Simmons* are

distinguishable.   *Beck* requires that the jury be instructed on applicable lesser-

included offenses, and *Simmons* requires an instruction that the defendant is subject

to a sentence of life-without-parole when the prosecution argues his "future

dangerousness" as a basis for assessing the death penalty.   Neither of these cases

deals with whether the jury must be instructed that an acquittal on mental-illness

grounds leads to civil commitment.   Indeed, at least in the context of the federal

Insanity Defense Reform Act ("IDRA"), the Supreme Court has held that neither the

IDRA, nor general federal criminal practice, requires that the jury be instructed on the

consequences of a verdict of not guilty by reason of insanity ("NGI").   The Court has

instead said:

> Shannon argues that the instruction he proposes is required as a matter
> of general federal criminal practice.  Presumably, Shannon asks us to
> invoke our supervisory power over the federal courts.  According to
> Shannon, the instruction is necessary because jurors are generally
> unfamiliar with the consequences of an NGI verdict, and may
> erroneously believe that a defendant who is found NGI will be
> immediately released into society. Jurors who are under this mistaken
> impression, Shannon continues, may also fear that the defendant, if
> released, would pose a danger to the community.  Shannon concludes
> that such jurors, in order to ensure that the defendant will not be
> released, may be tempted to return a guilty verdict in a case in which an
> NGI verdict would be appropriate.
>
> Even assuming Shannon is correct that some jurors will harbor the
> mistaken belief that defendants found NGI will be released into society
> immediately — an assumption that is open to debate — the jury in his
> case was instructed "to apply the law as [instructed] regardless of the
> consequence," and that "punishment . . . should not enter your
> consideration or discussion." . . . That an NGI verdict was an option here

151

gives us no reason to depart from "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S. Ct. 1702, 1707, 95 L. Ed. 2d 176 (1987). Indeed, although it may take effort on a juror's part to ignore the potential consequences of the verdict, the effort required in a case in which an NGI defense is raised is no different from that required in many other situations. For example, if the Government fails to meet its burden of proof at trial, our judicial system necessarily assumes that a juror will vote to acquit, rather than to convict, even if he is convinced the defendant is highly dangerous and should be incarcerated. We do not believe that the situation involving an NGI verdict should be treated any differently.

We also are not persuaded that the instruction Shannon proposes would allay the fears of the misinformed juror about whom Shannon is concerned. "[I]f the members of a jury are so fearful of a particular defendant's release that they would violate their oaths by convicting [the defendant] solely in order to ensure that he is not set free, it is questionable whether they would be reassured by anything short of an instruction strongly suggesting that the defendant, if found NGI, would very likely be civilly committed for a lengthy period." *United States v. Fisher*, 10 F.3d 115, 122 (CA3 1993), cert. pending, No. 93-7000.

*Shannon v. United States*, 512 U.S. 573, 584-586 (1994); *see also United States v. Thigpen*, 4 F.3d 1573 (11th Cir. 1993). Thus, as a general rule, federal statutory law does not require the giving of such an instruction, and there is no Supreme Court precedent holding that any constitutional provision requires it.

Finally, it should be noted that petitioner does not allege or argue that such an instruction was necessary to correct a misleading impression conveyed to the jury during trial. Certainly the Supreme Court recognized in *Shannon* that an instruction

152

concerning the consequences of an NGI verdict may be necessary in some circumstances, such as when the jury has been affirmatively misled into believing that such a verdict will result in the defendant being freed immediately. That is not the case here. Petitioner has not argued, nor has this court found in the trial record, any instance or circumstance that might have misled the jury about the consequences of such a verdict. The resolution of the claim by the state courts, therefore, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Consequently, § 2254(d) precludes *habeas* relief on this claim, and it is due to be denied.

### VI(d) — *Failure to instruct on mercy as a mitigating factor*

At paragraphs 61 and 62 of the Second Amended Petition, petitioner alleges that the trial court violated his right to due process by denying his request for an instruction to the jury that it could consider mercy as a mitigating factor in weighing the aggravating and mitigating factors relevant to his punishment. Petitioner raised this claim on direct appeal, and the Alabama Court of Criminal Appeals spoke directly to the question, while the Alabama Supreme Court rejected the argument summarily. The Court of Criminal Appeals wrote:

> The appellant also contends that the court erred in refusing to give a requested jury instruction during the penalty phase of the trial. The appellant's requested jury instruction read:

153

"If you see fit, whether mitigating circumstances exist or not, you may recommend mercy for Jack Harrison Trawick. This recommendation is solely in your discretion and not controlled by any rule of law.   You may make such recommendation with or without reason."

This court in *Morrison v. State*, 500 So. 2d 36 (Ala. Cr. App.1985), aff'd, 500 So. 2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S. Ct. 1634, 95 L. Ed. 2d 207 (1987), addressed the propriety of the trial court's refusal to give the same jury instruction.   This court stated:

"In *Whisenhant v. State*, 482 So. 2d 1225 (Ala. Cr. App.1982), this Court discussed the propriety of this precise charge and held that it was properly refused as an erroneous statement of the law in Alabama.  This holding was specifically affirmed by the Alabama Supreme Court in *Ex parte Whisenhant*, 482 So. 2d 1241 (Ala.1983).

"This court in *Whisenhant* stated that the correct principle underlying this issue was stated in *Beck v. State*, 396 So. 2d 645 (Ala. 1980), as follows:

"'The court shall instruct the jury that in determining whether to fix a punishment of death, the jury must weigh the aggravating and mitigating circumstances in determining whether to fix the punishment at death.  The trial court shall instruct the jury to avoid any influence of passion, prejudice or other arbitrary factor while deliberating and fixing the sentence.'

"We noted that while it is clearly the duty of the jury to weigh aggravating and mitigating circumstances it is not, as this charge implies, free to arbitrarily ignore any factor either positive or negative in arriving at the correct sentence.  We also noted that we viewed *Proffitt v. Florida*,

154

[428 U.S. 242 (1976)], as having tacitly held that such a mercy option is not a constitutional requirement. In *Proffitt,* Mr. Justice White, in his concurrence, noted that in Florida when the aggravating circumstances outweigh the mitigating circumstances the sentencing authority is required to impose the death penalty. We therefore noted that the required imposition of the death penalty, regardless of mercy, was determined to be constitutional in *Proffitt*, and that this was in keeping with the interest that arbitrary and capricious imposition of the death penalty be avoided. *Hopper v. Evans*, 456 U.S. 605, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982). Here again, for the above stated reasons, we hold that the trial court did not err in refusing to grant appellant's requested charge number five."

500 So. 2d at 43.

For the reasons discussed above, we conclude that the court committed no error in denying appellant's jury instruction.

*Trawick v. State*, 698 So. 2d 151, 161-62 (Ala. Crim. App. 1995), *aff'd, Ex parte*

*Trawick*, 698 So. 2d  162 (Ala. 1997). Respondents contend that, under § 2254(d), this conclusion is entitled to a presumption of correctness, and that *habeas* relief cannot be granted unless it is contrary to, or an unreasonable application of, Supreme Court precedent.

First, the petitioner has not identified any Supreme Court cases mandating that the jury be instructed explicitly on mercy as a mitigating factor, nor has this court found any. Although juries may not be instructed to *disregard* mercy or sympathy, the focus of sentencing instructions is the guided consideration and balancing of

155

aggravating and mitigating circumstances.  Alabama recognizes that mercy can be a proper mitigating factor to be considered by the jury, but it is found *implicitly* in the law's instruction that the jury consider "any aspect of a defendant's character or record in any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death." *Ala. Code* § 13A-5-52; *Nelson v. Nagle*, 995 F.2d 1549, 1556 (11ᵗʰ Cir. 1993).  A proper instruction with respect to this statutory definition of mitigating circumstances, therefore, places before the jury mercy and sympathy as mitigating factors to be considered.  There is no allegation that Alabama law prohibits the consideration of mercy.

As a matter of state law, the Alabama courts found the instruction requested by petitioner to be incorrect because it would have instructed the jury to disregard its duty to weigh the aggravating and mitigating circumstances.  While mercy and sympathy are proper mitigating factors to put into the balance, the weighing process may not be wholly disregarded.  Federal constitutional law also does not allow juries to exercise utterly unguided discretion with respect to mitigating factors.  *See Kansas v. Marsh*, ___ U.S. ___, 126 S. Ct. 2516 (June 26, 2006) ("[W]hile the Constitution requires that a sentencing jury have discretion, it does not mandate that discretion be

unfettered; the States are free to determine the manner in which a jury may consider mitigating evidence."); *see also Walton v. Arizona*, 497 U.S. 639 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Thus, the instruction was incorrect as a matter of state law, and its denial by the trial court did not prohibit the jury from weighing mercy as a mitigating factor in the petitioner's favor in violation of federal law. There is no Supreme Court case mandating a specifically worded instruction on mercy, so it cannot be said that the resolution of this issue by the Alabama courts was either contrary to, or an unreasonable application of, "clearly established" Supreme Court precedent. This claim is due to be denied.

           **VI(e)** — *Failure to instruct on the effect of "ties" when weighing aggravating and mitigating factors*

At paragraphs 69-70 of the Second Amended Petition, petitioner contends that the trial court denied him due process of law and his Eighth Amendment right to individualized sentencing by failing to instruct the jury explicitly that, in the event the aggravating and mitigating circumstances are equally balanced, the jury must recommend life without parole. Petitioner raised this issue on direct appeal, and the Alabama Supreme Court rejected it, saying:

> Trawick next argues that during the penalty phase of the trial the court failed to instruct the jurors as to how they were to weigh the aggravating and mitigating circumstances of Trawick's case. The trial court instructed the jury that, if it found that the mitigating

circumstances outweighed the aggravating circumstances, it was required to recommend a sentence of life imprisonment without parole. However, Trawick points out that the trial court did not further instruct the jury that if the aggravating and mitigating circumstances were equally balanced, the jury was likewise required to recommend a sentence of life imprisonment. Trawick concludes that, because Alabama law requires that aggravating circumstances must outweigh mitigating circumstances in order for a jury to recommend the death sentence, the trial court's instructions misstated Alabama law and improperly created an inference that the jury was required to recommend the death penalty if it found that the circumstances were equally balanced.

Because Trawick did not raise this issue at trial, we must consider it in accordance with the plain error rule. We note that the jury instructions as to the weighing of aggravating circumstances and mitigating circumstances were materially the same as those set out in the *Alabama Pattern Jury Instructions: Criminal* for use in the sentencing stage of a capital murder trial in this state, and this Court has held that no reversible error will be found when the trial court follows the pattern jury instructions adopted by this Court. *Kuenzel v. State*, *supra*. The trial court correctly instructed the jury to recommend the death penalty *only* if it found that the aggravating circumstances outweighed the mitigating circumstances, obviously implying that in all other circumstances the jury was required to recommend a sentence of life imprisonment without parole. We do not agree with Trawick that this instruction could have misguided the jury as to its responsibility and function in weighing the aggravating and mitigating circumstances; on the contrary, the instruction clearly explained that the jury could recommend the death penalty under only one circumstance.

*Ex parte Trawick*, 698 So. 2d  162, 173-74 (Ala. 1997) (emphasis added).[27]

_____

[27] In his brief, petitioner argues that the Alabama Supreme Court has mischaracterized the record by saying that the trial court instructed the jury that it could recommend death "only" if the aggravating circumstances outweigh the mitigating circumstances. Petitioner contends that such an instruction was never given. Although it is true that the trial court never considered the possibility of a tie in the weighing process (*see* Tab R-28, pp. 1208-9), part of the court's actual instruction to

Insofar as this claim raises only an issue about the adequacy of the instruction under Alabama law, it does not allege a basis for federal *habeas* relief. *Habeas* lies only to correct errors of federal law. To the extent petitioner claims that federal constitutional law requires an explicit instruction to the jury that "ties go to life," the Supreme Court recently made clear that such an instruction is not required by the Constitution. In *Kansas v. Marsh*, ___ U.S. ___, 126 S. Ct. 2516 (June 26, 2006), the Supreme Court held that the Kansas death penalty statute was not unconstitutional because it mandated the imposition of the death penalty when the aggravating and mitigating circumstances are equally balanced. The Court opened its opinion with the following:

> Kansas law provides that if a unanimous jury finds that aggravating circumstances are not outweighed by mitigating circumstances, the death penalty shall be imposed. *Kan. Stat. Ann*. § 21-4624(e) (1995). We must decide whether this statute, which requires the imposition of the death penalty when the sentencing jury determines that aggravating evidence and mitigating evidence are in equipoise, violates the Constitution. *We hold that it does not*.

---

the jury reads:

> The law also provides that whether death or life imprisonment without parole should be imposed upon the defendant, it depends upon whether any aggravating circumstances exist and if so *whether the aggravating circumstances outweigh the mitigating circumstances.* [Emphasis added].

(*See* Tab R-28, pp. 1175-6). Although other parts of the instructions failed to address the possibility of equally balanced aggravating and mitigating circumstances, the instruction taken as a whole, including this part, informed the jury that the aggravating circumstances must outweigh those submitted in mitigation in order for death to be imposed.

159

*Id*. at ___, 126 S. Ct. at 2520 (emphasis suppled).  Relying upon *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court in *Marsh* concluded that the Constitution leaves open to the states how the burden of proving mitigating circumstances is allocated.  As in *Walton*, states may constitutionally place on the defendant the burden of proving that mitigating circumstances *outweigh* the aggravating circumstances proven by the prosecution.  It follows, of course, as noted in *Marsh*, that states may direct that death be imposed if the aggravating and mitigating factors are in equipoise.

For purposes of the instant case, it must follow logically that federal constitutional law does not mandate an explicit jury instruction requiring something that federal law does not require.  If federal law does not require that aggravating circumstances outweigh mitigating factors before death can be imposed, a jury considering penalties need not be so instructed.  Thus, in this case, it cannot be said that the Alabama court's resolution of this constitutional claim is contrary to, or an unreasonable application of, Supreme Court precedent.  The claim is due to be denied.

**Claim VII** — *Witherspoon Error*

At paragraphs 81-83 of the Second Amended Petition, petitioner alleges that his Sixth and Fourteenth Amendment rights were violated when a prospective juror

was excused for cause by the court for expressing reservations about the death penalty.  Petitioner contends that Juror Porter was unconstitutionally excused from the venire in violation of *Witherspoon v Illinois*, 391 U.S. 510 (1968).  This issue was raised on direct appeal, and the Alabama Supreme Court expressed the following opinion on it:

> Trawick next argues that in granting one of the State's challenges for cause the trial court violated *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).  Trawick correctly states that, under *Witherspoon*, it is unconstitutional to exclude venire persons for cause when they express general objections to the death penalty; the juror may be excluded only if his or her view on capital punishment would prevent or substantially impair the performance of his or her duties as a juror.  Before deciding whether a juror is excludable under *Witherspoon*, the trial court must first determine whether the juror, given his or her stated objections to capital punishment, could nevertheless consider the evidence and instructions of the court and in an appropriate case return a verdict of guilty although that verdict could result in the imposition of the death penalty.

> During voir dire, the trial court asked the veniremembers whether any of them, because of religious, moral, or philosophical scruples, were unalterably opposed to capital punishment — specifically whether anyone was so opposed to it "that you know now before you hear a stitch of testimony, before you have heard anything about the legal components, that you know right know [sic] to a certainty that you would not vote for the death penalty."  Juror [Porter] answered in the affirmative.   The trial court then conducted individual voir dire with [Porter], wherein the following was said:

> "QUESTIONS BY THE COURT:

> "Q.  Could you impose the death penalty?

161

"A.  I don't know that I could.    To be truthful, I don't know that I could.

"Q.  . . . [I]s that to say you could not or you just don't know, you might could?   You could hypothesize-

"A.  Theoretically you've got — truthfully, I don't think I would.  I really don't think — I'm very strongly opposed to the death penalty.  Personally, I don't — I don't think it — I don't think that it's constitutional, on my own — my own mind.    And I have gone around and around and around on that subject with people as well.

". . . .

"Q.   . . . Now, can you play the role of the conscientious juror, or are your feelings about the death penalty so hardened that you cannot conscientiously consider death by electrocution in spite of the law and what facts might emerge in the course of the trial?

"A.  Put . . . to me that way, I would still have to come down that I would not.  I do not think that I would.  I know that's vague —

"Q.  You said two things.  You said that you would not and then you qualified and said you didn't think you could.  And because you are a lawyer I am going to pick on you.

"A.  I understand that.

"Q.  How could I read this?

"A.  I would not.  I feel — I can tell you that my feelings on the death penalty are stronger than — that my feelings — my feelings on death in general and death penalty are

162

> stronger than my feelings of obligation perhaps to — to that oath."

We conclude that [Porter's] statements regarding his feelings against the death penalty, and his statement of allegiance to his own feelings against it, were sufficient to justify granting the State's challenge for cause. Throughout repeated questioning, [Porter] consistently indicated that his own feelings of conscience against the death penalty would outweigh his obligation to any oath to consider recommending it.  We therefore find no plain error in the trial court's decision to exclude [Porter] from the jury.

*Ex parte Trawick*, 698 So. 2d  162, 170-71 (Ala. 1997).  This conclusion is not contrary to, nor an unreasonable application of, Supreme Court precedent.

Indeed, the Supreme Court has described its *Witherspoon* jurisprudence this way:

> *Witherspoon* limited a State's power broadly to exclude jurors hesitant in their ability to sentence a defendant to death, but nothing in that decision questioned "the power of a State to execute a defendant sentenced to death by a jury from which the only venire men who were in fact excluded for cause were those who made unmistakably clear that . . . they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." 391 U.S., at 522, n. 21, 88 S. Ct., at 1777, n. 21 (emphasis in original); *see also id.,* at 513-514, 88 S.Ct., at 1772-1773.
>
> In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), we revisited footnote 21 of *Witherspoon*, and held affirmatively that "the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths."  469 U.S., at 424, n. 5, 105 S. Ct., at 852, n.

5; *see also Lockett v. Ohio*, 438 U.S. 586, 595-596, 98 S. Ct. 2954, 2959-2960, 57 L. Ed. 2d 973 (1978).  Indeed, in *Lockhart v. McCree* we thereafter spoke in terms of "'*Witherspoon*-excludables'" whose removal for cause "serves the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in [a capital] case."  476 U.S., at 180, 106 S. Ct., at 1768.  From *Witt*, moreover, it was but a very short step to observe as well in *Lockhart*:

> "[T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence.  *Ipso facto*, the State must be given the opportunity to identify such prospective jurors by questioning them at voir dire about their views of the death penalty."  476 U.S., at 170, n. 7, 106 S. Ct., at 1763, n. 7.

This passage in *Lockhart* expanded but briefly upon what we had already recognized in *Witt*:

> "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  It is then the trial judge's duty to determine whether the challenge is proper."  469 U.S., at 423, 105 S. Ct., at 852 (citation omitted; emphasis added).

*Morgan v. Illinois*, 504 U.S. 719, 732-33 (1992).

The Alabama Supreme Court's analysis employed the correct legal standard, addressing whether Porter's views on the death penalty would "prevent or substantially impair the performance of [his] duties" in accordance with instructions given him by the court and his oath.  Not only was the state court's resolution not

"contrary" to Supreme Court precedent, it also was not an unreasonable application of it. Juror Porter unmistakably expressed the view that his opposition to the death penalty was even stronger than the obligations imposed by his oath as a juror. This is precisely the type of juror envisioned by the Supreme Court when upholding the right of the state to have an impartial jury composed of people not automatically predisposed against the death penalty.

There was no *Witherspoon* error in this case. Consequently, it cannot be said that the Alabama Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent. As such, petitioner cannot obtain *habeas* relief on this claim under § 2254(d). This claim is due to be denied.

**Claim VIII** — *Trial Judge's Failure to Recuse*

At paragraphs 87 and 88 of the Second Amended Petition, petitioner asserts that the trial judge's refusal to recuse himself from petitioner's trial violated the plaintiff's constitutional right to an impartial judge. He argues that there are two reasons the trial judge should have recused: first, the judge had formerly prosecuted and lost a murder case in which the victim had been allegedly threatened by petitioner; and second, the trial judge attended high school with petitioner. Although raised on direct appeal, the Alabama Supreme Court did not explicitly address this

claim in its opinion, finding only generally that this and other claims did not constitute plain error.

Much was written about this issue in the previous discussion of Claim III(m), dealing with the related assertion that petitioner's trial attorneys were ineffective for not "adequately" seeking the recusal of the trial judge.  It was noted there that neither of the grounds for recusal advanced by the petitioner warranted recusal.  There is no allegation that the trial judge had any personal or financial interest in the outcome of petitioner's trial.  What is suggested is the *possibility* of personal bias against petitioner.  The mere fact, however, that the trial judge attended the same high school as petitioner hardly creates any inference of bias.  That alone would raise no concerns.

More troubling, perhaps, is the argument that, as a young prosecutor, the trial judge had prosecuted another person (not this petitioner) for the murder of Betty Jo Richards; that the defendant in that case was acquitted; and that subsequent information came to light indicating that petitioner had threatened or harmed the victim.  While these circumstances may indicate that the trial judge harbored more than the usual interest in the trial before him, it hardly rises to the level of mandating the trial judge's recusal.

The touchstone of the constitutional right to an impartial tribunal is whether the trial judge harbors actual bias for or against parties in the litigation.  In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court noted that "the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,'. . ., before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Id.* at 904-05.  Although there may be many other standards by which the impartiality of judges may be measured,[28] only the constitutional minimum is implicated in *habeas*.

Nothing in this case suggests any actual bias or interest in the outcome of petitioner's trial on the part of the trial judge.  In a similar situation, the Eleventh Circuit rejected the notion that previous involvement in an unrelated prosecution of

---

[28]  In *Bracy*, the Court also explained:

> Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard.  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S. Ct. 1580, 1588-1589, 89 L. Ed. 2d 823 (1986).  Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar.  *See, e.g., Aetna, id.*, at 820-821, 106 S. Ct., at 1584-1585; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 441, 71 L. Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980).

*Bracy*, 520 U.S. at 904.  As this is a *habeas* action involving a state prosecution, only the *constitutional* right to an impartial tribunal comes into play.  None of the other standards by which the impartiality of judges may be measured supports the invocation of federal *habeas* relief because they are not grounded in federal law.

a defendant requires a trial judge to recuse.  In *Jarrell v. Balkcom*, 735 F.2d 1242

(11th Cir. 1984), the trial judge presiding at that *habeas* petitioner's trial had

previously prosecuted that very petitioner in an unrelated matter, yet the court of

appeals found no basis for disqualifying the trial judge, noting:

> The trial judge in the instant case was a former district attorney who had
> prosecuted the defendant in a case involving assault with intent to rape.
> Defendant was 15 years old at the time, but was prosecuted as an adult.
> Defendant entered a guilty plea. In the instant case, petitioner's counsel
> at trial specifically stated that he did not wish to move for
> disqualification. (T.T. at 83).  Petitioner's present counsel, however,
> maintains that the judge's failure to recuse himself *sua sponte* was error.
>
> The mere fact that a judge acted as prosecutor in an unrelated case
> is insufficient to constitute reversible error.  *Goodspeed v. Beto*, 341
> F.2d 908, 909 (5th Cir. 1965), cert. denied, 386 U.S. 926, 87 S. Ct. 867,
> 17 L. Ed. 2d 798 (1967). Petitioner has cited no prejudicial rulings, nor
> has he cited to any area in which the judge appeared to be biased in his
> rulings.  Additionally, cases cited by petitioner which hold that the trial
> judge deprived the defendant of his constitutional due process rights
> involved cases where the judge was the trier of fact.  *See, e.g., United
> States v. Denno*, 313 F.2d 364, 374 (2d Cir. 1961), cert. denied, 372 U.S.
> 978, 83 S. Ct. 1112, 10 L. Ed. 2d 143 (1963).  The instant case,
> however, was a trial by jury.  We find no error in the judge's failure to
> recuse himself.

*Jarrell*, 735 F.2d at 1258-1259.  If anything, petitioner's argument is even more

remote than in *Jarrell*.  Here, petitioner argues that the judge should have recused

because he prosecuted a *different* defendant, who was acquitted, for a murder in

which petitioner later claimed some involvement.  That alone would not indicate any

actual bias or interest in the outcome of petitioner's case necessitating the judge's disqualification.

Because petitioner has not shown that the determination of this claim by the Alabama Supreme Court was contrary to, or an unreasonable application of, Supreme Court precedent, § 2254(d) precludes *habeas* relief.  This claim is due to be denied.

**Claim IX** — *Improper Weighting of Aggravating and Mitigating Factors*

At paragraphs 89 and 90 of the Second Amended Petition for *Habeas Corpus*, petitioner alleges that the Alabama state courts committed two crucial, interrelated errors in the process of weighing aggravating and mitigating circumstances leading to the imposition of the death penalty. First, he contends that the state trial court erroneously placed the burden of proving the existence of statutory mitigating circumstances upon him, rather than on the state.  This led to the second error, the failure of the trial court to find the existence of the statutory mitigating circumstance that his capacity to appreciate the criminality of his acts was substantially impaired.

The court first notes that, although raised in the Second Amended Petition, petitioner did not argue or brief this claim.  (*See* doc. no. 23).  The court reads this claim as being focused on the trial court's findings and sentencing order, rather than

upon its instructions to the jury.[29]   Also, as noted elsewhere, to the extent that

petitioner contends that the trial court violated Alabama state law, such cannot be a

basis for federal *habeas* relief, as *habeas* relief under § 2254 is available only for

violations of federal law.   This claim was raised on direct appeal, and rejected by the

Alabama Supreme Court, which definitively concludes the question whether an error

of state law occurred.   On appeal, the Alabama Supreme Court said about this claim:

> Trawick next argues that, in sentencing him, the trial court
> improperly placed on him the burden of proving mitigating
> circumstances and erred in failing to find the existence of mitigating
> circumstances.   He first points out that, under Ala.Code 1975, §
> 13A-5-45(g), a defendant has only the burden of interjecting the issue
> of mitigating circumstances, and the burden then shifts to the State to
> disprove the existence of the mitigating circumstances, by a
> preponderance of the evidence.   He argues that the trial court improperly

----

[29]   Indeed, the court's instructions to the jury during the penalty phase of the trial explicitly
stated:

> When the factual existence of a mitigating circumstance is in dispute, the State shall
> have the burden of disproving the factual existence of that circumstance by a
> preponderance of the evidence.   The burden of disproving it by a preponderance of the
> evidence means that you are to consider that the mitigating circumstance does
> exist unless taking the evidence as a whole it is more likely than not that the
> mitigating circumstance does not exist.

> Therefore, if there is a factual dispute, you see, over the existence of a
> mitigating circumstance, then you should find and consider that mitigating
> circumstance, unless you find that it is more likely true than not that the mitigating
> circumstance does not exist.

(*See* Tab R.28, pp. 1187-8).

required him to prove the existence of mitigating circumstances, rather than requiring the State to disprove their existence.

In considering what Trawick offered as a mitigating circumstance — his contention that he had an impaired capacity to appreciate the criminality of this conduct or to conform his conduct to the requirements of law – the trial court stated:

> "[It] does not apply. Dr. Ronan finds that the defendant has serious characterologic and personality defects and paraphilia or sexual sadism to an extreme degree NOR [sic] Dr. Ronan's findings summarized at page 25 of her 28-page report nor do any of the other evidences (written or testimonial) *persuade me that the defendant did not* appreciate the wrongfulness of his actions or that his capacity to conform his conduct to the requirements of the law was substantially impaired."

(Emphasis added.)

Trawick argues that this indicates that the trial court placed the burden of persuasion upon him, rather than upon the State. We disagree. The trial court did not state that Trawick had failed to persuade it of the existence of the sixth statutory mitigating circumstance (set out at § 13A-5-51); rather, it indicated that the evidence rebutted Trawick's contention regarding the mitigating circumstance and that it was therefore not persuaded to find the existence of that mitigating circumstance. Moreover, the record shows that the trial court properly instructed the jury as to the burden of proof on mitigating circumstances, and it is presumed to follow its own correct instructions. *Ex parte Harrell*, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985). We therefore find no plain error in the trial court's finding as to this mitigating factor.

Trawick also claims that although the trial court did find a nonstatutory mitigating circumstance, based upon Trawick's "characterological defects," it should have found as a statutory

171

mitigating circumstance that his capacity to appreciate the criminality of his actions was impaired.  While the trial court was required by the United States Constitution to consider all the evidence Trawick presented in mitigation, *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), it was not required to determine that mitigating circumstances existed. *Ex parte Harrell*, *supra*.  The record contains sufficient evidence, presented by the various experts who testified at the guilt and sentencing stages of the trial, from which the trial court could conclude that, while Trawick may have suffered from a mental illness, his ability to appreciate the wrongfulness of his actions was not impaired by that illness.  In view of this, we find that the trial court did not abuse its discretion in failing to find the existence of the sixth mitigating circumstance.

*Ex parte Trawick*, 608 So. 2d 162, 176-77 (Ala. 1997).  This conclusion is not

contrary to, or an unreasonable application of, Supreme Court precedent.  Indeed,

there is nothing in the arguments  presented by the petitioner even to establish any

error.   It simply appears that the trial court did not believe that petitioner's

"characterological defect" impaired his ability to understand the criminality of his

acts and, therefore, it was not included as a mitigating factor to be weighed in the

balance against aggravating factors.  Petitioner is not entitled to any *habeas* relief on

this claim, and it is due to be denied.

**Claim X** — *Denial of Change of Venue*

At paragraph 91 of the Second Amended Petition, petitioner asserts that his

constitutional rights to due process, a fair trial, and an impartial jury were violated

when the trial court refused to change the venue of his trial, despite extensive pretrial

publicity of the crime, the investigation, and his arrest.  He notes that, of 58

prospective jurors summoned for duty at his trial, 40 admitted to having heard or read

something about the case.

This claim was raised and argued on direct appeal, and the Alabama Court of

Criminal Appeals rejected it.  That court wrote:

> The appellant further contends that the trial court erred in denying
> his motion for a change of venue.  The appellant alleged that extensive
> pretrial publicity rendered it impossible for him to obtain a fair trial in
> Jefferson County.
>
> The record indicates that the appellant produced a copy of only
> one newspaper article in support of his motion for a change of venue.
> The article appeared in the November 27, 1993, edition of the
> *Birmingham Post-Herald*.   The appellant's trial began on March 21,
> 1994.  The appellant's counsel stipulated that only two articles were
> printed after the first article — one appearing on January 2, 1994, and
> one on January 30, 1994.  The appellant admits that there was no news
> coverage for more than one and one-half months before his trial began.
>
> Moreover, of the 58 potential jurors in the venire panel, 17
> indicated that they had heard nothing about the case.  The potential
> jurors were questioned individually, and only one was struck for cause
> based on pretrial publicity.  In denying the appellant's motion, the trial
> court stated:
>
>> "I disagree vehemently.  [J.M.] is the only juror who cannot
>> set aside his impressions and bring us a fair verdict and he
>> was struck for cause.  We talked to all of these people
>> individually.   These people impressed me as very
>> conscientious people that will indeed abide by the Court's
>> instructions and set aside whatever impressions they may
>> have formed and bottom their verdict on the case in court.

173

And I will be repeating that throughout the course of the litigation."

The Alabama Supreme Court has issued explicit guidelines for a trial court's determination of a motion for a change of venue based on pretrial publicity.

> "In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966)*; Franklin v. State*, 424 So. 2d 1353 (Ala. Crim. App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. *Anderson v. State*, 362 So. 2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961):
>
>> "'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
>
> "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the *voir dire*

174

examination.'  *Anderson v. State,* 362 So. 2d 1296, 1299
(Ala. Crim. App. 1978)."

_____*Ex parte Grayson*, 479 So. 2d 76, 80 (Ala.), cert. denied, 474 U.S. 865,
106 S. Ct. 189, 88 L. Ed. 2d 157 (1985).

The appellant has not satisfied the requirements set forth in
*Grayson*.  The venire panel was examined individually and there was no
evidence that the prospective jurors remaining after one juror was struck
for cause could not try the case based solely on the evidence presented
at trial.   The trial court did not err in denying the motion for a change
of venue.

*Trawick v. State*, 698 So. 2d 151, 155-56 (Ala. Crim. App. 1996), *aff'd*, 698 So. 2d

162 (Ala. 1997).

The resolution of this claim by the Alabama Court of Criminal Appeals was not

contrary to, or an unreasonable application of, Supreme Court precedent.  The state

appellate court expressly cited the standards articulated in *Sheppard* and *Irvin,* and

reasonably applied them to the facts of this case.   Notwithstanding petitioner's

assertion of extensive pretrial publicity, the findings by the state court that there were

only a few news articles about the case, and none for several weeks before trial, are

entitled to a presumption of correctness.[30]  Petitioner has not proffered any evidence,

much less clear and convincing evidence, to rebut these findings.  While there was

_____

[30]  The court notes that a reading of the *voir dire* of the jury reveals that newspaper articles
and television and radio news reports reported on the upcoming trial just days before. *See* Tab R-7,
pp. 327, 328, 331, 334, 343, 348, 350, 359, 361, 363, 368, 378-79, 391-92.  This does not, however,
change the correctness of the state courts' analysis under *Sheppard* and *Irvin.*

some pretrial publicity relating to petitioner's case, the state courts concluded that it fell far short of the overwhelming and pervasive publicity involved in *Sheppard* and *Irvin*, and that careful, individualized *voir dire* sufficiently protected petitioner's rights to a fair and impartial jury.  This was not an unreasonable application of *Sheppard* and *Irvin*, and § 2254(d) precludes *habeas* relief on this claim.

**Claim XI** — *Defendant's Presence at All Proceedings*

At paragraphs 94 and 95 of the Second Amended Petition, petitioner contends that his constitutional right to be present at two pretrial proceedings was violated.  At Claim III(h) above, petitioner also alleged that his trial counsel were ineffective in failing to object to his absence from these two proceedings.

This claim was asserted on direct appeal, and the Alabama Supreme Court said:

> Trawick next argues that in regard to two pre-trial hearings he was improperly denied his constitutional right to be present.  He points out that in *Ex parte Jackson*, 674 So. 2d 1365 (Ala. 1994), this Court held that state law and federal law secure the right of a defendant accused of a capital crime to be present during all stages of the trial.  According to Trawick, he was excluded from two hearings wherein the parties outlined the case against him and discussed the admissibility of parts of his oral statements to the police.   He therefore concludes that his conviction must be reversed and a new trial ordered, under *Jackson*.

> In *Jackson*, the defendant was allowed to leave the courtroom twice during the sentencing portion of his trial, without having displayed a level of misconduct that would have constituted a forfeiture of his right to be present at the proceeding.  This Court has not held, however, that a defendant has the right to be present at all pre-trial proceedings

176

without regard to whether the defendant's absence will prejudice the defendant.

The record does not support Trawick's contention that he was denied the right to be present at a pre-trial hearing;  rather, it shows merely that Trawick arrived late at one such proceeding and that, when he did arrive, the trial court fully apprised him of what had occurred in his absence.  Trawick has not demonstrated how he was prejudiced by this, or how his presence at the entire proceeding might have changed the outcome of the trial.  Because Trawick did not raise this issue before the trial court, the Court of Criminal Appeals, or before this Court in his certiorari petition, we review it only for plain error.  We find none.

*Ex parte Trawick*, 698 So. 2d 162, 177 (Ala. 1997).  The respondents contend that

petitioner has not shown that this determination by the Alabama Supreme Court is

contrary to, or an unreasonable application of, Supreme Court precedent.

The essential legal issues underlying this claim were discussed extensively in

that portion of this opinion addressing Claim III(h).  Although a defendant has a right

to be present at "all critical stages" of the prosecution, this does not extend to in-

chambers conferences and bench conferences for the discussion of purely legal or

evidentiary questions.  *See United States v. Vasquez*, 732 F.2d 846 (11th Cir. 1984);

*see also In re Shriner*, 735 F.2d 1236, 1241 (11th Cir. 1984) ("Shriner had no

constitutional right to be present at the bench during conferences that involved purely

legal matters,, nor does the absence of recorded bench conferences constitute a

constitutional deprivation unless it renders our review impossible.") (citation

177

omitted).  As discussed in relation to Claim III(h), petitioner was not excluded from any critical stage of pretrial or trial proceedings.  Rather, what the record shows is that the trial judge and lawyers held brief discussions about petitioner's case on two occasions, concerning generally administrative matters.  On both occasions, the outcomes of those discussions generally were beneficial to the petitioner: *i.e.,* on one he was granted the right to call a state psychologist as an adverse witness, and on the other, two of his inculpatory statements were eliminated from evidence and a third was redacted.  There simply is no showing how petitioner could have been prejudiced by these administrative discussions in his absence, and the court re-affirms its earlier holding that these did not violate the defendant's Sixth Amendment right to be present at all critical proceedings in his case.  This claim is due to be denied.

### Claim XII — *Ring v. Arizona*

At pages 52 through 55 of the Second Amended Petition, petitioner contends that his death sentence is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002), because certain predicate facts necessary for the imposition of the death sentence were found by the trial judge and not the jury. Respondents contend that this claim is procedurally defaulted because it has never been presented to any Alabama court and, in any event, *Ring* does not apply retroactively to petitioner's sentence.

178

The court agrees that *Ring* does not apply retrospectively to petitioner's *habeas* action. In *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), the Supreme Court flatly held: "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." Petitioner's conviction became final on direct appeal when the United States Supreme Court denied his petition for writ of *certiorari* on December 1, 1997. *See Trawick v. Alabama*, 522 U.S. 1000 (1997). Consequently, the holding in and rationale of *Ring* cannot be applied to petitioner's case. *See Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005) (*Ring* does not apply retroactively to cases final before it was decided); *Sibley v. Culliver*, 377 F.3d 1196 (11th Cir. 2004) (same).

Even if *Ring* could be applied to this case, the court agrees with respondents that the claim is procedurally defaulted. Petitioner never presented this Sixth Amendment claim on direct appeal or in his Rule 32 petition, leaving it unexhausted. The one-year limitation for filing Rule 32 petitions defined by Rule 32.2(c), and the prohibition against successive petitions found at Rule 32.2(b), now preclude him from seeking to file a new petition to present this argument to the state courts. *See Collier v. Jones*, 910 F.2d 770 (11th Cir. 1990). It would be futile for petitioner to return to state court to seek exhaustion of a *Ring* claim, because these two rules preclude its consideration. Thus, the claim is procedurally defaulted, and petitioner has not

179

attempted to show "cause and prejudice" to excuse the default.  Moreover, petitioner has not attempted to, and cannot, show that he is actually innocent of either the capital crime he has been convicted of, or of the death sentence.  Therefore, it is not a fundamental miscarriage of justice to refuse consideration of this defaulted claim. This claim is due to be denied.

**Claim XIII** — *Cumulative Effect of Errors Violated Constitutional Rights*

Petitioner's final claim is that the cumulative effect of all of the errors alleged by him resulted in the denial of his constitutional rights.  It cannot be true that, where none of the individual claims asserted amounts to a basis for *habeas* relief, the sum of them together can create a remedy.  In a somewhat different § 2241 *habeas* context, involving a federal prisoner's challenge to the United States Parole Commission's denial of parole, the Eleventh Circuit refused to consider the cumulative effect of multiple claims of error when none of the individual claims showed any error.  The court said, "Shakur also argues on appeal that his claims of error should be reviewed cumulatively in assessing whether the Commission abused its discretion.  Because we find no error as to the individual claims, we do not address his argument as to cumulative effect." *Shakur v. Wiley*, 156 Fed. Appx. 137 (11th Cir. 2005) (unpublished).  Because § 2241 and § 2254 writs of *habeas corpus* are really the same remedy, *see Medberry v. Crosby*, 351 F.3d 1049 (11th Cir. 2003), *cert.*

*denied*, 541 U.S. 1032 (2004); *Peoples v. Chatman*, 393 F.3d 1352 (11th Cir. 2004), this reasoning would apply with equal weight to the instant action.  It would be anomalous, indeed, to conclude that, while none of petitioner's individual allegations of relief show any constitutionally prejudicial error, in combination they do.  This is not the law, and petitioner has not pointed to any authority saying it is.  This claim is due to be denied.

## Conclusion

Having now carefully reviewed the record, pleadings, briefs, and arguments presented, the court finds that petitioner is not entitled to relief from his conviction or sentence.  Accordingly, by separate order, the court will deny the petitioner's request for an evidentiary hearing, and deny his petition for *habeas corpus*.  A separate order will enter.

DONE this 29th day of September, 2006.

_____
United States District Judge